UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

MELVIN AVON WESSON,

                              Plaintiff,

                                                              9:19-CV-00609
v.                                                            (TJM/ML)

CORRECTIONS OFFICER LUIS OLIVENCIA and,
CORRECTIONS OFFICER DWAYNE DANZY,

                              Defendants.

_____

APPEARANCES:                                 OF COUNSEL:

MELVIN AVON WESSON
  Pro Se Plaintiff
Franklin Correctional Facility
P.O. Box 10
Malone, New York 12953

LETITIA A. JAMES                             JENNIFER J. CORCORAN, ESQ.
Attorney General for the State of New York   Assistant Attorney General
  Counsel for Defendant
The Capitol
Albany, New York 12224

MIROSLAV LOVRIC, United States Magistrate Judge

## **REPORT-RECOMMENDATION**

Currently before the Court, in this civil rights action filed by Melvin Avon Wesson

("Plaintiff") against Corrections Officer ("C.O.") Luis Olivencia and C.O. Dwayne Danzy

("Defendants"), is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56.

(Dkt. No. 76.)  For the reasons set forth below, I recommend that Defendants' motion for

summary judgment be denied.

## I.    RELEVANT BACKGROUND

### A.    Plaintiff's Claims

Plaintiff, who is proceeding pro se, is an inmate held under the jurisdiction of the New York State Department of Corrections and Community Supervision ("DOCCS"). (Dkt.No. 55 ¶ 1.)  He alleges that Defendants, who are DOCCS correctional officers, failed to protect him in violation of the Eighth Amendment and 42 U.S.C. § 1983. (*Id.* ¶ 33b.)  More specifically, Plaintiff alleges that Defendants improperly rejected his request for assistance as he exited a transport van with his arms and legs shackled, despite Plaintiff informing them that he "felt ill and dizzy," resulting in a fall that caused a laceration above Plaintiff's right eye. (*See generally* Dkt. No. 55 ¶¶ 18-32, *see also* Dkt. No. 56 at 3-5.)

### B.    Procedural Posture

The current operative complaint is Plaintiff's Third Amended Complaint, which was accepted for filing on October 5, 2022. (Dkt. Nos. 55, 56.)  Following completion of discovery, Defendants moved for summary judgment on August 1, 2023. (Dkt. No. 76.)

A full procedural history of this proceeding, which was commenced in May 2019, can be found in Senior District Judge Thomas J. McAvoy's April 19, 2021 Decision and Order and his October 5, 2022 Decision and Order. (Dkt. Nos. 30, 56.)  This court will also discuss some of the relevant procedural history in more detail while evaluating Defendants' *Jeffreys* argument, *infra.*

### C.    Defendants' Statement of Undisputed Material Facts

The following facts were asserted and supported by Defendants in their Statement of Material Facts. (Dkt. No. 76, Attach. 2.)  Plaintiff did not respond to the Statement of Material Facts, but certain of the asserted facts conflict with the factual allegations in Plaintiff's Third Amended Complaint. (Dkt. No. 55.)

1.      Plaintiff was an incarcerated individual in the custody of DOCCS during all relevant times.

2.      On May 19, 2016, Defendants were employed by DOCCS at Coxsackie Corrections Facility.

3.      On May 19, 2016, Defendants were part of a transport team taking several incarcerated individuals to Albany Medical Center for medical appointments.  Defendant Olivencia was driving the van and Defendant Danzy was riding with the incarcerated individuals.

4.      Upon arrival at Albany Medical Center, Defendant Danzy stood outside of the van while Defendant Olivencia remained in the driver's seat.

5.      Plaintiff was instructed to step down out of the van to the ground.

6.      Plaintiff did not request assistance in getting out of the vehicle, nor did he advise Defendants that he was feeling dizzy.

7.      Plaintiff fell getting out of the van and landed on the ground on his side, hitting his side and face.

8.      The entire incident lasted only a few seconds.  Defendant Danzy did not have enough time to respond prior to Plaintiff landing on the ground.  As Defendant Olivencia was still in the driver's seat, he did not have enough time to respond.

9.      Defendants assisted Plaintiff to his feet and escorted him into the Emergency Department at Albany Medical Center.

**D.      Defendants' Briefing in Support of Summary Judgment Motion and Plaintiff's Failure to Respond.**

**1.      Defendants' Memorandum of Law**

Generally, in support of their motion for summary judgment, Defendants assert the following three arguments: (1) Plaintiff cannot show that Defendants subjectively knew of and

disregarded an excessive risk of harm to Plaintiff's health and safety; (2) Plaintiff cannot show that he objectively faced a substantial risk of harm, and (3) Defendants are entitled to qualified immunity as a matter of law. (*See* Dkt. No. 76, Attach. 3 at 5-11.)

More specifically, with respect to their first argument, Defendants argue that Plaintiff cannot show that Defendants were aware of any conditions that would have allowed them to reasonably infer that Defendant was a fall or injury risk. (Dkt. No. 76 at 6.)  In this regard, Defendant Olivencia provided a sworn declaration that Plaintiff "did not request assistance in getting out of the transport vehicle, nor did he advise the officers present that he was feeling dizzy." (Dkt. No. 76, Attach. 1, ¶ 6.)  This contradicts Plaintiff's Third Amended Complaint, which states that "when directed by Defendant's [sic] Danzy and Olivencia to get out of the transport van, Plaintiff informed Defendants Danzy and Olivencia that he was feeling ill and dizzy," and alleges that Defendants rudely rejected Plaintiff's request for assistance. (Dkt. No. 55, ¶¶ 24-26.)  Defendants also contend that Plaintiff will be unable to produce any evidence that they "unreasonably rushed" Plaintiff out of the transport van or otherwise created any conditions that would have placed Plaintiff at risk, particularly where the entire incident occurred in a "matter of seconds." (Dkt. No. 76, Attach. 3 at 7.)

Advancing their second argument, Defendants argue that there is no objective evidence, such as a history of falls or an established medical condition, that would have alerted them of a substantial risk to Plaintiff during his exit from the transport van. (*Id*. at 9.)  Defendants argue the fall and resulting injury should be considered an "unfortunate accident" that does not rise to the level of a civil rights violation. (*Id*. at 9.)

Finally, Defendants argue that, even if their actions were found to amount to a constitutional violation, they are entitled to qualified immunity. (*Id*. at 10-11.)  In sum, they

argue that "there is no question that Defendants believed their actions to be objectively reasonable and that a similarly situated official would not have believed these actions violated Plaintiff's constitutional rights." (*Id*. at 11.)

### 2. Plaintiff Did Not File a Response to Defendants' Motion

The Court notified Plaintiff of the deadline to respond to Defendants' summary judgment motion and extended the deadline for his opposition papers on two occasions. (Dkt. Nos. 77, 81, 87.) Defendants also provided notice of the consequence of failing to respond to the motion for summary judgment in their motion papers. (Dkt. No. 76.)

Despite these notices and extensions, Plaintiff did not file any substantive response to the motion. During this same period, Plaintiff filed correspondence in August 2023, September 2023, and October 2023 advising the court of his transfer to a new facility and a series of health problems that required repeated hospitalization. (Dkt. Nos. 79, 82, 86.) These health problems were unrelated to the fall at issue in this case.

## II. RELEVANT LEGAL STANDARDS

### A. Standard Governing Motions for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a

genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation

omitted). As the Supreme Court has explained, "[The non-movant] must do more than simply

show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*

*Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the movant. *Id*., 477 U.S. at 255. In

addition, "[the movant] bears the initial responsibility of informing the district court of the basis

for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s]

the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24

(1986). However, when the movant has met its initial burden, the non-movant must come

forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P.

56(a), (c), (e).

Implicit in the above-stated burden-shifting standard is the fact that, where a non-movant

willfully fails to respond to a motion for summary judgment, a district court has no duty to

perform an independent review of the record to find proof of a factual dispute — even if that

non-movant is proceeding *pro se*. *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 (N.D.N.Y.

2009) (citing cases). This is because the Court extends special solicitude to the pro se litigant

largely by ensuring that he or she has received notice of the consequences of failing to properly

respond to the motion for summary judgment. *Id*. at 426. As has often been recognized by both

the Supreme Court and Second Circuit, even pro se litigants must obey a district court's

procedural rules. *Id*. at 426-27.

Of course, when a non-movant willfully fails to respond to a motion for summary

judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that

the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

Rather, as indicated above, the Court must assure itself that, based on the undisputed material

facts, the law indeed warrants judgment for the movant. *Id.*, 76 F.3d at 486; *Allen v.*

*Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001); N.D.N.Y. L.R.

56.1. What the non-movant's failure to respond to the motion does is lighten the movant's

burden.

For these reasons, this Court has often enforced Local Rule 56.1(b) by deeming facts set

forth in a movant's statement of material facts to be admitted, where (1) those facts are supported

by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that

statement[1]–even when the non-movant was proceeding pro se. *Cusamano*, 604 F. Supp. 2d at

427 & n.6 (citing cases); *see also Prestopnik v. Whelan*, 253 F. Supp. 2d 369, 371 (N.D.N.Y.

2003) (holding that the Court is not required to "perform an independent review of the record to

find proof of a factual dispute.")

Similarly, in this District, where a non-movant has willfully failed to respond to a

movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed

to have "consented" to the legal arguments contained in that memorandum of law under Local

Rule 7.1(a)(3). *See, e.g.*, *Beers v. GMC*, No. 97-CV-0482 (NPM/DNH), 1999 WL 325378, at

*8-9 (N.D.N.Y. March 17, 1999) (deeming plaintiff's failure to oppose certain of defendants'

arguments as consent to the granting of summary judgment for defendants with regard to those

arguments, under Local Rule 7.1(a)(3) (previously Local Rule 7.1(b)(3)); *Devito v. Smithkline*

---

[1]     Among other things, Local Rule 56.1 (previously Local Rule 7.1(a)(3)) requires that the
non-movant file a response to the movant's Statement of Material Facts, which admits or denies
each of the movant's factual assertions in matching numbered paragraphs and supports any
denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1.

*Beecham Corp.*, No. 02-CV-0745 (NPM), 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004)

(deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert

testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on

that ground). Stated another way, when a non-movant fails to oppose a legal argument asserted

by a movant, the movant may succeed on the argument by showing that the argument possesses

facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y.

L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the

moving party has met its burden to demonstrate entitlement to the relief requested therein . . . .");

*Rusyniak v. Gensini*, No. 07-CV-0279 (GTS/GHL), 2009 WL 3672105, at *1, n.1 (N.D.N.Y.

Oct. 30, 2009) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722 (GTS/GHL), 2009

WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (collecting cases).

**B.      Standard Governing Failure to Protect Claims**

"The Eighth Amendment requires prison officials to take reasonable measures to

guarantee the safety of inmates in their custody." *Hayes v. Dep't of Corr.*, 84 F.3d 614, 620 (2d

Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 831 (1994)). However, not "every injury

suffered by [a] prisoner at the hands of another translates into constitutional liability for prison

officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. Prison officials can be

held responsible for such harms only if they act with "deliberate indifference" to inmate safety.

*Hayes*, 84 F.3d at 620. The test for establishing deliberate indifference to inmate safety has an

objective component and subjective component. First, under the objective prong, a plaintiff must

show that he was "incarcerated under conditions posing a substantial risk of serious harm."

*Farmer*, 511 U.S. at 834. Second, under the subjective prong, a plaintiff must establish that the

prison official acted with a "sufficiently culpable state of mind." *Id*.

To evaluate culpability under an Eighth Amendment deliberate indifference framework, a prison official must know that the plaintiff "face[d] a substantial risk of harm and he disregard[ed] that risk by failing to take reasonable measures to abate the harm." *Hayes*, 84 F.3d at 620 (citing *Farmer*, 511 U.S. at 842, 845). The prison official need not be "aware[ ] of the specific risk to the plaintiff or from the assailant." *Warren v. Goord*, 579 F. Supp. 2d 488, 495 (S.D.N.Y. 2008). Rather, the risk may come from a "single source or multiple sources" and may be a risk that all prisoners in the plaintiff's position face. *Warren*, 579 F. Supp. 2d at 495 (quoting *Farmer*, 511 U.S. at 843). However, "[d]eliberate indifference requires 'more than mere negligence.'" *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (quoting *Farmer*, 511 U.S. at 835).

## III.    ANALYSIS

After carefully considering the matter, I recommend that the Court deny Defendants' motion for summary judgment.

### A.    Plaintiff's Failure to Protect Claim

Defendants have failed to show that there are no genuine disputes of material fact regarding Plaintiff's Eighth Amendment claim for failure to protect. Therefore, this Court recommends denial of Defendants' motion for summary judgment.

In his sworn declaration in support of Defendants' motion, Defendant Olivencia described Plaintiff's May 19, 2016 fall from the transport van. (Dkt. No. 76, Attach. 1.) He stated that Plaintiff was placed in "shackles, handcuffs, waist chain and black box" during the transport to Albany Medical Center, in accordance with standard practice. (*Id*. ¶ 9.) According to Defendant Olivencia, he was unaware of any risk or danger to Plaintiff, as "Plaintiff did not request assistance in getting out of the transport vehicle, nor did he advise the officers present

that he was feeling dizzy." (*Id.* ¶¶ 11, 16-17.)  Defendant Olivencia further explained that he was in the driver's seat of the transport van and observed Plaintiff "fall from the transport vehicle as he stepped down, landing on his side, and hitting his face on the ground." (*Id.* ¶ 12.)  At this time, Defendant Danzy and another officer were standing outside the transport van. (*Id.*)  Defendant Olivencia has declared that the entire incident took only a few seconds, and that none of the officers present had an opportunity to intervene to prevent the fall. (*Id.* ¶ 13.)  However, the officers promptly obtained medical attention for Plaintiff after the fall. (*Id.*

The parties agree that prior to boarding the transport van, Defendants Olivencia and Danzy "placed Plaintiff in full restraints, including, but not limited to, leg irons, handcuffs, and waist chain" and escorted him to the transport van to be taken to Albany Medical Center for a colonoscopy. (Dkt. No. 55 ¶¶ 21-22.)  Otherwise, Defendant Olivencia's description of the incident differs sharply from many of the relevant factual allegations in Plaintiff's Third Amended Complaint. (Dkt. No. 55.)  For example, Plaintiff alleges that after both Defendants directed him to get out of the transport van, Plaintiff informed Defendants that he was feeling ill and dizzy, and "requested to be assisted by Defendants Danzy and Olivencia to get out of the transportation van." (*Id.* ¶ 25.)  According to Plaintiff, "Defendant Olivencia told Plaintiff to 'STOP F***ING AROUND AND GET OUT OF THE VAN!'" while "Defendant Danzy simply laughed." (*Id.* ¶ 27.) (emphasis in original.)  As set forth in the Third Amended Complaint, Plaintiff "attempted to stand and get out of the van unassisted" after Defendants' refusal to help, but he "experienced a dizzy spell and fell from the van onto the tarmac of the parking lot, landing on his face and shoulder," suffering a "laceration over his right eye." (*Id.* ¶¶ 28-29.)

As Judge McAvoy recognized in his October 5, 2022 Decision and Order, the facts as alleged by Plaintiff in his Third Amended Complaint,

plausibly suggest that (1) defendants Olivencia and Danzy were aware that plaintiff had undergone a procedure in preparation for his colonoscopy on the morning of May 16, 2016, (2) both plaintiff's hands and feet were shackled while he was in the transport van, (3) plaintiff advised defendants Olivencia and Danzy before exiting the vehicle that he was "feeling ill and dizzy" and needed assistance getting out, and (4) defendants Olivencia and Danzy refused to provide the requested assistance.

Dkt. No. 56 at 4-5. Judge McAvoy thus found that these additional facts "plausibly suggest that defendants Olivencia and Danzy were (1) aware that plaintiff faced a risk of falling, without any way of bracing himself, if he was forced to exit the transportation van without assistance, and (2) indifferent to that risk." *Id*. at 5.

In support of their summary judgment motion, Defendants encourage the Court to adopt Defendant Olivencia's description of the "unfortunate accident" that occurred on May 18, 2019. (Dkt. No. 76, Attach. 3 at 9.) Indeed, Defendant Olivencia's recollection of the incident is the only evidence offered in support of their summary judgment motion.[2] (Dkt. No. 76, Attach. 1.) Defendants' motion suffers from several defects.

To begin with, this Court will address Plaintiff's failure to respond to the present motion, in order to determine Defendants' burden of proof. Despite Plaintiff's poor compliance history[3] with court-imposed deadlines, this Court recommends that his failure to respond not be considered "willful." *See Sacks v. Deutsche Bank National Trust Co., et al.,* No. 12-CV-6338 (LDW/SIL), 2016 WL 11480710, at *7 (E.D.N.Y. August 15, 2016) (collecting cases holding

---

[2]    Defendants' Memorandum of Law references a declaration from Defendant Danzy, but Defendants' counsel subsequently confirmed that Defendant Danzy, who is retired, had not finalized his declaration prior to the filing deadline. (Dkt. No. 26 at 1; Dkt. No. 76, Attach. 3 at 4, 8; Dkt. Nos. 92, 93.)

[3]    Plaintiff failed to respond to Defendants' June 2021 Motion to Dismiss his Second Amended Complaint despite this Court granting multiple extensions to the response deadlines, and only filed objections to my recommendation for dismissal after several extensions. (Dkt. Nos. 40, 42, 46-51.)

that "willfulness" requires evidence that failure to respond was strategic or otherwise in bad

faith).  Although Plaintiff did not provide a substantive response to Defendants' summary

judgment motion despite several extensions, his correspondence to the Court offered evidence of

repeated hospitalizations during the period when his response was due. (Dkt. No. 79 at 5; Dkt.

No. 82 at 5; Dkt. No. 86 at 5.)  Courts in similar circumstances have declined to label a party's

failure to respond as willful.  *See, e.g., JUUL Labs, Inc. v. Kingston Snack Shop, Inc.*, No. 1:21-

CV-1299 (TJM/CFH), 2022 WL 21309984, at \*2 (N.D.N.Y. Sept. 23, 2022) (finding corporate

defendant's failure to respond to complaint was not willful where it was partially attributable to

chief operating officer's hospitalization and extended recovery).

Accordingly, in evaluating Defendants' motion, this Court will draw all inferences in the

light most favorable to Plaintiff.  At its heart, the present summary judgment motion asks the

Court to resolve material factual disputes between the parties by favoring Defendant Olivencia's

recollection of the incident over Plaintiff's version of events.  Generally, of course, credibility

issues, which are questions of fact for resolution by a jury, may not be decided by a court on

motion for summary judgment.  *See Frost v. New York City Police Dep't*, 980 F.3d 231, 245 (2d

Cir. 2020) ("It is a bedrock rule of civil procedure that 'a district court generally cannot grant

summary judgment based on  its assessment of the credibility of the evidence presented.'")

(quoting *Agosto v. INS*, 436 U.S. 748, 756, 98 S.Ct. 2081, 56 L.Ed.2d 677 (1978)); *Rule v. Brine*,

85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting

versions of the events are matters for the jury, not for the court on summary judgment.").

Plaintiff made the factual allegations in his Third Amended Complaint under penalty of

perjury. (Dkt. No. 55 at 7.)  "[A] verified pleading . . . has the effect of an affidavit and may be

relied upon to oppose summary judgment." *See West v. Harkness*, No. 17-CV-0621 (GTS/DJS),

2022 WL 1555364, at *6 n.10 (N.D.N.Y. May 17, 2022)  (citing *Patterson v. Cnty. of Oneida*,

375 F.3d 206, 219 (2d Cir. 2004)); *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001)

(holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing

summary judgment"), *cert. denied*, 536 U.S. 922 (2002); *Colon v. Coughlin*, 58 F.3d 865, 872

(2d Cir. 1993) ("A verified complaint is to be treated as an affidavit for summary judgment

purposes."); *McAllister v. Call*, No. 10-CV-0610 (FJS/CFH), 2014 WL 5475293, at *3

(N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's verified complaint sufficient to

controvert facts in Statement of Material Facts on motion for summary judgment).

Defendants encourage the Court to adopt Defendant Olivencia's description of the

incident because essential elements of Plaintiff's claim appear for the first time in Plaintiff's

Third Amended Complaint, or his "fourth 'bite at the apple.'" (Dkt. No. 76, Attach. 3 at 7.)

These elements include Plaintiff alerting Defendants that he felt dizzy and requesting assistance,

Defendant Olivencia yelling at Plaintiff to exit the transport van, and Defendant Danzy laughing

at Plaintiff.  (Dkt. No. 55 ¶¶ 24-26.)

Even if Defendants' skepticism is understandable, their argument is unpersuasive.  As a

general rule, an amended complaint supersedes the original and renders it of no legal effect, and

only "in rare circumstances," will courts in the Second Circuit consider a prior pleading.  *See*

*Smith v. Sullivan*, No. 9:20-CV-659 (DNH/CFH), 2023 WL 3727447, at *4 (N.D.N.Y. May 3,

2023) (collecting cases), *report and recommendation adopted*, No. 9:20-CV-659, 2023 WL

3722137 (N.D.N.Y. May 30, 2023).  A court will do so only "when the plaintiff directly

contradicts the facts set forth in his original complaint."  *Diaz v. Loc. No. 241, Transp. Workers*

*Union of Am., Univ. Div.*, No. 17-CV-8898, 2019 WL 3765924, at *2 (S.D.N.Y. Aug. 9, 2019)

(collecting cases).

Defendants essentially ask the Court to search these prior pleadings for contradictions[4], by invoking *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005). In *Jeffreys*, the Second Circuit held that summary judgment may be awarded in the rare circumstance where there is nothing in the record to support the alleged constitutional violations, aside from plaintiff's own contradictory and incomplete testimony, and, even after drawing all inferences in the light most favorable to the plaintiff, the court determines that "no reasonable person" could credit his testimony. *Id*. at 554-55.

In *Jeffreys*, the plaintiff claimed that police officers assaulted him and threw him out of a third-story window. *Id*. at 551. In support of their summary judgment motion, defendants provided record evidence that the plaintiff had confessed to jumping out of the window "on at least three occasions." *Id*. at 552. The Second Circuit Court of Appeals held that the district court did not err in awarding summary judgment where it (1) "found nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony" and (2) "even after drawing all inferences in the light most favorable to the plaintiff, determined that no reasonable person could believe [plaintiff's] testimony." *Id*. at 555 (internal quotation marks and citation omitted).

A review of Plaintiff's prior recitation of events does not raise any obvious *Jeffreys* concerns. For example, Plaintiff included his June 1, 2016 inmate grievance describing the fall as an exhibit to his original complaint. (Dkt. No. 1, Attach. 1.) In relevant part, Defendant explained that a C.O. opened the transport van door, and "[w]hile I was trying to gathered [sic] myself, I felled out the van on the ground. The incident occurred beyond my control and C.O.

---

[4] Defendants do not identify any specific inconsistencies themselves, stating only that "Plaintiff's prior Complaints and related exhibits imply that Plaintiff caused the harm to himself out of impatience, not for lack of help." Dkt. No. 76, Attach. 3 at 8.

Mr. Lewis seen I was in need for medical urgency." (Dkt. No. 1, Attach. 1 at 2.)  The inmate

grievance process does not appear to have resolved the key factual issues in this case, as

documentation shows the administrative investigation included

> written statements from the Coxsackie C.F. officers that transported the grievant
> . . . to Albany Med.  They reported that the grievant fell while exiting the van.
> They contacted their supervisor and transported the grievant to the ER for
> treatment.  The extent to which the grievant was assisted was not provided in
> these statements.  It could not be determined whether the transportation officers
> could have acted to prevent this accident from occurring.  Transportation officers
> are responsible for escorting and assisting inmates, who are shackled, with
> entering and exiting the van.

(Dkt. No. 1, Attach. 1 at 5.)

Plaintiff's original federal complaint essentially repeated the administrative grievance's

barebones description of his fall. (Dkt. No. 1 at 5.)  Plaintiff identified the driver of the transport

van as "Mr. Lewis," and was unable to identify any other C.O. present during the incident. (*Id.*)

With regard to the fall itself, Plaintiff only states that "while I was trying to gathered myself, I

felled out the Van on the ground. [sic]  The incident occurred beyond my control, and C.O. Mr.

Lewis seen I was in need for medical urgency." (Dkt. No. 1 at 5, 11.)  This Complaint was

dismissed without prejudice for failure to state a claim. (Dkt. 9 at 13-14.)  In his Decision and

Order dismissing the Complaint, Judge McAvoy explained that the original Complaint "is devoid

of any allegations regarding the nature of plaintiff's medical condition that resulted in his

transport to Albany Medical Center on May 19, 2016," and "lacks any allegations which

plausibly suggest that [defendants] forced plaintiff to exit a van on May 19, 2016, and refused to

provide him with any assistance, despite knowing that doing so presented a substantial risk to his

health or safety." (*Id*. at 9.)

Plaintiff subsequently amended his complaint.  In relevant part, this First Amended

Complaint provides:

The Defendant No. 1: John Doe, and Defendant No. 2: John Doe felt they would put plaintiff in the van last. They recognized that plaintiff was the oldest among the other passengers. And they noticed plaintiff looked fatigue, from the purging process. Finally, the Defendants assisted plaintiff into the van, and we left . . . .

At approximately 10:35 a.m., we arrived at Albany Medical Center and parked on a hill there. Thereafter, Defendant No. 2: John Doe ("DOCCS') who opened the van door. While plaintiff trying to gathered myself, plaintiff felled out the van on the ground. . .

The incident occurred beyond plaintiff control, and Defendant No. 3: John Doe, see plaintiff was in need for medical urgency.

(Dkt. No. 24 ¶¶ 11-13.)

The Court accepted Plaintiff's First Amended Complaint for filing. (Dkt. No. 25.) Following service of the First Amended Complaint, the New York State Attorney General provided information to assist Plaintiff in identifying the correct Defendants. (Dkt. No. 26.) In Judge McAvoy's February 19, 2021 order, he directed Plaintiff to prepare a Second Amended Complaint if he was able to identify any of the John Doe defendants. (Dkt. No. 27.)

On March 22, 2021, Plaintiff filed a Second Amended Complaint that identified Defendants Olivencia and Danzy. (Dkt. No. 28.) In relevant part, Plaintiff stated:

At approx. 10:35 a.m., we arrived at Albany Medical Center and parked on a Hill there. Therefore, Defendant No. 1: Luis Olivencia ("DOCCS") a Correctional Officer who opened the van door. While Plaintiff, trying to gathered [sic] myself, Plaintiff felled out the van on the ground . . . .

The incident occurred beyond plaintiff control, and Defendant No. 1: Luis Olivencia and Defendant No. 2: Dwayne Danzy seen plaintiff was in need for medical urgency.

(Dkt. No. 28 ¶¶ 12-13.)

The Court accepted this Second Amended Complaint for filing. (Dkt. No. 30.) Following the completion of service, counsel for Defendants filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 37.) Although plaintiff's deadline to

oppose the Motion to Dismiss was extended multiple times, he never filed a response to the motion.  On February 17, 2022, I issued an Order and Report-Recommendation recommending that the Motion to Dismiss be granted. (Dkt. No. 45.)  After being granted several extensions, plaintiff filed an Objection conceding that the Second Amended Complaint failed to adequately plead an Eighth Amendment claim but requesting additional time to file another amended complaint. (Dkt. No. 52.)  Plaintiff explained that he would be receiving assistance that should result in a better drafted pleading, as he now had "the available guidance to appropriately amend his complaint to satisfy the two prongs of the failure to protect claim." (Dkt. No. 52 at 2.)

Judge McAvoy's July 6, 2022 Decision and Order accepted and adopted my Report-Recommendation and granted the Motion to Dismiss. (Dkt. No. 54.)  In light of plaintiff's pro se status, Judge McAvoy dismissed the Second Amended Complaint without prejudice to Plaintiff filing another amended pleading within forty-five days. *Id*. at 5.  In relevant part, Judge McAvoy ruled:

> The Court will permit Plaintiff one final chance to plead his claims on the single issue remaining in the Complaint: whether the remaining Defendants violated Plaintiff's constitutional rights by failing to protect him from injury during transport.  The Court finds that Plaintiff may have facts sufficient to raise a plausible claim that Defendants were deliberately indifferent to a serious risk of injury in that setting.  He may be able to plead such a case with better guidance.

(*Id*. at 4-5.)

Consistent with Judge McAvoy's Decision and Order, Plaintiff prepared a Third Amended Complaint that made additional factual allegations against both Defendants. (Dkt. No. 55.)  These included Plaintiff alerting Defendants that he felt ill and dizzy, Defendants yelling and laughing at Plaintiff, and Defendants refusing his request for assistance prior to the fall. (*Id*. at ¶ 23-28.)  The additional details in Plaintiff's Third Amended Complaint do not raise the same concerns as *Jeffreys*.  Any inconsistencies between Plaintiff's Third Amended Complaint and his

prior descriptions of the May 2019 transport to Albany Medical Center and his fall from the transport are not "so problematic that no reasonable juror could credit it." *Frost*, 980 F.3d at 246. Indeed, while Plaintiff's most recent Amended Complaint adds more facts and may "amplify his prior claim" in accordance with Judge McAvoy's instructions, it does not contradict any of his earlier factual assertions. *See Kavanaugh v. Vill. of Green Island*, No. 8:14-CV-1244 (DJS), 2018 WL 1033288, at *5 (N.D.N.Y. Feb. 22, 2018) (finding that Jeffreys was not controlling where plaintiff "has not presented wholly inconsistent positions.").

Even if Plaintiff's failure to respond to the substance of Defendants' motion was deemed to be willful, this Court would still recommend denial of summary judgment because Defendants' argument rests on a credibility assessment that is best left to a trier of fact. *See Kavanaugh*, 2018 WL 1033288, at *5-6 (finding that Defendants' "strenuous arguments that Plaintiff's testimony is contradicted by the testimony of three separate Police Officers" . . . "are all certainly appropriate matters for cross-examination and summation before a jury, but they do not warrant granting summary judgment."); *see also Henard v. Green*, 10 Fed. App'x 357, 360-361 (May 3, 2001) (finding summary judgment was inappropriate where motion required credibility assessment of whether correctional officer was aware of shackled inmate's dizziness and difficulty breathing prior to fall down stairs). Even with the burden of proof reduced, Defendants' motion papers still would leave a number of unresolved questions of material fact that could lead a reasonable jury to conclude that Defendants were deliberately indifferent to a substantial risk of harm when they failed to assist an older shackled prisoner stepping down from a transport van prior to a medical appointment.

Accordingly, this courts recommends that Defendant's motion for summary judgment be

denied due to the number of unresolved material questions of fact relevant to the alleged violation of Plaintiff's Eighth Amendment rights.

### B.    Qualified Immunity

The affirmative defense of qualified immunity "shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Stephenson v. Doe*, 332 F.3d 68, 76 (2d Cir.2003) (quoting *McCardle v. Haddad*, 131 F.3d 43, 50 (2d Cir.1997)). A qualified immunity inquiry in prisoner civil rights cases generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton*, 380 F.3d 57, 68–69 (2d Cir.2004) (citations omitted); *accord, Higazy v. Templeton*, 505 F.3d 161, 169 n. 8 (2d Cir.2007) (citations omitted).

Thus, the defense is unavailable and summary judgment is inappropriate where "the objective reasonableness of defendants' actions turns on disputed questions of fact." *Id*. at 927. To establish the qualified immunity defense, defendants "must show that it was 'objectively reasonable' . . .  for them to believe that they had not acted with the requisite deliberate indifference." *McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir.2004) (quoting *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir.2003)).  As discussed above, a reasonable jury could conclude that Defendants violated the Eighth Amendment in failing to protect Plaintiff from his fall.  Thus, a jury could conclude that their actions were not objectively reasonable. Accordingly, this court recommends that Defendants' motion for summary judgment on qualified immunity grounds also be denied.

19

**ACCORDINGLY**, it is respectfully

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 76) be

**DENIED**; and it is further respectfully

**ORDERED** that the Clerk of the Court shall file a copy of this Report and

Recommendation on the docket of this case and serve a copy upon the parties in accordance with

the local rules.[5]

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have

fourteen (14) days within which to file written objections to the foregoing report.[6]  Such

objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS**

**REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human*

*Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.


Dated:    January 10, 2024
          Binghamton, NY

Miroslav Lovric
U.S. Magistrate Judge

---

[5]    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein
in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[6]    If you are proceeding *pro se* and served with this report, recommendation, and order by
mail, three additional days will be added to the fourteen-day period, meaning that you have
seventeen days from the date that the report, recommendation, and order was mailed to you to
serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a
Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day
that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

1999 WL 325378
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Mark W. BEERS and Janet Beers, Plaintiffs,

v.

GENERAL MOTORS CORPORATION, Defendant.

No. 97–CV–482(NPM/DNH).
|
May 17, 1999.

**Attorneys and Law Firms**

LoPinto, Schlather, Solomon & Salk, Ithaca, Attorneys for Plaintiff, Diane V. Bruns, Esq.

Eckert Seamans Cherin & Mellott, LLC, Pittsburgh, PA, Timothy S. Coon, Esq.

Chernin & Gold, LLP, Binghamton, Attorneys for Defendant, Margaret J. Fowler, Esq., Of Counsel.

MEMORANDUM–DECISION & ORDER

MCCURN, Senior J.

INTRODUCTION

**\*1** Defendant General Motors ("GM") moves for dismissal pursuant to Federal Rule of Civil Procedure 37(b)(2), [1] or alternatively, for summary judgment. The motion for dismissal is based on plaintiff's loss of crucial evidence. Plaintiff opposes the sanction of dismissal, and argues in part that summary judgment is inappropriate . [2] For the reasons that follow, the court grants GM's motion to dismiss, or in the alternative, grants summary judgment.

BACKGROUND

Plaintiff Mark Beers was injured in March of 1994 while working on a friend's 1984 GM pickup truck. The truck had a flexible engine cooling fan ("flex fan") installed to cool the engine. It is undisputed that this flex fan did not belong on the truck, and was installed by a third party. [3] At some point, while the engine was running, one of the flex fan blades broke off, penetrated the plastic protective shroud, and struck plaintiff, injuring him.

Plaintiff retained legal counsel, and the flex fan assembly was obtained from the owner of the truck. Plaintiff's expert, Robert Wehe, then examined the flex fan assembly. *See* Wehe Dep. at 11. As part of the inspection, he disassembled the flex fan assembly, which irreparably altered it from its condition at the time of the accident. *See* GM's Supplemental Br. Ex. 1 at ¶ 20, docket no. 62. Moreover, plaintiff's counsel never notified GM that the flex fan was to be taken apart, gave it the opportunity to be present, or allowed it to inspect the flex fan first. *See id.* at ¶¶ 21–22. No video or photos were taken at the time of disassembly. *See id.* at ¶ 23. Although Wehe now claims the fan blade broke because of a design defect, he also noted the arm which held that blade was "severely bent." [4] Wehe Dep. at 11. Wehe recognized that this damage could have caused the blade

to come off. [5] *See id.* at 79–80. In response to the present motion, Wehe now admits that he has misplaced most of the flex fan assembly, and that it is lost. *See* Wehe Aff. at ¶ 3, docket no. 56.

Plaintiff brought suit against GM in the New York Supreme Court, Cortland County, on March 12, 1997. The action was removed to the United States District Court for the Northern District of New York on the basis of complete diversity.

The file and record in this case are replete with examples of discovery abuse by plaintiff. GM has sought to inspect the flex fan assembly for more than a year. On May 12, 1998, after application by GM, Magistrate Judge Hurd found that plaintiff failed to comply with the pretrial scheduling order (in part to supply the flex fan assembly for inspection), failed to respond in opposition, and failed to participate in a telephone conference with the court. He consequently granted GM permission to move before this court for dismissal under either Federal Rule of Civil Procedure 37 or 56. *See* Order of May 12, 1998, docket no. 14. GM then promptly moved for the same.

In opposition to the motion, plaintiff's counsel Diane Bruns filed an affidavit with this court averring that "[t]he fan blades and housing are available for defendant's inspection, should the court [deny GM's motion and] grant plaintiffs' cross motion to reopen and extend the discovery period." Bruns Aff. of June 17, 1998 at ¶ 8, docket no. 22. Plaintiff's statement of material facts in opposition to this first motion stated that "[t]he fan belt [sic] assembly, which was in the custody of plaintiffs' expert witness and in storage during his absence, and the housing are now available for defendant's inspection." Pl.'s Statement of Material Facts of June 17, 1998 at ¶ 6, docket no. 24. Finally, plaintiff's memorandum in opposition argued that the action should not be dismissed for discovery abuse because "plaintiffs ... have provided ... access to the fan blade assembly now that it has become possible to do so." [6] Pl.'s Mem. of Law of June 17, 1998 at 5, docket no. 25. On August 18, 1998, this court denied GM's motion and granted plaintiff's cross-motion to reopen and extend the discovery period because counsel represented that plaintiff was now willing to comply with discovery orders and turn over the flex fan assembly.

 **\*2** Following the court's denial of GM's first motion, plaintiff continuously failed to turn over the flex fan assembly, despite counsel's representations that she would do so. Consequently, on September 14, 1998, GM moved by order to show cause to compel discovery. Judge Hurd granted the order to show cause. *See* Order to Show Cause of September 17, 1998, docket no. 35. GM then withdrew the motion to compel when it appeared plaintiff would finally turn over the flex fan assembly. *See* Coon Letter to Judge Hurd of September 23, 1998, docket no. 37. Plaintiff's cooperation, however, proved short-lived. GM again moved for orders to show cause and compel before Judge Hurd on October 7, 1998. Judge Hurd granted the order to show cause on the same date. *See* Order to Show Cause of October 7, 1998, docket no. 39. In opposition to the motion to compel, plaintiff's counsel admitted that "defendant's counsel is correct in stating that the complete fan assembly has not yet been provided to defendant's expert." Rather, she stated that Wehe "has moved twice and placed many of his records and files in storage." Thus, although some fan blades had been sent to GM, Wehe had yet to locate the remainder of the fan assembly. *See* Bruns Aff. of October 7, 1998 at ¶ 3–4, docket no. 40.

On October 26, 1998, Judge Hurd granted the motion to compel, and specifically ordered plaintiff to turn over the flex fan assembly for inspection. ("Plaintiffs shall produce the complete engine cooling fan to the attorneys for the defendant on or before November 6, 1998. Failure to produce shall entitle defendant to make a dispositive motion or preclusion motion to the District Judge."). Order of October 26, 1998, docket no. 42. GM then moved for leave to file a summary judgment motion on the merits of the case on November 3, 1998. On the same day, this court denied the motion without prejudice to renew. Moreover, it stated that "the parties are hereby ORDERED to comply in all respects with the aforementioned order of Magistrate Judge Hurd." Order of November 3, 1998, docket no. 44. Plaintiff, as of present, has yet to turn over the flex fan assembly. Pursuant to this court's Order of November 3, 1998, and Judge Hurd's Order of October 26, 1998, GM filed the present motion to dismiss, or alternatively moves for summary judgment. In opposition to this present motion, plaintiff finally admits that the remainder of the flex fan assembly has been lost, and can not be found. *See* Bruns Aff. of February 1, 1999 at ¶ 4, docket no. 55.

After motion papers were filed, the United States Court of Appeals for the Second Circuit decided the case of *West v. Goodyear Tire and Rubber Co.,* 167 F.3d 776 (2d Cir.1999), which pertained to spoliation of evidence and the propriety of dismissal

Case 9:19-cv-00609-DNH-ML    Document 95    Filed 01/10/24    Page 23 of 128
Beers v. General Motors Corp., Not Reported in F.Supp.2d (1999)
1999 WL 325378

as a sanction pursuant to Federal Rule of Civil Procedure 37. The court then directed the parties to file supplemental briefs discussing this new case and Rule 37, as each related to dismissal for spoliation of evidence.

**\*3** Oral argument was held in Syracuse, New York on March 24, 1999. There, the court questioned plaintiff's counsel to determine what fault, if any, plaintiff bore for the loss of the flex fan assembly. While the court reserved decision on the motions for dismissal or summary judgment, it did make a finding of fact that counsel and Wehe had been, at minimum, negligent in failing to preserve the crucial evidence.

Aside from arguments as to spoliation of evidence, plaintiff also raised a new theory of liability. [7] Defendant argued that plaintiff should not be permitted to assert a new claim so late in case and only in response to summary judgment.

The court noted that discovery and motions were closed, and that it would not allow plaintiff to amend the complaint. The court did, however, instruct plaintiff to file a statement setting forth his new claim, with any references in the record supporting its existence, within seven days. Thereafter, defendant was ordered to file its opposition within ten days. Finally, the court ordered plaintiff to file a reply within an additional ten days. [8]

For the reasons that follow, GM's motion to dismiss under Rule 37 is granted. Alternatively, the court grants summary judgment for defendant.

## DISCUSSION

### I. Dismissal

GM argues that this matter should be dismissed as a sanction for spoliation of evidence. Spoliation of evidence, as recently defined by the Second Circuit, consists of "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West,* 167 F.3d at 779 (citation omitted). A federal court may impose sanctions upon a party who engages in spoliation in derogation of court order. *See* Fed.R.Civ.P. 37(b)(2); *West,* 167 F.3d at 779; *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.,* 845 F.2d 1172, 1176 (2d Cir.1988). Even in the absence of a discovery order, the court "may impose sanctions for spoliation, exercising its inherent power to control litigation." *West,* 167 F.3d at 779; *accord Chambers v.. NASCO, Inc.,* 501 U.S. 32, 43–45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *Sassower v. Field,* 973 F.2d 75, 80–81 (2d Cir.1992), *cert. denied,* 507 U.S. 1043, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993).

Sanctions for spoliation, including dismissal, are reviewed by the Circuit for abuse of discretion. *See West,* 167 F.3d at 779 (citing *Complaint of Consolidation Coal Co.,* 123 F.3d 126, 131 (3d Cir.1997), *cert. denied,* 523 U.S. 1054, 118 S.Ct. 1380, 140 L.Ed.2d 526 (1998)); *Sieck v. Russo,* 869 F.2d 131, 134 (2d Cir.1989). The Circuit "will reject the district court's factual findings in support of its imposition of sanctions only if they are clearly erroneous." *West,* 167 F.3d at 779 (citing *Friends of Animals, Inc. v. United States Surgical Corp.,* 131 F.3d 332, 334 (2d Cir.1997) (per curiam)).

The district court possesses "broad discretion in crafting a proper sanction for spoliation" but such sanction is to "serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *Id.* This sanction is fashioned to: "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.' " *Id.* (quoting *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir.1998)).

**\*4** " '[O]utright dismissal of a lawsuit ... is within the court's discretion.' " *Id.* (quoting *Chambers,* 501 U.S. at 45); *see also* Fed.R.Civ.P. 37(b)(2)(C). Dismissal is proper if there is "a showing of willfulness, bad faith, or fault on the part of the sanctioned party." *West,* 167 F.3d at 779 (citing *Jones v. NFTA,* 836 F.2d 731, 734 (2d Cir.1987)). Contrary to plaintiff's arguments, dismissal

is not limited only to matters where the offending party has acted with bad faith or willful intent, but is permitted where there is *any* fault of the sanctioned party. *See Bobal v. Rensselaer Polytechnic Institute,* 916 F.2d 759, 764 (2d Cir.1990). Plaintiff argues that "the court should consider less drastic measures[.]... where there is no evidence of bad faith causing the loss of the evidence, *because two of the most important rationales underlying Rule 37 sanctions are to punish an offending party, and to deter others from acting similarly.*" Pl.'s Supplemental Brief at 5 (emphasis supplied). Yet, it has been noted that *negligent* wrongs, like intentional wrongs, are proper subjects for general deterrence. *See Penthouse Int'l, Ltd. v. Playboy Enters., Inc.,* 663 F.2d 371, 387 (2d Cir.1981) (citing G. Calabresi, *The Cost of Accidents,* 133–173 (1970)). Not only have negligent wrongs been found proper subjects for deterrence, but federal courts have dismissed under Rule 37 as punishment for negligence. *See Thiele v. Oddy's Auto and Marine Inc.,* 906 F.Supp. 158, 162–63 (W.D.N.Y.1995) (evidence negligently lost by plaintiff necessitated dismissal under Fed.R.Civ.P. 37); *Brancaccio v. Mitsubishi Motors Co., Inc.,* 1992 WL 189937, at \*2 (S.D.N.Y.1992) (plaintiff's negligent loss of the defective product, after her expert had examined it, but where defendant had not, necessitated dismissal under Rule 37). [9] Hence, even under plaintiff's own interpretation of the purposes of Rule 37, quoted above, it is quite clear that courts regard the type of spoliation undertaken by plaintiff as cause for dismissal.

Plaintiff should be held responsible for both his expert's loss of the crucial evidence, and his counsel's defiance of court orders. This is the type of fault required for dismissal under Rule 37; although there has been no allegation that Wehe intentionally discarded the flex fan assembly, as an expert retained to examine the actual defective part, he was grossly negligent in permanently altering, and then even worse, losing the very item this lawsuit is over. "[G]ross professional incompetence no less than deliberate tactical intransigence may be responsible for the interminable delays and costs that plague modern complex laws uits."*Penthouse,* 663 F.2d at 387.

Aside from Wehe's loss of the crucial evidence, counsel bears fault for disobeying several orders of both Magistrate Judge Hurd and this court in failing to provide the flex fan assembly, and wasting the scant judicial resources of the court in assuring plaintiff's compliance with mandatory discovery. Until this present motion, counsel never notified the court of her inability to comply with the court's orders, instead engaging in a pattern of delay and avoidance, perhaps waiting for Wehe to return from his trip, and then hoping Wehe would rediscover the missing evidence. The district court possesses the discretion to dismiss for disobedience of discovery orders. *See Sieck,* 869 F.2d at 134 ( [w]e ... prefer to ... provide the teeth to enforce discovery orders by leaving it to the district court to determine which sanction from among the available range is appropriate.").

**\*5** Counsel not only bears fault for disobeying court orders, but responsibility for carefully supervising the expert retained. The fact that plaintiff or counsel themselves did not personally lose the evidence is irrelevant. With full knowledge of the pretrial discovery order, and deadlines to turn over evidence, including the flex fan assembly, counsel continued to retain Wehe despite his trip, and let him keep the very items required to be turned over, which were inaccessible while he was on his trip (and ultimately lost). Even after Wehe returned, despite numerous representations to the court that the complete flex fan assembly would be turned over to defendant, it never was.

Finally, plaintiff sometimes must suffer for the faults of his lawyers and experts, especially when their acts are extremely prejudicial to the opposing party, who otherwise has no effective remedy. *See Link v. Wabash R.R. Co.,* 370 U.S. 626, 633–34, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962) (client freely selected attorney and is bound by acts of lawyer-agent); *see also* James Wm. Moore, *Moore's Federal Practice* § 37.50[2][b], at 37–83, and 37–83 n. 42.2 ("the Supreme Court has rejected the notion that dismissal of a plaintiff's complaint because of counsel's unexcused conduct imposes unjust penalty on the client.").

Dismissal is a drastic remedy and should be imposed only after consideration of alternative, less drastic sanctions. *See West,* 167 F.3d at 779. [10] The Second Circuit has also directed, however, that in fashioning a sanction, the district court must take into account the ability of the sanction to "restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *Id.* As GM's defense revolves around pre-accident damage to the very item missing, it will be unable to effectively show that the fan blade broke for reasons other than a defect. A lesser sanction is thus inappropriate as it does not cure the prejudice to GM. [11]

*A. Distinction Between West and the Present Case*

Plaintiff argues that this case is similar to *West,* and consequently should not be dismissed. In *West,* the district court dismissed pursuant to Rule 37 after plaintiff spoliated certain evidence which prejudiced defendants. *See West v. Goodyear Tire and Rubber Co.,* 1998 WL 60942 (S.D.N.Y.1998). The Second Circuit reversed, 167 F.3d 776, holding that other, less severe sanctions than dismissal should have been utilized. *West* is clearly distinguishable.

The *West* plaintiff was injured when a tire he was mounting exploded. Plaintiff had already mounted an identical tire (the "exemplar wheel") which had not exploded. Defendants' theory of defense was that plaintiff grossly overinflated both tires, and the second tire exploded. They planned to show the overinflation by introducing evidence of the overinflated but unexploded exemplar wheel. The exemplar wheel, however, was sent by plaintiff to a lawyer specializing in tire explosion cases. Fearing the tire would explode, that lawyer ordered it deflated. As the Circuit noted, "defendants believe that by deflating the exemplar wheel, West's lawyers deflated their case." *West,* 167 F.3d at 780.

 **\*6** Furthermore, defendants planned to introduce the tire mounting machine and air compressor as circumstantial evidence that the exploded tire was overinflated. As the Circuit itself observed, "[t]he compressor was set at an astronomical pressure of 160 pounds per square inch." *Id.* at 778. Though defendants requested inspection of the compressor and tire mounting machine, and an inspection was scheduled, plaintiff sold the devices before inspection occurred. *See id.* The devices were later located, but by then had been left outside and their conditions had deteriorated. *See id.* While defendants' experts were able to examine the devices, and opined that the devices could have malfunctioned and caused overinflation, "because West sold these items and the purchaser left them outside over the winter, defendant's experts had no way to determine the condition of the machines when they were in West's shop at the time of the accident." *Id.* at 780.

Based upon the spoliation of the exemplar wheel, compressor and tire mounting machine, the district court held defendants had been severely prejudiced, and dismissed the case pursuant to Rule 37. Reversing, the Circuit held that other less drastic sanctions were available to the district court which would have eliminated the prejudice to defendants without disposing of the case, such as evidence preclusion and inference charges. *See West,* 167 F.3d at 780.

The present matter is entirely different. Most importantly, the missing or spoliated item, unlike in *West,* is not circumstantial evidence, but the actual part that failed. There can be no adequate lesser sanctions, as they would be tantamount to summary judgment against plaintiff. *Cf. Pesce v. General Motors Corp.,* 939 F.Supp. 160, 165 (N.D.N.Y.1996) (Hurd, M.J.) ("the drastic sanction of preclusion [as to the missing defective item] would be tantamount to dismissal of the action."). Although in a defective design case lesser sanctions may not always prevent the claim, both federal and New York State courts have dismissed defective design cases as a result of plaintiff's spoliation, even where the spoliation occurred negligently.[12]

Even if the court did impose lesser sanctions, they would not likely remedy the wrong GM has suffered. Not only does GM argue that the flex fan was damaged, precipitating its failure, but GM sought inspection of the flex fan assembly to develop other defenses. As GM never examined the complete flex fan assembly, it does not even know what sanctions it wants the court to impose because it will never know of other defenses an inspection may have revealed. *See* GM Supplemental Brief at 6–7, 10–11.

In *West,* the Circuit Court also observed that the exemplar wheel was allegedly deflated as a purported public safety measure, which was a mitigating factor in the spoliation. There are no mitigating factors in the present matter. Plaintiff's expert lost the crucial evidence in this case. There is no excuse for such conduct, nor has plaintiff attempted to argue such. Furthermore, plaintiff's counsel has utterly failed to explain any efforts on her part to mitigate her failure to comply with the court's orders.

 **\*7** Another notable distinction between *West* and the present case is the type of remedy defendants sought as a sanction for spoliation. In *West,* only one of two defendants moved to dismiss. The other defendant moved only for lesser sanctions.

1999 WL 325378

This made clear that alternatives were available other than dismissal. [13] The circumstances here are different: GM, the sole defendant, moves for dismissal and argues that no other sanction will remove the prejudice plaintiff's spoliation has caused. The court agrees.

Finally, as a last distinction, the district court in *West* relied only on plaintiff's spoliation for dismissal. In this matter, the court relies not only upon the spoliation, but counsel's noncompliance with orders of both a Magistrate Judge and a District Judge. Not only does this court have the discretion under Rule 37 to order dismissal for a plaintiff's noncompliance, *see* Fed.R.Civ.P. 37, but as the Supreme Court has recognized, the district court has the inherent power to regulate and control litigation before it. *See Chambers,* 501 U.S. at 43–45. If parties were allowed to disregard mandatory discovery deadlines and orders of the court, orderly and timely adjudication of cases would be subverted.

In summary, *West* can be distinguished, and the result will not be followed here for several reasons: (1) the evidence spoliated is not circumstantial; (2) due to the nature of the spoliated evidence, effective lesser sanctions may well be tantamount to summary judgment; (3) lesser sanctions may not remedy GM's prejudice because it does not know exactly what a physical inspection of the flex fan would have revealed as a potential defense; (4) no mitigating factors to the spoliation are present; (5) defendant herein actually moves for dismissal and argues only dismissal will protect its interests adequately; (6) plaintiff's counsel's disregard of discovery and other orders of the court support dismissal as a sanction under Rule 37 and under the court's inherent power to control litigation before it.

Having carefully examined and considered the alternatives, no other remedy than dismissal appears appropriate. Only dismissal serves the three prongs the *West* panel enumerated as to the purposes of Rule 37 and spoliation. [14] First, it will serve as a deterrent to plaintiff's counsel, his expert and non-parties from engaging in spoliation and disobedience of court orders. Second, the risk of an erroneous judgment will be on the party to lose the critical evidence. Third, it appears no other sanction will restore GM to the position it would have been in absent the spoliation.

Accordingly, GM's motion for dismissal is granted. Moreover, as set forth below, the court alternatively grants GM's summary judgment motion.

*II. Summary Judgment*

Even if the court did not impose lesser sanctions (which it would if it were not dismissing the case) plaintiff's claims fail as a matter of New York law. [15]

 **8** Plaintiff's defective design claims are barred by the subsequent modification doctrine of *Robinson v. Reed–Prentice Div. of Package Mach. Co.,* 49 N.Y.2d 471, 475, 426 N.Y.S.2d 717, 403 N.E.2d 440 (1980). As the New York Court of Appeals recently reiterated, "a manufacturer is not responsible for injuries resulting from substantial alterations or modifications of a product by a third party that render the product defective or otherwise unsafe." *Liriano v. Hobart Corp.,* 92 N.Y.2d 232, 236, 677 N.Y.S.2d 764, 765, 700 N.E.2d 303 (1998) (citing *Robinson* ).

This present matter is analogous to a recent Appellate Division, Third Department case upholding the subsequent modification doctrine under similar facts. *See Colonial Indem. Ins. Co. v. NYNEX,* 260 A.D.2d 833, 688N.Y.S.2d 744, 1999 WL 216867, *2 (3d Dep't April 15, 1999). There, the Appellate Division granted summary judgment to defendant manufacturer because the undisputed cause of the damages was a part added by a third party subsequent to the product's manufacture. *See id.* at *1–2.

In the case at bar, as in *Colonial Indemnity,* plaintiff seeks to hold the manufacturer, GM, liable for the failure of a part which was added to the truck by a third party subsequent to the truck's manufacture and sale. Despite GM's assertion that New York law mandates summary judgment on these claims, plaintiff fails to oppose this argument in his opposition papers. [16] The court

1999 WL 325378

agrees that the subsequent modification doctrine of *Robinson* requires the claims to be dismissed. Moreover, plaintiff's failure to oppose GM's argument is deemed by the court as consent to summary judgment on these claims.

Plaintiff also alleges a failure to warn claim in his complaint, and reiterated the same at oral argument. Plaintiff otherwise fails to mention or support his allegation of failure to warn. In its motion for summary judgment, GM argues that "there is no record evidence to establish that a warning would have prevented this action, to whom a warning should have been given, the content of the warning, and all the other elements necessary to prove this type of claim." Def. Mem. of Law at 18 n. 7, docket no. 48. Plaintiff never responded to or refuted this argument in his opposition papers. After the court ordered supplemental briefing at oral argument, GM again argued the failure to warn claim was unviable. "[P]laintiff[ ] here can point to no evidence or expert opinion in the record that the 1984 truck was defective because it lacked appropriate warnings. In contrast, the record shows that GM did provide information about the proper cooling fan to use on this truck." Def. Response at 8 n. 4, docket no. 67. Despite the court's order at oral argument for plaintiff to reply to GM's Response, plaintiff again not only failed to address GM's argument, but failed to file the reply at all. Thus, plaintiff has never opposed GM's argument for summary judgment on this claim.

**\*9** This court has dismissed failure to warn claims when plaintiff fails to support the claim at a summary judgment motion. *See June v. Lift–A–Loft Equip., Inc.,* 1992 WL 168181, \*2–3 (N.D.N.Y.1992) (McCurn, C.J.). As with the present case, the *June* plaintiff left the "record [ ] devoid of any factual basis for concluding that the [product] carried inadequate warnings" and the court therefore granted summary judgment to defendant. *Id.* at \*3. The same result is required here.

Additionally, Local Rule 7.1(b)(3) states that "[f]ailure to file or serve any papers as required by this rule shall be deemed by the court as consent to the granting or denial of the motion, as the case may be, unless good cause is shown." N.D.N.Y. L.R. 7.1(b)(3). Plaintiff fails to oppose summary judgment on the warning claim although GM specifically argues it is entitled to such. Not only does plaintiff fail to address GM's argument in his opposition papers, but he failed to file a reply addressing similar arguments after the court directed him to file the same. The court considers plaintiff's failures to oppose as consent to GM's motion for summary judgment on the failure to warn claim.


CONCLUSION

For the aforementioned reasons, GM's motion to dismiss pursuant to Fed.R.Civ.P. 37 is GRANTED. Dismissal is granted (a) due to plaintiff's spoliation of the crucial evidence under Rule 37; (b) due to counsel's noncompliance with orders of the court, pursuant to Rule 37; and (c) under the inherent authority of the court to control litigation before it. Alternatively, defendant's motion for summary judgment is GRANTED in the entirety.

IT IS SO ORDERED.


**All Citations**

Not Reported in F.Supp.2d, 1999 WL 325378


**Footnotes**

1    Fed.R.Civ.P. 37(b)(2) states:

   If a party ... fails to obey an order to provide or permit discovery ... the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following: ... (C) An order striking out

1999 WL 325378

pleadings or parts thereof ... or dismissing the action or proceeding ... or rendering a judgment by default against the disobedient party[.]

    Fed.R.Civ.P. 37(b)(2).

2    Although GM moves for summary judgment on all of plaintiff's claims, including failure to warn, *see* Def. Mem. of Law at 18 n. 7, docket no. 48 and Def. Response at 6–8, docket no. 67, plaintiff fails to oppose summary judgment on the failure to warn claim.

3    It appears the flex fan was from a 1974 GM truck. Trucks designed with flex fans had metal protective shrouds over the fans. The 1984 type of truck involved in plaintiff's injury was not designed to have a flex fan, and had a plastic protective shroud over the fan.

4    The possibility that the flex fan failed due to prior damage is a major reason GM moves for dismissal. GM's primary defense theory is that the fan was not defective, but failed because it had been previously damaged. GM argues it is unable to present such a defense because the flex fan, except for a few pieces, is now missing, and thus its expert is not capable of effectively rendering such an opinion.

5    At a later portion of his deposition, Wehe maintained that he had ruled out the flex fan's failure due to the bent arm. *See* Wehe Dep. at 81–82. He was unable to explain, however, what basis he had for ruling out the same. *See id.* GM argues that because its expert has not examined the flex fan assembly, including the bent arm, he is unable to effectively refute Wehe.

6    The reason plaintiff then claimed inability to comply with the discovery orders was an extended trip by Wehe. *See* Bruns Aff. of June 17, 1998 at ¶ 3. Wehe apparently had the flex fan assembly in storage during his trip. As GM then correctly pointed out, however, "there is no indication ... that any attempt was made [by plaintiff's counsel] to contact Dr. Wehe during the period of his alleged 'unavailability[.]' " GM Reply of June 30, 1998 at 2, docket no. 27.

7    "Although the 1984 Chevrolet pick-up was designed with a [safer] clutch fan as original equipment, it was also designed in such a way that the clutch fan could be readily and easily replaced with the more dangerous flex fan, resulting in the hazardous combination of a flex fan with an insufficiently protective plastic shroud, and no warnings concerning the hazards."

    Pl.'s Statement of Design Defect at 2, docket no. 66.

8    Plaintiff filed his statement of the new theory and defendant responded in opposition. Plaintiff, however, then failed to file a reply as directed by the court.

9    New York State courts also dismiss for negligent spoliation. *See Squitieri v. City of New York,* 248 A.D.2d 201, 202–03, 669 N .Y.S.2d 589, 590 (1st Dep't 1998) ("Spoliation sanctions such as [dismissal] are not limited to cases where the evidence was destroyed willfully or in bad faith, since a party's negligent loss of evidence can be just as fatal to the other party's ability to present a defense[.]" [citation omitted] ); *Kirkland v. New York City Housing Auth.,* 236 A.D.2d 170, 174–75, 666 N.Y.S.2d 609 (1st Dep't 1997) (noting that numerous federal and state courts "have found dismissal warranted when discovery orders were not violated, and even when the evidence was destroyed prior to the action being filed ... notwithstanding that the destruction was not malicious ... or in bad faith[.]" [citations omitted] ); *Mudge, Rose, Guthrie, Alexander & Ferdon v. Penguin Air Conditioning Corp.,* 221 A.D.2d 243, 243, 633 N.Y.S.2d 493 (1st Dep't 1995) ("Dismissal of the amended complaint is also warranted because of plaintiff's *negligent loss of a key piece of evidence which defendants never had an opportunity to examine* [.]" [citation omitted] ) (emphasis supplied). While this federal court is bound to vindicate the Federal Rules of Civil Procedure, it surely would be an anomaly if plaintiff was permitted to negligently spoliate evidence and have his case survive in a federal diversity action, but have his claim dismissed if the action was in state court.

10    Another circuit has noted that the district court should not be required "to incant a litany of the available lesser sanctions [.]" *Harmon v. CSX Transp., Inc.,* 110 F.3d 364, 368 (6th Cir.1997).

11    Alternatively, if lesser sanctions were imposed, such as evidence preclusion, there is a strong possibility of summary judgment in GM's favor due to plaintiff's inability to make out a prima facie case without evidence of the flex fan or pertinent portions of his expert's testimony.

12    A defective design claim arguably does not require evidence of the product which actually failed, since all of the same type of product are uniformly defective. However, courts have dismissed for spoliation, even where plaintiff alleged a design defect. *See Brancaccio,* 1992 WL 189937, at *2 (case dismissed for spoliation under Rule 37 where claim of improper seat belt design was present, when seat belt—and vehicle—were disposed of through plaintiff's negligence); *Squitieri v. City of New York,* 248 A.D.2d 201, 202, 669 N.Y.S.2d 589, 590 (1st Dep't 1998) (dismissal of third party complaint alleging defective design for loss of the defective product).

13    As the Circuit stated, "[i]t is noteworthy that Goodyear did not move for dismissal as a sanction for spoliation; it only sought to have evidence relating to the spoliated materials excluded at trial. Only [the second defendant] moved to dismiss the complaint on the ground of spoliation. *Obviously, Goodyear believed that lesser sanctions, like exclusion of spoliated evidence, would protect its interests, although Goodyear would now benefit from the district court's dismissal.*" *West,* 167 F.3d at 780 n. 1 (emphasis supplied).

14    "(1) [D]eter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *West,* 167 F.3d at 779 (internal quotations and citation omitted).

15    In a diversity action, the court must apply the substantive law of New York. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed.2d 1188 (1938); *Caiazzo v. Volkswagenwerk A.G.,* 647 F.2d 241, 243 (2d Cir.1981); *Paul Revere Life Ins. Co. v. Adelmen,* 1997 WL 773706 (N.D.N.Y.1997) (Munson, S.J.).

16    Plaintiff's sole opposition to summary judgment on his defective design claims is the assertion of the "new" theory of liability, mainly that the truck was defectively designed when it left GM's hands, as it was designed to allow the less safe flex fan to be installed. It is too late for plaintiff to assert this new theory, especially when his purpose is plainly to avoid summary judgment due to the subsequent modification doctrine. To determine whether the claim was indeed new, or had been present all along, as maintained by plaintiff, the court directed plaintiff to file a statement describing this new theory, supplemented with references to the record supporting its previous existence. Contrary to his assertions, none of the citations plaintiff points to disclosed or set forth this new theory. As discovery and motions are closed, the court declines to permit the new liability theory on either defective design or failure to warn.

Notwithstanding the untimeliness of plaintiff's new theory, the court notes and adopts GM's argument that plaintiff's novel theory still has, "at its heart, the issue of whether the flex fan was defective and at the root of that issue lies the question of the cause of the failure; a question that GM cannot adequately defend due to plaintiffs' negligent loss of the fan." Def. Reply at 4 n. 2, docket no. 59. Accordingly, even if the court allowed plaintiff's new theory, it does not alter the court's conclusion that this case must be dismissed for spoliation.

---

End of Document          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 3691343

2004 WL 3691343
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Michael DEVITO, Plaintiff,

v.

SMITHKLINE BEECHAM CORPORATION d/b/a Glaxosmithkline, Defendant.

No. Civ.A. 02–CV–0745NPM.
|
Nov. 29, 2004.

**Attorneys and Law Firms**

De Lorenzo Law Firm, LLP, Schenectady, New York, for Plaintiff, Scott Lieberman, of counsel.

Phillips Lytle, LLP, Buffalo, New York, for Defendant, Paul B. Zuydhoek, of counsel.

King & Spalding, LLP, Atlanta, Georgia, for Defendant, Chilton D. Varner, of counsel.

*MEMORANDUM–DECISION AND ORDER*

MCCURN, Senior J.

I. Preclusion Motion.................................................................................................................... 4

A. Standard for Admissibility of Expert Evidence................................................................... 6

1. Deborah L. Sweeney................................................................................................................ 9

a. Qualified?.................................................................................................................................. 9

2. Kevin W. George, M.D........................................................................................................... 10

3. James T. O'Donnell................................................................................................................ 13

a. General Causation.................................................................................................................. 14

i. Qualified?................................................................................................................................. 14

ii. Reliability of Testimony?...................................................................................................... 17

b. Specific Causation.................................................................................................................. 19

c. Warnings.................................................................................................................................... 19

i. Qualified?.................................................................................................................................. 20

ii. Reliability of Testimony?......................................................................................................... 22

II. Summary Judgment Motion..................................................................................................... 24

Introduction

**\*1**  "Between 1987 and 1997, the percentage of Americans being treated for depression more than tripled nationwide[.]" Shankar Vedantam, *Report Shows Big Rise in Treatment for Depression,* WASH. POST,, Jan. 9, 2002, at A01. In December 1996, plaintiff Michael DeVito became one of those Americans. At that time, his primary care physician prescribed Paxil, a selective serotonin reuptake inhibitor ("SSRI"). Mr. DeVito takes Paxil to this day, despite attempts through the years to discontinue. DeVito claims that he cannot discontinue taking Paxil because he has become "dependent" upon it. Affidavit of Robert E. Glanville (Oct. 20, 2003), exh. A thereto (Complaint) at 2, ¶ 9. More specifically, plaintiff alleges that he has been unable to stop taking Paxil due to what he characterizes as "withdrawal reactions" or "dependency/withdrawal syndrome," which according to plaintiff "includ[es], but [is] not limited to, dizziness, nausea, shaking, electrical-like shocks and horrible dreams." *Id.* at 2, ¶¶ 7 and 6.

In this lawsuit plaintiff alleges five causes of action against the manufacturer of Paxil, defendant Smithkline Beecham Corporation d/b/a Glaxo Smithkline ("Glaxo"): (1) fraud; (2) negligence; (3) strict liability; (4) breach of express warranty; and (5) breach of implied warranty. There is a great deal of overlap among these five causes of action. The thrust of plaintiff's complaint is that Glaxo failed to adequately warn of "Paxil's addictive qualities and dependency/withdrawal characteristics[.]" *Id.* at 6, ¶ 19; *see also id.* at 3, ¶ 11b); at 7, ¶ 25; and at 8, ¶ 33. [1]

Discovery is complete and Glaxo is now moving for summary judgment pursuant to Fed.R.Civ.P. 56. Pursuant to Fed.R.Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S .Ct. 2786 (1993), Glaxo is also moving to preclude the testimony of the three witnesses whom plaintiff is proffering as experts. The court will address Glaxo's motion to preclude first because if any or all of the proffered testimony is inadmissible, then that could significantly impact Glaxo's summary judgment motion in terms of the admissible proof before the court. *See Toole v. Toshin Co. Ltd .,* No. 00–CV–821S, 2004 WL 2202580, at *4 (W.D.N.Y. Sept. 29, 2004) (granting defense motion to preclude testimony of plaintiff's expert and declining to consider his report on summary judgment motion).

I. Preclusion Motion

Each of the five causes of action which plaintiff alleges requires him to prove causation. "Under settled New York law, whether the action is pleaded in strict products liability, breach of warranty or negligence, the plaintiff in a products liability case bears the burden of establishing that a defect in the product as a substantial factor in causing the injury." *Prohaska v. Sofamor, S.N.C.,* 138 F.Supp.2d 422, 434 (W.D.N.Y.2001) (internal quotation marks and citation omitted). Common law fraud likewise "requires a showing of proximate causation, such that the injury is the natural and probable consequence of the defrauder's misrepresentation or ... the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud." *Cyber Media Group, Inc. v. Island Mortgage Network, Inc.,* 183 F.Supp.2d 559, 580 (E.D.N.Y.2002) (internal quotation marks and citation omitted). To establish causation here, plaintiff DeVito "must offer admissible testimony regarding *both general causation,"* *i.e.* that Paxil can cause the type of symptoms of which plaintiff complains when attempting to discontinue that drug, *"and*

specific causation," *i.e.* that Paxil actually caused DeVito's alleged symptoms upon discontinuation of Paxil. *See Amorgianos v. National Railroad Passenger Corporation,* 303 F.3d 256, 268 (2d Cir.2002) (citation omitted) (emphasis added); *see also Blanchard v. Eli Lilly & Co.,* 207 F.Supp.2d 308, 314 (D . Vt.2002) (citations omitted) ("Plaintiffs ... must prove both general and specific causation in order to prevail on their claim, that is, that Prozac is capable of causing and in fact did cause the deaths in this case."). In the context of Paxil litigation, "the general causation question is limited to whether discontinuation from Paxil is *capable* of causing dizziness, agitation, anxiety, nausea, etc." *In re Paxil Litigation,* 218 F.R.D. 242, 249 (C.D.Cal.2003). Specific causation, on the other hand, focuses on whether a plaintiff can "prove that [his] symptoms came from Paxil, as opposed to, for example, the relapse of the underlying illness or the consumption or discontinuation of other drugs." *Id.*

**\*2** To establish causation, plaintiff DeVito seeks to offer the testimony of three "expert" witnesses: (1) Mr. John T. O'Donnell, a pharmacist with a Master's Degree in nutrition; (2) Dr. Kevin W. George, a former psychiatrist of plaintiff's; and (3) Ms. Deborah Sweeney, plaintiff's treating nurse practitioner. Glaxo is seeking to "preclude ... [these] experts from offering any opinion that: (I) Paxil causes substance dependence, or is either addictive or habit-forming; or (ii) that plaintiff is addicted to Paxil or has developed substance dependence as a result of taking it." Memorandum of Law in Support of Glaxosmithkline's Motion to Preclude Plaintiff's Experts' Testimony Pursuant to Fed.R.Evid. 702 and *Daubert* ("Def. Preclude Memo.") at 4. In preparation for trial, each of these witnesses has been deposed and Mr. O'Donnell has provided an "expert" report on plaintiff's behalf. Apart from these witnesses, plaintiff proffers no other causation evidence.

To support his theory that Paxil is defective due to an inadequate warning, plaintiff is relying solely upon the deposition testimony and "expert" report of Mr. O'Donnell. Glaxo argues for the preclusion of "[h]is warnings 'opinions' ' because O'Donnell is not qualified to testify on that issue and even if he were, "his opinions are neither reliable nor scientific." Def. Preclude Memo. at 24.

A. Standard for Admissibility of Expert Evidence

There is a two-part inquiry in deciding the admissibility of expert evidence. First, in accordance with Fed.R.Evid. 702, "[t]he court should admit specialized expert testimony if the witness is 'qualified as an expert by knowledge, skill, experience, training or education' and his testimony 'will assist the trier of fact to understand the evidence or to determine a fact in issue." ' *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 746 (2d Cir.1998) (quoting Fed.R.Evid. 702); *see also Kass v. West Bend Company,* No. 02–CV–3719, 2004 WL 2475606, at \*4 (E.D.N.Y. Nov. 4, 2004) (citation omitted) ("As a threshold matter, the court must examine [the witness'] qualifications to testify about alternative ... designs.") Second, "in the form of an opinion or otherwise," the court must insure that "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. In other words, whether an expert witness' "opinion is ultimately admissible depend on the reliability and relevance of the proffered testimony." *Kass,* 2004 WL 2475606, at \*5.

In this regard, the Supreme Court has instructed the by now oft-cited rule that a district court must act as "a gatekeeper to exclude invalid and unreliable expert testimony." *Bonton v. City of New York,* No. 03 Civ. 2833, 2004 WL 2453603, at \*2 (S.D.N.Y. Nov. 3, 2004) (citation omitted). This gatekeeping obligation applies whether the proposed expert testimony is based upon scientific knowledge, "technical," or some other "specialized" knowledge. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 1171 (1999) (citing Fed.R.Evid. 702). As with other types of evidence, the court must also bear in mind that under Rule 403, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury." Fed.R.Evid. 403. In *Daubert* the Supreme Court soundly reasoned that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the *judge* in weighing possible prejudice against probative force under Rule 403 ... *exercises more control over experts* than over lay witnesses." *Daubert,* 509 U.S. at 595, 113 S.Ct. at 2798 (quotation marks and citation omitted) (emphasis added). Finally, it should be noted that "[t]he proponent of expert evidence must establish admissibility under Rule 104(a) of the Federal Rules of Evidence by a preponderance of the proof." *Bonton,* 2004 WL 2453603, at \*2 (citing *Bourjaily v. United States,* 483 U.S. 171, 175–76 (1987)). This burden is the same regardless of whether the issue is the "qualification[s] of a person to be a witness, ..., or the admissibility of the evidence" itself. Fed.R.Evid. 104(a). In the present case, this requires plaintiff Devito to prove by a

2004 WL 3691343

preponderance of the evidence that each of the three witnesses whom he is proposing to call as an expert qualify as such; *and* that the proposed testimony of each is admissible.

**\*3** "In assessing expert qualifications, '[l]iberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications." ' *Kass,* 2004 WL 2475606, at *4 (quoting *Lappe v. American Honda Motor Co., Inc.,* 857 F.Supp. 222, 227 (N.D.N.Y.1994) *aff'd* 101 F.3d 682 (2d Cir.1996)). "So long as the expert stays within the 'reasonable confines of his subject area,' the expert can fairly be considered to possess the 'specialized knowledge' required by Rule 702." *Id.* (quoting *Lappe,* 857 F.Supp. at 227) (other citation omitted).

"In *Daubert,* the Supreme Court articulated four factors pertinent to determining the reliability of an expert's reasoning or methodology: (1) whether the theory or technique relied on has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community." *Id.* (citing *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97). "These factors do not, however, constitute a 'definitive checklist or test." ' *Id.* (quoting *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796). "Rather, they are intended to be applied flexibly, depending on the particular circumstances of the particular case at issue." *Id.* (citing *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175).

In *Kumho,* the Supreme Court recognized that "when evaluating the admissibility of non-scientific expert testimony, the standard under Rule 702 is a liberal and flexible one, and the factors outlined in *Daubert* are merely guidelines in aiding a court's reliability determination." *Houlihan v. Marriott International, Inc.,* No. 00 Civ. 7439, 2003 WL 22271206, at *3 (S.D.N.Y. Sept. 30, 2003) (citing *Kuhmo,* 526 U.S. at 151, 119 S.Ct. at 1175). "For example, in some cases, reliability concerns may focus on personal knowledge or experience rather than strict scientific methods." *Id.* (citation omitted). Regardless of which criteria a court applies to assess the admissibility of expert testimony, "the Supreme Court has made clear that the district court has a 'gatekeeping function' under Rule 702—is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." ' *Amorgianos,* 303 F.3d at 265 (quoting *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786) (other citation omitted). Finally, it should be noted that " 'the gatekeeping inquiry must be tied to the facts of a particular case[.]" ' *Id.* at 266 (quoting *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175).

### 1. Deborah L. Sweeney

#### a. Qualified?

Glaxo's motion to preclude the testimony of Ms. Sweeney [2] requires little if any analysis. Glaxo is moving to preclude her testimony because it does not believe she is qualified to testify as an expert. Additionally, Glaxo contends that "her proposed opinion lacks a reliable scientific foundation." Def. Preclude Memo. at 26. Plaintiff did not bother to respond to this aspect of Glaxo's motion. This lack of response amounts to a concession by plaintiff that the court should exclude Ms. Sweeney's testimony. *Cf. Green v. Doukas,* No. 97 CIV.8288CMGAY, 2001 WL 767069, at *8 (S.D.N.Y. June 22, 2001) (granting motion to preclude expert testimony because "plaintiff's failure to oppose the motion suggests ... it has merit[ ]"). Accordingly, the court grants Glaxo's motion to the extent it is seeking preclusion of Ms. Sweeney's testimony. *See Amaker v. Coombe,* No. 96 Civ. 1622, 2003 WL 21222534, at *6 (S.D .N.Y. May 27, 2003) (granting motion to preclude where plaintiff defaulted); *see also Martinez v. Sanders,* No. 02 Civ.5624, 2004 WL 1234041, at *3 (S.D.N.Y. June 3, 2004) (because plaintiff did not respond to motion, court granted same on "default" theory) (and cases cited therein).

### 2. Kevin W. George, M.D.

**\*4** Glaxo also seeks to preclude the testimony of Dr. Kevin George. Dr. George is a psychiatrist who saw Mr. DeVito in consultation twice—once on November 2, 2001 and again on December 13, 2001. Glanville Aff., exh. G thereto at 51 and 76.

Glaxo is not challenging Dr. George's qualifications, but rather the nature of his testimony. Glaxo is seeking to exclude Dr. George's testimony because he "has expressly disavowed all of the opinions that plaintiff ascribed to him in plaintiff's expert disclosure." Def. Preclude Memo. at 25. Further, even if Dr. George had not disavowed those opinions, Glaxo argues that his "proposed testimony [is] inadmissible because it lacks any reliable scientific foundation." *Id.*

Plaintiff's response focuses almost exclusively on Dr. George's qualifications, which are not in dispute. As to the opinions which plaintiff attributes to Dr. George, the sum total of plaintiff's response is that any alleged "shortcomings" in that testimony go to weight and credibility, and not to admissibility. Memorandum of Law in Opposition to Defendant's Motion to Preclude Plaintiff's Experts ("Pl. Opp'n Preclude") at 5. The court disagrees. As will be seen, Dr. George's purported opinion testimony does not have simply a few "shortcomings." It has glaring holes in terms of reliability, not the least of which is Dr. George's unequivocal deposition testimony disavowing that he made the opinions which plaintiff claims he did.

In his expert disclosure plaintiff specifically identifies Dr. George as an "expert" whom he intends to call at the time of trial. Glanville Aff., exh. E thereto at 1. According to plaintiff's expert disclosure, Dr. George will testify as follows:

> that in his opinion, within a degree of reasonable medical certainty, ... [1] the plaintiff is experiencing withdrawal reactions from the drug Paxil and that each time the plaintiff attempts to 'wean' himself off of the drug or to lower the dosage of the drug, the plaintiff experiences said withdrawal; 2) ... the plaintiff's withdrawal signs and symptoms are a result of the plaintiff ingesting Paxil; and 3) ... the plaintiff has sustained injury in that he has been unable to discontinue the use of Paxil and has been caused to suffer the signs and symptoms of the withdrawal syndrome associated with the use and attempted discontinuance of Paxil.

Glanville Aff., exh E thereto. Dr. George is confining his opinions to how Paxil allegedly *effected* plaintiff DeVito—not whether Paxil is *capable generally* of causing the symptoms of which DeVito complains. Therefore, although the plaintiff did not specify the purpose for which he is offering Dr. George's testimony, presumably it is being offered on the issue of specific causation.

As noted earlier, ordinarily once a court finds a witness qualified as an expert, the next issue is the admissibility of that witness' opinion testimony. Here, however, it appears that each of the opinions which plaintiff attributes to Dr. George have been expressly disavowed in his deposition. Dr. George was asked point blank whether he had formed any of the three opinions quoted above, and whether he was prepared to testify to same. Each time he answered no. *See* Glanville Aff., exh. G thereto at 88–91. Obviously, if Dr. George has not formed the opinions which plaintiff is ascribing to him, necessarily he has no foundation, scientific or otherwise, for same. Accordingly, the court excludes the opinion testimony outlined above which plaintiff is attributing to Dr. George.

**\*5** Even if Dr. George had not expressly disavowed the opinions set forth above, the court still must exclude his testimony. The crux of each of these opinions is that plaintiff DeVito has "withdrawal reactions," or "withdrawal signs and symptoms" caused when he attempts to discontinue or taper below a certain dosage of Paxil. Glanville Aff., exh. E thereto. Dr. George's deposition testimony did not so state such. To be sure, Dr. George did testify that he used "Paxil withdrawal" as a *"label* to capture what [DeVito] was describing that he had been experiencing." *Id.,* exh. G thereto at 59 (emphasis added). When later in his deposition Dr. George was pressed as to whether or not he diagnosed plaintiff "as suffering from Paxil withdrawal [,]" he reiterated that he *"applied that label* to describe the symptoms that [DeVito] reported in relation to tapering Paxil." *Id.* at 102 (emphasis added).

There is an obvious difference between labeling a symptom which a patient describes and actually diagnosing that person. Significantly, Dr. George did *not* diagnosis plaintiff with Paxil withdrawal. Perhaps that is because "Paxil withdrawal is not a formal diagnosis within DMS–IV[.]" *Id.* at 94. ("The DSM–IV is the Diagnostic and Statistical Manual, the fourth revision of it, that psychiatrists generally base their diagnoses on." *Id.*) And, "[t]here is no criteria for diagnosing somebody with Paxil

withdrawal." *Id.* at 60. For example, there are no "objective tests or assessments," aside from skin inspection for signs of sweating, "that could have been done to determine whether those reports [by DeVito] were genuine[.]" *Id.* at 62. So, Dr. George simply took plaintiff's description of his symptoms at "face value," and made no attempt to determine whether [DeVito's] report of those symptoms was genuine [.]" *Id.* at 62 and 79.

In light of the foregoing, even if Dr. George were inclined to testify that Paxil specifically caused the symptoms which plaintiff claims it did, there is no foundation for this testimony. What is particularly revealing in this regard is Dr. George's candor when asked: "Have you ever made any determination as to why Mr. DeVito's tapering off of Paxil may be taking longer than some of your other patients?" ' *Id.* at 100. Dr. George replied, "I had *no scientific way, ...,* of explaining why he was having such difficulty tapering off Paxil." *Id.* (emphasis added).

Further, plaintiff DeVito saw Dr. George in the latter's capacity as a treating psychiatrist. Thus, as is plain from Dr. George's deposition, he was concerned primarily with the symptoms of which plaintiff complained, not determining the underlying cause. *See Munafo v. Metropolitan Transportation Authority,* Nos. 98 CV–4572, 00–CV–0134, 2003 WL 21799913, at *19 (E.D.N.Y. Jan. 22, 2003). Had Dr. George been focusing on the underlying cause, undoubtedly he would have performed a differential diagnosis, which "typically includes a physical examination, clinical tests, and a thorough case history." *Zwillinger v. Garfield Slope Housing Corp .,* No. CV 94–4009, 1998 WL 623589, at *19 (E.D.N.Y. Aug. 17, 1998) (citations omitted). But, Dr. George did not. Without a differential diagnosis, specific causation cannot be established. *See id.* ("To establish specific causation, other possible causes for the symptoms experienced by plaintiff should be excluded by performing a 'differential diagnosis." ')

### 3. James T. O'Donnell

**\*6** Glaxo argues that the court must preclude O'Donnell's testimony for two reasons. First, he is not qualified as an expert as to the issues upon which he is being asked to opine—general and specific causation and the adequacy of the Paxil warnings. Second, even if he does qualify as an expert, Glaxo contends that the court should preclude his opinions because they lack the requisite scientific foundation and are otherwise unreliable. Plaintiff responds that O'Donnell's "experience and credentials are impressive [,]" whether the issue is his qualifications to testify as an expert on causation or as an expert on warnings. Pl. Preclude Memo. at 4. Plaintiff further responds that regardless of whether O'Donnell is opining on causation or warnings, any alleged "shortcomings" in that testimony go to "weight and credibility, and not [to] ... admissibility." *Id.* at 5 (citation omitted).

Plaintiff DeVito is offering O'Donnell's testimony on three separate issues, which require different areas of expertise. The court will examine O'Donnell's qualifications as to each.

### a. General Causation

Glaxo offers a host of reasons as to why O'Donnell "is not an 'expert' on scientific issues concerning general *or* specific causation" with respect to SSRIs or Paxil. Def. Preclude Memo. at 7 (emphasis added). All of these reasons have merit.

### i. Qualified?

This is not the first court to be confronted with the issue of whether Mr. O'Donnell is qualified to give an expert opinion here. In *Newton v. Roche Laboratories, Inc.,* 243 F.Supp.2d 672 (W.D.Tex.2002), the court found that he was *not* qualified to render an opinion on general causation. *Id.* at 679. There, the parents of a 16 year old girl claimed that Accutane, a prescription acne medication manufactured by the defendant, caused or precipitated the onset of their daughter's schizophrenia. In much the same way plaintiff DeVito is offering O'Donnell's testimony here, the plaintiffs in *Newton* offered O'Donnell as an expert "to testify regarding general causation, *i.e.,* that Accutane is pharmacologically capable of causing schizophrenia." *Id.* at 677. After outlining a number of ways in which O'Donnell's qualifications were lacking, the court expressly found that he was not qualified to render such an opinion.

2004 WL 3691343

To support that conclusion, the *Newton* court relied upon O'Donnell's deposition testimony, which is substantially similar to his deposition testimony in this case. For example, O'Donnell testified in *Newton,* as he did here, that "he has never earned an M.D., a Ph.D., or any degree in pharmacology." *Id.* at 677; *see also* O'Donnell Dep'n at 24–25 and 53. Yet, he "still holds himself out as a 'doctor' and a pharmacologist[.]" *Id.* As in *Newton,* "O'Donnell ... [continues to] grant[ ] himself the title of 'doctor' in reliance upon his Pharm.D degree, [which] he conceded in his deposition that in the majority of pharmacy schools, th[at] ... degree is 'an entry-level degree' that pharmacists must have to ... even practice pharmacy." *Id.* at 677 n. 2 (citation omitted); *see also* O'Donnell Dep'n at 24–25. In contrast, to obtain a degree in pharmacology usually three or four years of graduate school is required. O'Donnell Dep'n at 25–26. O'Donnell did get a graduate degree, but it was not in pharmacology. O'Donnell's formal education consists of a four year degree in pharmacy and a Master's Degree in clinical nutrition. *Id.* at 27.

 **\*7**  In addition to questioning O'Donnell's background generally, the *Newton* court pointed out his "lack [of] appropriate pharmacological training relevant to the issues" therein, *i.e.* "Accutane, Vitamin A, schizophrenia, or psychosis[.]" *Id.* at 678. The same may be said here. There is no factual basis upon which this court can find that O'Donnell is an expert regarding SSRIs generally, not to mention Paxil or discontinuation of Paxil. Indeed, as his deposition testimony shows, O'Donnell's asserted expertise on these subjects is non-existent. *See id.* at 21, 24; 38–40; and 45.

Given that SSRIs are a fairly recently developed class of drugs, understandably they were not the subject of O'Donnell's course work as an undergraduate, or when getting his Master's Degree in nutrition. *Id.* at 21 and 24. Since that time, O'Donnell has done nothing to advance his own knowledge as to SSRIs generally or Paxil in particular. When directly asked if he had "done any clinical research whatsoever relating to antidepressants," O'Donnell replied that he had not. *Id.* at 38. He responded the same way when asked if he had "done any scientific research concerning Paxil or SSRI antidepressants[.]" *Id.* at 39. Moreover, O'Donnell conceded that the first time he "review[ed] ... scientific literature in connection with Paxil discontinuation symptoms[ ]" was for this case. *Id.* at 40–41.

This is the sort of "litigation-drive expertise" which courts have eschewed. To illustrate, the court in *Mancuso,* 967 F.Supp. at 1443, reasoned that it could not "help but conclude that [plaintiff's expert] was not in fact an expert ... when he was hired by the plaintiffs, but that he subsequently attempted, with dubious success, to qualify himself as such be selective review of the relevant literature." This appears to be an apt description of what Mr. O'Donnell attempted to do in the present case.

The court stresses that it is no single factor which is dispositive of whether O'Donnell qualifies as an expert on the issue of general causation. Rather, it is the cumulative effect of the foregoing which convinces the court that O'Donnell lacks the lack of relevant "knowledge, skill, experience, training or education" to testify as an expert on the issue of general causation *vis-a-vis* the discontinuation of Paxil. As he admitted, O'Donnell is *not* a pharmacologist. Therefore, he cannot, as he does in his "expert report," opine to a "reasonable pharmacological certainty," that plaintiff is experiencing "withdrawal toxicity reactions from Paxil[.]" O'Donnell Rep. Clearly, allowing a pharmacist/nutritionist such as O'Donnell to testify in that way would run afoul of the rule that an expert must stay "within the reasonable confines of his subject area[.]" ' *Kass,* 2004 WL 2475606, at \*2475606, at \*4 (internal quotation marks and citations omitted). Simply put, the court agrees with the court's comment in *Newton* that "[p]laintiff's attempts to present O'Donnell as an expert pharmacologist [is] ... an extremely bold stretch." *Newton,* 243 F.Supp.2d at 279. [3]

### ii. Reliability of Testimony?

 **\*8**  O'Donnell's lack of education, training and background as to Paxil becomes even more apparent when viewed in terms of the opinions which he has rendered in this case. That is so because a "court's evaluation of qualifications is not always entirely distinct from the court's evaluation of reliability." *Pearson v. Young,* No. CIV–99–1559–F, 2002 WL 32026157, at \*3 (W.D.Okla. Jan. 17, 2002).

O'Donnell's opinion as to causation is that "DeVito is experiencing withdrawal toxicity reactions from Paxil, and indeed, each time he attempts to wean or lower the dosage, he again experiences such infinity [sic]." Glanville Aff., exh. E thereto. O'Donnell

states that when plaintiff's dosage of Paxil is lowered, he suffers from the following "withdrawal signs and symptoms [:] anxiety, jitery [sic], agitation, nausea, drowsiness, generalized discomfort and vertigo[.]" O'Donnell Report at 2. "For this opinion to be admissible, O'Donnell must have a *reliable scientific basis* to support not only (1) a casual relationship between" Paxil and the enumerated side-effects, "but also (2) his assertion that [Paxil] will produce these side-effects." *See Newton,* 243 F.Supp.2d at 679 (emphasis added). O'Donnell's report and deposition testimony are void of a scientific basis to support either of those assertions.

In terms of publications, O'Donnell testified that he was the editor of a non-peer reviewed book entitled "Drug Injury Liability, Analysis and Prevention." *Id.* at 98–99. That book contained a mere six sentences on SSRIs, including the two sentences on Paxil. *Id.* at 99. Given that minimal reference to SSRIs, it is not surprising that that book contains nothing about discontinuation symptoms. *See id.* It further appears that he has performed absolutely no research regarding Paxil, much less its discontinuation. *Id.* at 38–39. What is more, O'Donnell has done no scientific or clinical research of any kind for almost two decades. The last time he did any such research was in he "early '80s as part of a pharmacology lab sabbatical," where he was looking at vitamins and critical care drugs used in Intensive Care Units. *Id.* at 36.

In light of the foregoing, to allow plaintiff to rely upon Mr. O'Donnell's opinions as to general causation clearly would violate *Daubert'* s "requirement that the expert testify to scientific knowledge—conclusions support by good grounds for each step in the analysis[.]" ' *Amorgianos,* 303 F.3d at 267 (citations and quotation marks omitted).

### b. Specific Causation

It stands to reason that if Mr. O'Donnell lacks (which he does) the qualifications to testify as to general causation, he lacks the qualifications to testify as to specific causation. His opinion as to specific causation suffers from the same infirmities, detailed above, as to general causation. Accordingly, the court finds that Mr. O'Donnell does not have the requisite qualifications to testify as to specific causation; and even if he did, his opinions in that regard are unreliable.

### c. Warnings

**\*9** Glaxo contends that because O'Donnell "lacks any pertinent qualifications[,]" Def. Memo. at 14, he should not be allowed to testify that in his opinion the "lack of ... a precaution and warning about withdrawal risk and the need to taper [when discontinuing Paxil] renders the product defective due to an inadequate warning. *See* O'Donnell Report at 3. Plaintiff did not directly respond to this argument. Included in the list of highlighted credentials in plaintiff's memorandum of law is that Mr. O'Donnell "is currently involved in the teaching of New Drug Development and Regulations [.]" Pl. Opp'n Memo. at 2. However, plaintiff does not explain, or cite any portion of O'Donnell's deposition explaining, how or why this position qualifies him to testify as an expert on warnings.

As with the other issues upon which plaintiff intends to offer O'Donnell's testimony, plaintiff baldly retorts that O'Donnell's "extensive experience qualifies as specialized knowledge gained through experience, training, or education[.]" Pl. Memo. at 4 (internal quotation marks and citations omitted). And, once again, he relies upon the argument that Glaxo's reasons to preclude O'Donnell's testimony regarding warnings should be saved for trial, *i.e.* they should be used to attack O'Donnell's credibility and the weight which the jury might give to his opinions regarding Paxil warnings.

### i. Qualified?

O'Donnell "claim[s] to be an expert in drug labeling[.]" O'Donnell Dep'n at 90. Presumably he is including drug warnings within the province of this supposed expertise. In any event, to qualify as an expert it is not enough for a witness to simply declare that he is one. Federal Rule of Evidence 702 requires more. As plaintiff acknowledged, a witness must satisfy the court that he has a certain amount of "knowledge, skill, experience, training or education [ ]" in the relevant field before he can be deemed an expert. *See Nora Beverages,* 164 F.3d at 746 (internal quotation marks and citation omitted). Close examination of

2004 WL 3691343

O'Donnell's deposition testimony reveals that he is lacking in each of those areas when it comes to the subject of the adequacy of prescription drug warnings.

O'Donnell's claimed expertise admittedly is "through experience," not through formal education. O'Donnell Deposition at 90–92. His experience consists primarily of having attended continuing education ("CE") programs, where drug labeling was a topic. *Id.* Those CE programs were to satisfy his pharmaceutical and nutritionist CE requirements, however; and he was unable to elaborate on the substance of same. *See id.* Furthermore, O'Donnell has not consulted with any pharmaceutical company "concerning the labeling for any antidepressant[.]" *Id.* at 96. O'Donnell agrees "that the FDA [Food and Drug Administration] is the highest authority on how drugs are labeled in this country[,]" but he has also never consulted with them "concerning the labeling for any antidepressant. *Id.* For that matter, O'Donnell has not worked for or consulted with the FDA in any capacity. *See* Glanville Aff. at 9, ¶ 39. Thus, O'Donnell's experience in this area is extremely limited.

 **\*10**  Moreover, O'Donnell made two especially damaging concessions which seriously undermine the suggestion that he is an expert as to the adequacy of prescription drug warnings. O'Donnell readily agreed "that in assessing the adequacy of a label for a prescription drug, the expert rendering the opinion generally should be familiar with the clinical trials data on the drug as it relates to the side effect concerning which he is opining[.]" *Id.* at 192. Yet, O'Donnell frankly admitted that he had not reviewed any of the Paxil clinical trials data. *See id.* Similarly, O'Donnell conceded that "generally to reach a conclusion regarding the adequacy of a label for a prescription drug, the expert rendering the opinion should be familiar with at least a majority of the available medical literature on the drug as it relates to the side effect on which he is opining[.]" *Id.* at 193. Despite the foregoing, O'Donnell went on to testify that he has "not read the specific literature [ ]" relating to discontinuation symptoms of Paxil. *Id.* 193 and 45. In fact, he has only read "abstracts" of articles. *Id.* at 46–47. Finally, Mr. O'Donnell has not lectured on, or written anything (peer reviewed or not) about, "Paxil discontinuation symptoms apart from [his] export [sic] report in this case[.]" *Id.* at 45. As the foregoing clearly shows, Mr. O'Donnell does not "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field[,]" which here is the adequacy of prescription drug warnings and Paxil in particular. *See Kumho Tire,* 526 U .S. at 152, 119 S.Ct. at 1176.

Mr. O'Donnell may qualify as an expert in the fields of pharmacy or nutrition, but that is not the purpose for which his testimony is being offered here. Instead, his testimony is being offered on the adequacy of Paxil warnings. O'Donnell has never been drafter or been asked to draft a warning for any antidepressant, let alone for Paxil. Likewise, he has not done any research or written any publications on prescription drug warnings. Thus, whether judged in terms of his education or experience, does not rise to the level of "expertise ... that the jury would expect from a bona fide warnings expert." *See Robertson v. Norton,* 148 F.3d 905, 907 (8th Cir.1998) (internal quotation marks omitted).

In sum, O'Donnell is being called upon to testify regarding the adequacy of the Paxil warning, an issue which clearly is outside the "reasonable confine [s] of his subject area[s,]" which are pharmacy and nutrition. *See Kass,* 2004 WL 2475606, at \*4 (internal quotation marks and citations omitted). Therefore, because O'Donnell does *not* "possess the specialized knowledge required by Rule 702[,]" the court finds that he is not qualified as an expert on the issue of the adequacy of the Paxil warning. *See id.*

 ii. Reliability of Testimony?
 **\*11**  Given the nature of the claims which plaintiff is alleging in this case, plainly there is a close relationship between excluding the causation opinion and excluding the warning opinions which are being offered by O'Donnell. *Miller v. Pfizer, Inc.,* 196 F.Supp.2d 1062 (D.Kan.2002), *aff'd on other grounds,* 356 F.3d 1326 (10th Cir.2004), *cert. denied,* 125 S.Ct. 40 (Oct. 4, 2004), provides a good example of how a decision to preclude causation "expert" testimony impacts upon a decision to also preclude warning testimony. The plaintiff parents in *Miller* were suing the manufacturer of Zoloft, another SSRI, alleging that it caused their son to commit suicide. Similar to the present case, the plaintiffs in *Miller* asserted state law claims for strict liability for marketing defects and misrepresentations, and negligence for failure to test and warn. The court held that an "eminent" psychiatrist and neuropsychopharmocologist's proposed testimony regarding general causation, *i.e.* that Zoloft causes suicide, did not satisfy the *Daubert* criteria for admissibility because, in short, "he lack[ed] sufficient expertise on the issue of suicide."

*Id.* at 1087 and 1088. The *Miller* court, as is this court, was then confronted with the issue of whether that same doctor could qualify as an expert who would opine "that Zoloft labels do not adequately warn against the danger of SSRI-induced suicide." *Id.* at 1088. After finding that the doctor was not an expert on that issue, the court soundly reasoned, "[i]f the jury will hear no evidence that [Paxil] causes [withdrawal symptoms/addictive], it cannot possibly conclude that [Paxil] labels do not adequately warn against the danger that [Paxil] causes [such condition.]" *Id.* at 1089. That reasoning applies with equal force here. Even if O'Donnell qualifies as a prescription drug warning expert, because neither O'Donnell nor Dr. George (plaintiff's only proof as to causation) qualify to testify about causation, the former's warning testimony "would essentially be irrelevant to any larger issues in the case." *See id.* Accordingly, there is no need to analyze whether O'Donnell's opinions as to warnings pass muster under *Daubert.*

In short, plaintiff DeVito has not sustained his burden of proving by a preponderance of the evidence that Mr. O'Donnell is qualified to render an opinion as to general causation, specific causation, or the adequacy of Paxil warnings. Even if O'Donnell could somehow be deemed to have the requisite "specialized knowledge" to testify as to any or all of those issues, "courts do not have to credit opinion evidence connected to data 'only by the *ipse dixit* of the expert.' " *Prohaska,* 138 F.Supp.2d at 438 (quoting *General Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. (1997)). That is all O'Donnell has to rely upon; simply because he offers an opinion which he claims to be valid, plaintiff assumes it is so. This court will not, however.

**\*12** For the reasons set forth above, the court grants in its entirety Glaxo's motion to preclude the testimony of Mr. O'Donnell; Dr. George; and Ms. Sweeney.

II. Summary Judgment Motion

The court assumes familiarity with the Supreme Court's trilogy of cases clarifying the governing legal standards on summary judgment motions, and sees no need to repeat those standards herein. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); and *Matsushita Elec. Industr. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)

It is an understatement to say that the wholesale exclusion of the testimony of O'Donnell, George and Sweeney significantly impacts plaintiff DeVito's case. As discussed at the outset causation is a necessary element of each of the five causes of action which plaintiff is alleging herein. Because plaintiff's only causation evidence has been excluded, it necessarily follows that Glaxo is entitled to summary judgment in its favor. *See Kass,* 2004 WL 2475606 (after granting motion to exclude testimony of plaintiff's claimed expert regarding the feasibility of alternative designs, court granted defense summary judgment motion because plaintiff could not satisfy the critical element of a design defect cause of action); and *Zwillinger,* 1998 WL 623589 (where plaintiff claimed that her exposure to defendants' carpeting causes her to develop immunotoxicity syndrome, court granted summary judgment in defendants' favor after excluding the of doctor's testimony, which was plaintiff's only causation evidence).

To conclude, the court hereby GRANTS the motion by Smithkline Beecham Corporation d/b/a Glaxo Smithkline, to preclude the testimony of James O'Donnell; Dr. Kevin George; and Ms. Deborah Sweeney. The court further GRANTS the motion by Smithkline Beecham Corporation d/b/a Glaxo Smithkline for summary judgment pursuant to Fed.R.Civ.P. 56 dismissing all of plaintiff Michael DeVito's claims as against it.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 3691343

Devito v. Smithkline Beecham Corp., Not Reported in F.Supp.2d (2004)
2004 WL 3691343

# Footnotes

1    The present action, which has been referred to as a "tag-along action," is one of a number throughout the country wherein plaintiffs are alleging that Glaxo knew of the hazardous side effects of Paxil and either concealed, misrepresented or failed to warn of them. *See In re Paxil Products Liability Litigation,* 296 F.Supp.2d 1374 (Judicial Panel on Multidistrict Litigation 2003). In mid-February 2004, this court was advised that the Judicial Panel on Multidistrict Litigation ("the Panel") had conditionally transferred this action to the United States District Court fo the Central District of California for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407." Glaxo moved to vacate that conditional transfer as it pertained to the present case. When plaintiff did not respond, on June 15, 2004, the Panel vacated that conditional transfer as it relates to Mr. DeVito.

2    During her deposition Ms. Sweeney unequivocally testified, "I'm not a physician. I'm not a nurse practitioner." Glanville Aff ., exh H thereto at 123. She holds an associates' degree in nursing, a bachelor of science degree in health and human services, and a nurse practitioner's degree." *Id.* at 12, 17, 35–36. Thus, to refer to Ms. Sweeney as "Doctor Sweeney, as plaintiff does throughout his expert disclosure, is not only a misstatement but directly contradicts Sweeney's own testimony. Plaintiff's tendency to exaggerate or overstate certain things, as will be seen, is not limited to the qualifications of his experts.

3    O'Donnell's insistence on holding himself out as a pharmacologist, *see* O'Donnell Dep'n at 54, ignores at least one fundamental distinction between pharmacology and pharmacy—a distinction which is critical here. "Pharmacology can be fairly described as the study of the effect of drugs on living organisms. Pharmacy, on the other hand, is the profession of preparing and dispensing drugs." *Newton,* 243 F.Supp.2d at 677, n. 1. It is self-evident that there is a vast difference in the education, experience and skill necessary to obtain degrees in these two different fields.

   Apparently O'Donnell recognizes this distinction because in *Newton* he "admitted ... that from approximately 1982 to 1985, he intentionally and falsely advertised that he possessed a doctorate in pharmacology in an attempt to attract more interest from lawyers for his consulting expert business." *Id.* at 677, n .3 (citation omitted). He made that same admission in this deposition herein. O'Donnell Dep'n at 28–31. O'Donnell did change this advertisement because, in his words, it was "incorrect." *Id.* at 29. This court cannot overlook what at best appears to be a serious lapse in judgment, however.

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 3672105
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Walter RUSYNIAK; and Anthony Rusyniak, Plaintiffs,

v.

Ena Paola GENSINI; Gunilla De Montaigu; and Concha Futura, S.A., Defendants.

No. 5:07–CV–0279 (GTS/GHL).

|

Oct. 30, 2009.

**Attorneys and Law Firms**

Costello, Cooney & Fearon, PLLC, Robert M. Smith, Esq., Kristen L. Pickard, Esq., of Counsel, Syracuse, NY, for Plaintiffs.

Hiscock & Barclay, LLP, Robert A. Barrer, Esq., of Counsel, Syracuse, NY, for Defendants Gunilla De Montaigu and Concha Futura, S.A.

Greene, Hershdorfer & Sharpe, Victor J. Hershdorfer, Esq., of Counsel, Syracuse, NY, for Defendant Ena Paola Gensini.

### *MEMORANDUM DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** Currently pending before the Court in the above-captioned action is a motion by Defendants containing two alternative requests for relief: (1) a request for reconsideration of Part III.D.5 of the Court's Decision and Order of May 5, 2009, denying Defendants' request for dismissal of all of Plaintiffs' claims due to the doctrine of *forum non conveniens;* and (2) a request for dismissal of the First Cause of Action of Plaintiffs' Third Amended Complaint (asserting a claim of violation of Panama law) as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code. (Dkt. No. 61.) For the reasons set forth below, Defendants' motion is granted in part, and denied in part.

## I. REQUEST FOR RECONSIDERATION

To the extent that Defendants' motion requests reconsideration of the Court's decision to denying their request for dismissal of all of Plaintiffs' claims due to the doctrine of *forum non conveniens,* that motion is untimely.

Defendants' motion was filed on June 8, 2009. (Dkt. No. 61.) The Order of which reconsideration was sought was entered on May 5, 2009. (Dkt. No. 56.) *See* N.D.N.Y. L.R. 7.1(g) (setting ten-day deadline for motions for reconsideration). Defendants' attempt to characterize the Order of which reconsideration is sought as being the Court's Text Order of May 29, 2009, is unconvincing. That Text Order merely indicates the extent to which Plaintiffs' signed Third Amended Complaint fails to comport with the Court's Decision and Order of May 5, 2009 (and was issued in response to Plaintiffs' request for guidance). Even liberally construed, Defendants' motion for reconsideration expressly and repeatedly challenges the substance of the Court's Order of May 5, 2009 (specifically, Part III.D.5. thereof), and only that Order. (*See, e.g.,* Dkt. No. 61, Part 2, ¶ 4; Dkt. No. 61, Part 4, Points II and III.)

Rusyniak v. Gensini, Not Reported in F.Supp.2d (2009)
2009 WL 3672105
Case 9:19-cv-00609-DNH-ML   Document 95   Filed 01/10/24   Page 42 of 128

In any event, even if the Court were to consider the merits of Defendants' motion for reconsideration, the Court would deny that motion as without cause: there has been no intervening change of controlling law, no previously unavailable evidence, and there exists no clear error of law or manifest injustice with regard to the relevant portion of the prior decision in question.

For these reasons, Defendants' request for reconsideration is denied.

## II. REQUEST FOR DISMISSAL OF FIRST CAUSE OF ACTION

To the extent that Defendants' motion alternatively requests the dismissal of the First Cause of Action of Plaintiffs' Third Amended Complaint (asserting a claim of violation of Panama law) as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code, that motion is granted.

Defendants are correct that Plaintiffs failed, in their response papers, to oppose this request. (*See* Dkt. No. 63.) The closest that Plaintiffs come to opposing this request is when, in a supplemental letter request, they (correctly) point out that Defendants have improperly broadened the target of their Panamanian-statute-of-limitations argument from Plaintiffs' First Cause of Action to all of Plaintiffs' causes of action. (Dkt. No. 66; *see also* Dkt. No. 61, Part 4, at 7–8.) As a result of Plaintiffs' failure to address Defendants' argument regarding Plaintiffs' First Cause of Action, Defendants' burden on this motion is somewhat lightened with regard to that cause of action. [1]

 **\*2** After carefully reviewing the parties' motion papers, and Plaintiffs' Third Amended Complaint, the Court finds that Defendants have met their lightened burden on their motion to dismiss Plaintiff's First Cause of Action. The Court reaches this conclusion based on substance of the certified translation provided by Defendants (i.e., the certified translation of Article 1652 of the Commercial Code of the Republic of Panama). (Dkt. No. 61, Part 3.) The Court reaches this conclusion also based on the reasons stated in Part III.D.7.a. of the Court's Order of May 5, 2009. (*See* Dkt. No. 56, at 44–47.) *See also Rusyniak v. Gensini,* 629 F.Supp.2d 203, 231–33 (N.D.N.Y.2009) (Suddaby, J.).

For these reasons, Defendants' request to dismiss Plaintiff's First Cause of Action is granted.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion (Dkt. No. 61) is ***GRANTED* in part,** and ***DENIED* in part,** in accordance with the above Decision and Order; and it is further

**ORDERED** that Defendants' motion for reconsideration of the May 5, 2009 Decision and Order is ***DENIED,*** however, the First Cause of Action of Plaintiffs' Third Amended Complaint (Dkt. No. 58) is ***DISMISSED*** as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code; and it is further

**ORDERED** that counsel for all parties are directed to attend an in-person pretrial conference on **NOVEMBER 19, 2009 at 2:00 p.m.** in Judge Suddaby's chambers in Syracuse, New York, at which counsel are directed to appear with settlement authority.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3672105

## Footnotes

1    *See Cossey v. David,* 04–CV–1501, 2007 WL 3171819, at *7 (N.D.N.Y. Oct. 29, 2007) (Lowe, M.J. *adopted by* Scullin, J.) (noting that, where plaintiffs do not respond to defendants' argument made in their summary judgment motion, plaintiffs are deemed to have consented to defendants' argument, and thus defendants must only satisfy "their modest burden of demonstrating entitlement to the relief requested through that argument"); *Saunders v. Ricks,* 03–CV–598, 2006 WL 3051792, at *9 (N.D.N.Y. Oct. 18, 2006) (Lowe, M.J. *adopted by* Hurd, J.) ("By failing to respond to Defendants' first argument ... Plaintiff may be deemed to have consented to that argument under Local Rule of Practice 7.1(b)(3). Thus, Plaintiff's claim against those Defendants may be dismissed on that ground alone [provided that] ... Defendants have met their modest threshold burden to demonstrate entitlement to the relief requested in their motion for summary judgment."); *Beers v. GMC,* 97–CV–0482, 1999 U.S. Dist. LEXIS 12285, at *27–31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ).

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 2473509
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Donna ESTE–GREEN, Plaintiff,

v.

Michael J. ASTRUE, Comm'r of Social Security, Defendant.

No. 5:09–CV–0722 (GTS/GHL).
|
Aug. 7, 2009.

**Attorneys and Law Firms**

Donna Este–Green, Hempstead, NY, pro se.

Hon. Andrew T. Baxter, United States Attorney for the Northern District of New York, William H. Pease, Esq., Assistant U.S. Attorney, of Counsel, Syracuse, NY.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court, in this *pro se* action filed by Donna Este–Green ("Plaintiff") to recover funds allegedly owed to her by the Social Security Administration, is a motion by Michael J. Astrue, Commissioner of Social Security ("Defendant") to dismiss the action pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction due to Plaintiff's failure to exhaust her administrative remedies before filing suit. (Dkt. No. 3.) Plaintiff has not opposed the motion. For the reasons set forth below, Defendant's motion is granted, and Plaintiff's Complaint is dismissed.

## I. BACKGROUND

### A. Procedural History

On or around May 27, 2009, Plaintiff brought this action in Small Claims Court, City of Ithaca, County of Tompkins ("Small Claims Court"), naming the Social Security Administration ("SSA") as Defendant. (Dkt. No. 1, Part 3.) Liberally construed, Plaintiff's Complaint alleges that the SSA wrongfully garnished her wages in the amount of five hundred seventy-one dollars ($571.00). (*Id.*) On June 24, 2009, the United States Attorney's Office for the Northern District of New York removed this case from the Small Claims Court, pursuant to the exclusive original jurisdiction of the District Court under 42 U.S.C. §§ 405(g)-(h) and 1383(c)(3), "because Plaintiff's claim appeared to relate to the payment of Social Security benefits to her as representative payee for the account of Albertina King." (Dkt. No. 3.)

### B. Relevant Facts

In 1999, Plaintiff had been acting as representative payee for Albertina King, who had been receiving Social Security benefits under Title II of the Act. (Dkt. No. 3.) In October 1999, the SSA issued an overpayment to Plaintiff on Albertina King's account. (*Id.*) In March 2001, the SSA and Plaintiff arranged a repayment plan pursuant to which Plaintiff agreed to repay the amount due the SSA in fifty-dollar installments beginning on April 15, 2001. (*Id.*) In October 2007, the SSA sent a letter to Plaintiff, in which the SSA stated the following: (1) Plaintiff had been overpaid as representative payee; (2) Plaintiff had the right to question

the decision about her overpayment and to ask that the SSA not recover the overpayment; (3) the SSA's past attempts to recover this overpayment had not been successful; (4) there are actions that the SSA can take to recover the money, including wage garnishment; (5) Plaintiff could prevent the wage garnishment by taking certain steps within sixty days of the letter, including repaying the debt, agreeing to a definite repayment plan and repaying the debt according to that plan, asking the SSA to review the finding that she owed the amount stated and that the SSA had the right to collect it, asking the SSA to waive collection of the overpayment, or asking the SSA to review its plan to collect up to fifteen percent of her disposable pay. (*Id.*) In addition, the letter informed Plaintiff of how she could repay the SSA. (*Id.*)

**\*2** Plaintiff returned this letter to the SSA, stating that the overpayment was not her fault. (*Id.*) Plaintiff indicated that she could not afford the amount owed, and that the money that she received was used for the payee's burial. (*Id.*) In March, 2008, Plaintiff spoke with a supervisor of the SSA by telephone and negotiated a repayment plan agreement for installments of twenty dollars ($20). (*Id.*) On April 29, 2008, the SSA sent Plaintiff a billing statement indicating her debt of five hundred seventy-one dollars ($571), and that a minimum payment of twenty dollars ($20) must reach the SSA by May 15, 2008. (*Id.*) On May 6, 2008, documentation issued in connection with the administrative garnishment of Plaintiff's wages was returned to the SSA from Plaintiff's employer, stating that Plaintiff was no longer employed there. (*Id.*)

On April 17, 2009, the SSA issued an order to Plaintiff's employer to garnish her wages. (*Id.*) Plaintiff's employer completed this order and returned it to the SSA. (*Id.*) On May 21, 2009, Plaintiff contacted the SSA to complain about the garnishment. (*Id.*) Shortly thereafter, Plaintiff filed this action with the Small Claims Court, and the Complaint was mailed to the SSA on May 27, 2009.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard Governing Motions to Dismiss for Lack of Subject Matter Jurisdiction

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000) (citing Fed.R.Civ.P. 12[b] [1] ). With regard to a challenge to a determination by the Social Security Administration, "[a]ny individual may seek judicial review under 42 U.S.C. § 405(g) 'after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy." *Diagnostic Cardioline Monitoring of New York, Inc. v. Leavitt,* 171 F. App'x. 374, 375 (2d Cir. March 17, 2006) (citing 42 U.S.C. § 405[g] ). "This final-decision-after-a-hearing requirement is critical to the federal court's grant of subject matter jurisdiction over these claims." *Leavitt,* 171 F. App'x. at 375 (citing *Weinberger v. Salfi,* 422 U.S. 749, 763–64 [1975] ). "In the absence of a final decision after a hearing, the federal court lacks subject matter jurisdiction to entertain the claim, and it must be dismissed." *Id.* (citation omitted).

### B. Standard Governing Unopposed Motions

"Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown." N.D.N.Y. L.R. 7.1(b)(3). Defendant's motion to dismiss was properly filed, and Plaintiff has failed to oppose them. Therefore, the Court must determine whether Defendant has met her burden to "demonstrate entitlement to the relief requested" under Local Rule 7.1(b)(3). [1] An inquiry into whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1(b)(3) is a more limited endeavor than a review of a contested motion. Specifically, under such an analysis, the movant's burden has appropriately been characterized as "modest." [2] This is because, as a practical matter, the burden requires only that the movant present an argument that is "facially meritorious." [3]

## III. ANALYSIS

 **\*3**  After carefully considering the file in this action, including Defendant's motion to dismiss and Plaintiff's Complaint, the Court finds that Defendant has met his lightened burden on his unopposed motion: he has demonstrated entitlement to the relief requested by presenting an argument that is facially meritorious. Even if the Court were to subject Defendant's motion to the more rigorous scrutiny appropriate for contested motions, the Court would find that Defendant has met his burden: Plaintiff failed to exhaust her administrative remedies prior to commencing this action. [4] As a result, the Court lacks subject matter jurisdiction over Plaintiff's claims, and her Complaint is dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Complaint is *DISMISSED.* The clerk is directed to enter judgment and close the case.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2473509

## Footnotes

1    *See also* Fed.R.Civ.P. 7(b)(1) (requiring motions to, *inter alia,* "state with particularity the grounds therefor").

2    *See, e.g., Ciaprazi v. Goord,* 02–CV0915, 2005 WL 3531464, at \*8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03–CV–0598, 2006 WL 3051792, at \*9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.), *Smith v. Woods,* 03–CV–0480, 2006 WL 1133247, at \*17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.); *see also Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109–1110 (N.D.N.Y.2003) (Munson, J.) (reviewing merely whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96–CV–1269, 1997 U.S. Dist. LEXIS 16345, at \*2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at \*2 (N .D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95–CV–989, 1996 U.S. Dist. LEXIS 15072, at \*3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

3    *See, e.g., Hernandez v. Nash,* 00–CV–1564, 2003 U.S. Dist. LEXIS 16258, at \*7–8, 2003 WL 22143709(N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b] [3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted]; *accord, Topliff v. Wal–Mart Stores East LP,* 04–CV–0297, 2007 U.S. Dist. LEXIS 20533, at \*28 & n. 43, 2007 WL 911891 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); *Hynes v. Kirkpatrick,* 05–CV–0380, 2007 U.S. Dist. LEXIS 24356, at \*5–6 & n. 2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04–CV–1311, 2007 U.S. Dist. LEXIS 26583, at \*28–29 & n. 40, 2007 WL 951447 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03–CV–0170, 2006 U.S. Dist. LEXIS 95065, at \*5 & n. 2, 2006 WL 3940592 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

4    As noted by Defendant in his motion to dismiss, because Plaintiff failed to follow the required SSA regulations before bringing this action, there is no final decision for the Court to review under 42 U.S.C. § 405(g).

2009 WL 2473509

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Sacks v. Deutsche Bank National Trust Company as..., Not Reported in Fed....

2016 WL 11480710

2016 WL 11480710
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Lois SACKS, Plaintiff,

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY, AS Indenture TRUSTEE FOR AMERICAN HOME
MORTGAGE INVESTMENT TRUST 2006-3, Mortgage-Backed Notes, Series 2006-3; American Home Mortgage;
AHM SV, Inc.; American Home Mortgage Servicing Inc.; Merscorp Holdings, Inc. f/k/a Mortgage Electronic
Registration Systems, Inc. f/k/a Merscorp, Inc.; Federal Deposit Insurance Corporation, and John Does 1-100,000
(Described as Anyone Having or Claiming Any Interest in the American Home Mortgage Investment Trust 2006-3,
Mortgage-Backed Notes, Series 2006-3 or Anyone Claiming Any Interest in All or Any Part of the Property
Located in Suffolk County, New York, Known as 72 Becky's Path, Bridgehampton, New York 11932), Defendants.
Ocwen Loan Servicing, LLC, as Successor in Interest to Homeward Residential, Inc., f/k/a American Home
Mortgage Servicing, Inc. as Servicer for Deutsche Bank National Trust Company, as Indenture Trustee for
American Home Mortgage Investment Trust 2006-3, Mortgage Backed Notes, Series 2006-3, Third-Party Plaintiff,

v.

Robert Sacks; Fidelity National Title Insurance Company; and Ira Kahn, Third-Party Defendants.

12-CV-6338 (LDW)(SIL)
|
Signed 08/15/2016

**Attorneys and Law Firms**

Jonathan S. Gould, Law Office of Jonathan Gould, Edward V. Sapone, Law Offices of Edward V. Sapone, Carl E. Person,
New York, NY, Lawrence John Semenza, Pro Hac Vice, Lawrence J. Semenza, Ltd., Las Vegas, NV, for Plaintiff/Third-Party
Defendants.

Diana M. Eng, Rachel Gail Packer, Jill Elizabeth Alward, Jonathan M. Robbin, Blank Rome LLP, Jennifer Neuner, Reed
Smith LLP, Kathleen McClure Massimo, Houser & Allison, Colin E. Kaufman, David Ryan Smith, Adam Leitman Bailey, P.C.,
Rosemary Q. Barry, Federal Deposit Insurance Corporation, New York, NY, for Defendants/Third-Party Plaintiff.

## REPORT AND RECOMMENDATION

STEVEN I. LOCKE, United States Magistrate Judge

**\*1** Presently before the Court, on referral from the Honorable Leonard D. Wexler, is Defendant/Third-Party Plaintiff Ocwen
Loan Servicing, LLC's ("Ocwen") Motion to Vacate Entry of Default (the "Motion to Vacate"), *see* Docket Entry ("DE") [57];
Third-Party Defendant Fidelity National Title Insurance Company's ("Fidelity") Motion in Partial Support of Ocwen's Motion to
Vacate Entry of Default (the "Fidelity Motion"), *see* DE [58]; Ocwen's Motion to Amend its Answer (the "Motion to Amend"),
*see* DE [71]; and Plaintiff Lois Sacks' ("Plaintiff" or "Sacks") Motion to Strike Ocwen's Motion to Amend (the "Motion to
Strike"), *see* DE [73]. Plaintiff opposes both the Motion to Vacate and the Fidelity Motion. *See* DE [61], [62]. For the reasons
set forth herein, the Court respectfully recommends that Plaintiff's motion to strike Ocwen's motion to amend be denied and
that Ocwen's motion to amend its Answer be granted. The Court further recommends that Ocwen's motion to vacate entry of
default be granted, and that Fidelity's motion in partial support thereof be denied as moot.

Sacks v. Deutsche Bank National Trust Company as..., Not Reported in Fed....

2016 WL 11480710

# I. BACKGROUND

### A. Relevant Facts

At all relevant times, and since at least 1998, Plaintiff owned the property located at 72 Becky's Path, Bridgehampton, New York (the "Subject Property") without any liens or encumbrances by any lender, bank, or judgment creditor. *See* Compl., DE [1], ¶¶ 7-9. Sometime in 2006, without Sacks' knowledge or authorization, an unknown person or persons negotiated a loan secured by a mortgage lien on the Subject Property (the "Mortgage") with non-party mortgage broker East Coast Capital Corp. ("East Coast"). *Id.* at ¶ 20. East Coast presented the proposed loan transaction to the American Brokers Conduit ("ABC") division of Defendant American Home Mortgage Corp. ("AHMC"), which created papers for a secured loan in the amount of $805,000, with an annual interest rate of 7.982%, and monthly payments of $2,589.20 to be made to AHMC (the "Note," and together with the Mortgage, the "Loan"). *Id.* at ¶ 21. Defendant AHM SV, Inc. ("AHM") was a mortgage servicing organization servicing mortgages owned by AHMC, including the Mortgage on the Subject Property. *Id.* at ¶¶ 16, 31. The Note and Mortgage are dated June 26, 2006, and were recorded in the Office of the Clerk for Suffolk County on July 27, 2006 in Liber 21348 at Page 179. *Id.* at ¶¶ 22, 29.

Although Plaintiff acknowledges that the Note and Mortgage are in her name, she claims that her signature was forged, and that two New York notaries public falsely attested that she signed the Note and Mortgage in their presence. *Id.* at ¶¶ 22-25. Sacks further alleges that she "was unaware of the documents, or the transaction, and (i) did not authorize the documents, (ii) did not participate in preparation or review of the documents, (iii) did not sign or receive copies of any of the documents, and (iv) did not receive any money or other consideration from the transaction or any of the participants therein." *Id.* at ¶ 24. Moreover, Plaintiff claims that she "never executed or granted any power of attorney for anyone to enter into the transaction with the Defendants or any other person concerning the [Subject Property]." *Id.* at ¶ 28.

**\*2** On August 12, 2009, Defendant Merscorp Holdings, Inc., f/k/a Mortgage Electronic Registration Systems, Inc., f/k/a Merscorp Inc. ("MERS"), as nominee for ABC, assigned the Note and Mortgage to Defendant Deutsche Bank National Trust Company as Indenture Trustee for American Home Mortgage Investment Trust 2006-3, Mortgage-Backed Notes, Series 2006-3 ("DBNTC"). *Id.* at ¶ 30. The assignment was recorded in the Office of the Clerk of Suffolk County on August 18, 2009 in Liber 21849 at Page 242. *Id.* From June 26, 2006 through February 1, 2009, an unknown person or persons made the monthly payments of $2,589.20 to AHM as the Loan's servicer. *Id.* at ¶ 31. However, in June 2009, AHM or AHMC issued a notice of default on the Loan.[1] *Id.* at ¶ 32.

On September 10, 2009, after the default remained uncured, DBTNC commenced a foreclosure action against Plaintiff in the Supreme Court of the State of New York, Suffolk County, under Index No. 35515/2009 (the "New York Foreclosure Action"). *Id.* at ¶ 33. Thereafter, on or about March 21, 2010, Sacks commenced an action against a separate DBNTC trust entity in the Supreme Court of the State of New York, New York County, bearing index No. 103295/2010, seeking to prevent the foreclosure of the property located at 200 East End Avenue, New York, New York (the "New York Property"). *See* Countercl., DE [12], ¶ 6. In that action, on or about August 9, 2010, Plaintiff executed an affidavit stating that the power of attorney used to execute mortgages on both the Subject Property and New York Property was fraudulent. *Id.* at ¶ 7. When DBNTC learned of Sacks' affidavit in the New York Action, it elected to discontinue the New York Foreclosure Action described above. *Id.* at ¶ 8. According to Sacks, after her attorney "explained the situation to counsel for Deutsche Bank, a stipulation of discontinuance was filed and on September 27, 2010 an Order of Discontinuance" was entered in the New York Foreclosure Action. *See* Compl. ¶ 34.

### B. Procedural History

#### 1. Plaintiff's Complaint

By way of Complaint dated December 26, 2012, Plaintiff commenced this action against DBTNC, AHMC, AHM, MERS, the Federal Deposit Insurance Corporation ("FDIC"), and John Does 1-100,000 (collectively, "Defendants"), seeking: (i) to quiet

Sacks v. Deutsche Bank National Trust Company as..., Not Reported in Fed....

2016 WL 11480710

Case 9:19-cv-00609-DNH-ML    Document 95    Filed 01/10/24    Page 50 of 128

title to the Subject Property pursuant to N.Y. Real Prop. Acts. Law § 1521(1); (ii) to quiet title to the Subject Property pursuant to equitable considerations; and (iii) a declaration that the Note and Mortgage are invalid pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq. See* DE [1]. [2] According to Sacks, the Note, Mortgage, and various related documents "are replete with indications that [they] have been forged, and that the transaction was authorized by Defendants without adherence to reasonable investment, lending and banking standards." Compl. ¶ 35. Plaintiff further alleges that "Defendants had knowledgeable intent to create a fraudulent mortgage." *Id.* at ¶ 36. Relevant for purposes of the instant motion, DBNTC was served with the Summons and Complaint in this action on January 10, 2013 by delivering a copy thereof to a general agent located at 60 Wall Street, New York, New York. *See* DE [6].

### 2. Ocwen's Answer, Counterclaim, and Third-Party Complaint

On December 12, 2014, Ocwen filed an Answer, Affirmative Defenses, Counterclaim, and Third Party Complaint in its own name "as successor in interest to Homeward Residential, Inc., f/k/a American Home Mortgage Servicing, Inc., as Servicer for Deutsche Bank National Trust Company as Indenture Trustee for American Home Mortgage Investment Trust 2006-3, Mortgage-Backed Notes, Series 2006-3." *See* DE [12]. Relevant here, in its counterclaims against Plaintiff, Ocwen alleges that both the Note and Mortgage were signed by Plaintiff's son, Robert Sacks, as her "attorney in fact" pursuant to a power of attorney that was executed in order to effectuate the transaction. Countercl. ¶ 2. Ocwen further alleges that notary public Ira L. Kahn attested that Sacks was present and executed the power of attorney in his presence. *Id.* at ¶ 3.

**\*3** By way of Third-Party Complaint, filed contemporaneously with Ocwen's Answer, Ocwen commenced a third-party action against Fidelity, Robert Sacks, and Ira Kahn. *See* Third-Party Complaint ("TPC"), DE [12]. As against Fidelity, Ocwen asserts causes of action for breach of contract and bad faith breach of contract. *Id.* at ¶¶ 38-48. According to Ocwen, Fidelity provided title insurance with respect to the Mortgage in favor of DBNTC as successor in interest to AHM, but refuses to provide coverage or a defense thereunder in connection with this litigation. *Id.* at ¶ 2. As against Robert Sacks, Ocwen asserts causes of action for common law fraud, breach of contract, and unjust enrichment. *Id.* at ¶¶ 49-67. As against Ira Kahn, Ocwen asserts a cause of action for common law fraud. *Id.* at ¶¶ 68-74. Ocwen also asserts counterclaims against Plaintiff for breach of contract, account stated, unjust enrichment, equitable mortgage, fraudulent transfer, and declaratory judgment. Countercl. ¶¶ 12-32.

### 3. Entry of Default and the Instant Motions

On December 23, 2014, Plaintiff rejected Ocwen's Answer as untimely and improper "to the extent that Ocwen purport[ed] to respond for any defendant other than its alleged entity predecessors, American Home Mortgage Servicing, Inc. and Homeward Residential, Inc. (assuming they are entity predecessors and not servicing-rights predecessors)." *See* DE [18]. Sacks further wrote that, "Ocwen has no right to appear instead of Named Defendants [Deutsche Bank] and Merscorp Holdings, Inc. or for Homeward and American Home Servicing if they are merely loan servicing predecessors to Ocwen." *Id.* According to Plaintiff, "[i]t seems possible that the pleading filed by Ocwen is null and void because neither Ocwen nor any predecessor entity to Ocwen is a defendant in this action." *Id.* Accordingly, the same day, Sacks requested that default be entered against DBNTC and AHM. *See* DE [17]. On January 6, 2015, the Clerk of Court entered default against both DBNTC and AHM. *See* DE [21].

On October 23, 2015, Ocwen filed the instant motion to set aside entry of default pursuant to Fed. R. Civ. P. 55(c). *See* DE [57]. According to Ocwen, good cause exists to set aside default because its late pleading was not willful, it appeared and answered the Complaint immediately upon learning of the pendency of this action, and it has a meritorious defense and counterclaims. *See* Memorandum of Law in Support of Motion to Set Aside Clerk's Entry of Default Pursuant to Rule 55(c) ("Ocwen's Mem."), DE [57-1], at 1. Ocwen further argues that "the default is prejudicing DBNTC's litigation position and complicating settlement negotiations." *Id.* In opposition, Plaintiff argues, among other things, that the six-year statute of limitations applicable to foreclosure actions has expired, and that DBNTC is therefore precluded from contesting this quiet title action. *See* Memorandum of Law in Opposition to Motion to Vacate Default ("Pl.'s Opp'n"), DE [61-11], at 2.

Case 9:19-cv-00609-DNH-ML    Document 95    Filed 01/10/24    Page 51 of 128

Sacks v. Deutsche Bank National Trust Company as..., Not Reported in Fed....

2016 WL 11480710

Also on October 23, 2015, Fidelity filed a Motion in Partial Support of Ocwen's Motion to Vacate the Certificate of Default. *See* DE [58]. Pursuant to a Loan Policy of Title Insurance bearing Policy Number G47-Z172452 (the "Title Policy"), Fidelity provided title insurance to the Mortgage. *See* Declaration of Colin E. Kaufman in Partial Support of a Motion by Ocwen Loan Servicing, LLC to Vacate a Certificate of Default (the "Kaufman Decl."), DE [59], ¶ 10. The Title Policy provides in relevant part, "coverage is provided, subject to the Exceptions from Coverage, Exclusions from Coverage, Conditions and Stipulations of the policy, in the event of 'loss or damage ... sustained or incurred by the insured by reason of: ... the invalidity or unenforceability of the insured mortgage.' " *Id.* at ¶ 15. According to Fidelity, "if the mortgage is vacated because it is unenforceable on the basis of fraud, it may trigger coverage under the Title Policy." *Id.* Fidelity argues that DBNTC possesses meritorious defenses to Plaintiff's claims, including statute of limitations, laches, unclean hands, and estoppel. *Id.* at ¶¶ 3, 6. In opposition to the Fidelity Motion, Plaintiff argues, among other things, that: (i) Fidelity lacks standing because it is not protecting its own interests; (ii) Fidelity has failed to comply with rules regarding submission of *amicus* motions; and (iii) DBNTC does not have meritorious defenses to Plaintiff's claims. *See* Memorandum of Law in Opposition to Third-Party Defendant Fidelity's Motion to Support Third-Party Plaintiff Ocwen's Motion to Vacate Default ("Pl.'s Fidelity Opp'n"), DE [62-5], at 6-15.

**\*4** On January 1, 2016, Ocwen filed a motion to amend its Answer. *See* DE [72]. According to Jill Alward, Esq., counsel for Ocwen, "although Ocwen does have the authority to take action on behalf of DBNTC pursuant to the Servicing Agreement, the Answer should have been filed directly in the name of DBNTC, and not in the name of Ocwen on behalf of DBNTC." *See* Declaration of Jill E. Alward in Support of Ocwen and DBNTC's Motion to Amend Answer, Counterclaim, and Third Party Complaint (the "Alward Decl."), DE [72-4], ¶ 9. Accordingly, "[t]he filing of the Answer (including the Third-Party Complaint) in Ocwen's name on behalf of DBNTC was an unintended error given the limited information available at the time, and the urgency of filing a responsive pleading as quickly as possible, due to the time that had passed since the filing of the Complaint." *Id.* at ¶ 10. Rather than opposing Ocwen's Motion to Amend, Plaintiff filed a motion to strike the motion on the grounds that: (i) it was not made by letter motion, exceeds three pages, and "is called a motion instead of a Letter Motion"; (ii) does not adhere to this Court's Individual Rule IV(C) requiring that motions be filed once fully briefed; (iii) is an attempt to undermine determination of the Motion to Vacate and make additional issues available to the Court; and (iv) provides no grounds for vacating the default. *See* DE [73].

## II. DISCUSSION

For the reasons set forth herein, the Court respectfully recommends that Plaintiff's motion to strike Ocwen's motion to amend be denied and that Ocwen's motion to amend its Answer be granted. The Court further recommends that Ocwen's motion to vacate entry of default be granted, and that Fidelity's motion in partial support thereof be denied as moot. Because Plaintiff contends that DBNTC remains in default as a result of Ocwen's inability to act on DBNTC's behalf, the Court first addresses Ocwen's Motion to Amend.

### A. Ocwen's Motion to Amend

Motions to amend pleadings are governed by Fed. R. Civ. P. 15, which provides that "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also Amaya v. Roadhouse Brick Oven Pizza, Inc.*, 285 F.R.D. 251, 253 (E.D.N.Y. 2012) ("A court should freely give leave when justice so requires, and such leave is in the court's discretion.") (internal quotation omitted). Courts interpret Fed. R. Civ. P. 15 liberally. *See Assam v. Deer Park Spring Water, Inc.*, 163 F.R.D. 400, 404 (E.D.N.Y. 1995) ("Federal Rule of Civil Procedure 15(a) dictates that motions to amend complaints are liberally granted absent a good reason to the contrary....."). Leave to amend a pleading should only be denied "if there is delay, bad faith, futility, or prejudice to the non-moving party." *Hosking v. New World Mortg., Inc.*, 602 F. Supp. 2d 441, 445 (E.D.N.Y. 2009) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962) ). The party opposing a motion to amend bears the burden of establishing that the amendment should be denied. *See Joinnides v. Floral Park–Bellerose Union Sch. Dist.*, No. 12-CV-5682, 2015 WL 1476422, at *9 (E.D.N.Y. Mar. 31, 2015) ("With respect to the Rule 15(a) factors, '[t]he party opposing the motion for leave to amend has the burden of establishing that an amendment would be prejudicial or futile.' ") (quoting *Cummings–Fowler v. Suffolk Cty. Cmty. Coll.*, 282 F.R.D. 292, 296 (E.D.N.Y. 2012) ). Ultimately, "[t]he decision to allow such leave [to

Sacks v. Deutsche Bank National Trust Company as..., Not Reported in Fed....

2016 WL 11480710

amend] is firmly within the discretion of the district court." *Konrad v. Epley*, No. 12-CV-4021, 2013 WL 6200009, at *20 (E.D.N.Y. Nov. 25, 2013).

In the Second Circuit, "[m]ere delay, ... absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981). Nevertheless, "[w]here a significant period of time has passed prior to filing a motion to amend ... the moving party must provide an explanation for the delay." *Agerbrink v. Model Serv. LLC*, ––– F. Supp. 3d ––––, 2016 WL 93865, at *2 (S.D.N.Y. Jan. 7, 2016); *see also Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) ("[T]he longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice.").

Here, Plaintiff has failed to establish that the proposed amendment would be prejudicial or futile, or that Ocwen acted in bad faith or with undue delay such that its Motion to Amend should be denied. When Ocwen filed its December 12, 2014 Answer, it did so under the name "Ocwen Loan Servicing, LLC as successor in interest to Homeward Residential, Inc. f/k/a American Home Mortgage Servicing, Inc., as Servicer for Deutsche Bank National Trust Company, as Indenture Trustee for American Home Mortgage Investment Trust 2006-3, Mortgage-Backed Notes." *See* DE [12]. According to Alward, "it appeared appropriate to file the Answer in the name of Ocwen as servicer, on behalf of DBNTC, with the intent being that this would serve as a responsive pleading for DBNTC." Alward Decl. ¶ 8. However, in communicating with DBNTC with respect to Ocwen's Motion to Vacate, Alward "was informed that although Ocwen does have the authority to take action on behalf of DBNTC pursuant to the Servicing Agreement, the Answer should have been filed directly in the name of DBNTC, and not in the name of Ocwen on behalf of DBNTC." *Id.* at ¶ 9. Accordingly, Ocwen seeks to amend its Answer to reflect that it is filed directly in DBNTC's name and to correct "several other inadvertent errors in the Answer." *Id.* at ¶¶ 9 n.1, 15, 16. These facts are sufficient to establish that Ocwen has not acted with undue delay or in bad faith in moving to amend its Answer. *See, e.g., Agerbrink*, 2016 WL 93865, at *2 (granting motion to amend where the defendant failed to show that "the plaintiff unduly delayed or acted with a dilatory motive"); *Alexander Interactive, Inc. v. Adorama, Inc.*, No. 12 Civ. 6608, 2014 WL 113728, at *2 (S.D.N.Y. Jan. 13, 2014) (granting motion to amend where the plaintiff offered a credible explanation for its delay in seeking to file an amended complaint).

**\*5** Moreover, amendment is appropriate based on the language of a December 28, 2006 Servicing Agreement (the "Servicing Agreement"), which establishes Ocwen's obligations as Servicer of the Loan. *See* Declaration of Ronaldo Reyes in Support of Ocwen's Motion to Amend (the "Reyes Decl."), DE [72-1], Ex. B. Relevant here, the Servicing Agreement provides that "[t]he Servicer shall service, or take such actions as are necessary to ensure, the servicing and administration of the Mortgage Loans and any REO Property in accordance with this Servicing Agreement and its normal servicing practices...." *See* Servicing Agreement § 3.01. Moreover, "[t]he Servicer shall ... foreclose upon or otherwise comparably convert the ownership of properties securing any Mortgage Loans that come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments pursuant to Section 3.06 ...." *Id.* at § 3.13(a). To that end, the Servicing Agreement further provides that "[t]he Servicer shall foreclose ... on any Mortgaged Property in the name of the Indenture Trustee for the benefit of the Noteholders." [3] *Id.* at § 3.13(b). Indeed, it is well-established that a trustee may act through a special servicer where servicing agreements allow for such representative actions. *See, e.g., Bank of New York Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc.*, No. 11 Civ. 505, 2011 WL 2610661, at *10 (S.D.N.Y. June 27, 2011) (allowing for amendment of pleading to identify the correct special servicer of a trust); *see also Torchlight Loan Servs., LLC v. Column Fin., Inc.*, No. 11 Civ. 7426, 2012 WL 3065929, at *4 (S.D.N.Y. July 25, 2012) (observing that the special servicer was "entitled to bring litigation ... on behalf of the Trustee"). Accordingly, the proposed amendment is appropriate.

In opposition to Ocwen's Motion to Amend, Plaintiff does not argue that she would be prejudiced or that Ocwen acted in bad faith or with undue delay. Indeed, rather than opposing the merits of Ocwen's Motion to Amend, Plaintiff filed a Motion to Strike on the grounds that "the Motion to Amend was not made by letter motion," because it exceeds three pages in length, and because it did not conform to the Court's "bundle rule." *See* DE [73] ¶¶ 1, 2. As an initial matter, this Court's Individual Rule IV(A) provides that, "[a]lthough parties are encouraged to make discovery and other non-dispositive motions by letter pursuant to Local Rule 37.3, such motions may be made on notice pursuant to Local Civil Rule 6.1...." *See* Individual Rule of Practice

IV(A). Where a motion is made on notice, memoranda of law are limited to twenty-five pages. *Id.* Accordingly, Plaintiff's argument that the motion to amend should be stricken because it was not made by letter motion and exceeds three pages lacks merit. Moreover, it is well-established that courts have "broad discretion to determine whether to overlook a party's failure to comply with local rules." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 108 n.2 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) ). In any event, because nothing before the Court supports an inference that Plaintiff would be prejudiced if Ocwen were allowed to amend its Answer, Plaintiff fails to satisfy her burden in demonstrating that the Motion to Amend should be denied.

Based on the foregoing, the Court recommends that Plaintiff's motion to strike be denied, and that Ocwen's motion to amend be granted.

### B. Ocwen's Motion to Vacate Default

Pursuant to Fed. R. Civ. P. 55, "[t]he court may set aside an entry of default for good cause...." Fed. R. Civ. P. 55(c); *see also Grant v. City of New York*, 145 F.R.D. 325, 326 (S.D.N.Y. 1992) ("In accordance with Rule 55(c), the court may set aside an entry of default for good cause shown.") (internal quotation omitted). In determining whether good cause exists to vacate an entry default, courts consider "whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented." *Meehan v. Snow*, 652 F.2d 274, 277 (2d Cir. 1981); *see also Addison v. Reitman Blacktop, Inc.*, 272 F.R.D. 72, 77 (E.D.N.Y. 2010) ("In determining whether good cause exists to set aside an entry of default, courts should consider: (1) the willfulness of the default; (2) the existence of a meritorious defense; and (3) the level of prejudice that the non-defaulting party may suffer should relief be granted.") (internal quotations omitted). It is well established that "default judgments are disfavored," and that "[a] clear preference exists for cases to be adjudicated on the merits." *Pecarsky v. Galaxiworld.com, Ltd.*, 249 F.3d 167, 171 (2d Cir. 2001). Therefore, in deciding a motion to vacate entry of default, "all doubts must be resolved in favor of the party seeking relief...." *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005); *see also Cumberbatch v. Emstar Pizza, Inc.*, No. 13-CV-7170, 2014 WL 5682513, at *4 (E.D.N.Y. Nov. 4, 2014) ("[I]n light of the 'oft-stated preference for resolving disputes on the merits,' defaults are 'generally disfavored,' and doubts should be resolved in favor of the defaulting party.") (quoting *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95-96 (2d Cir. 1993) ). On a motion to vacate, "the defaulting party bears the burden of proof." *Time Warner Cable of New York v. Cabada*, No. 97-CV-4172, 1997 WL 797533, at *1 (E.D.N.Y. Dec. 31, 1997).

**\*6** According to Ocwen, good cause exists to vacate entry of default against DBNTC because "DBNTC's late pleading was not willful" and because "DBNTC has a meritorious defense to Plaintiff's claims seeking to extinguish the Mortgage at issue." *See* Ocwen's Mem. at 1. In opposition, in addition to arguing that DBNTC lacks meritorious defenses to Plaintiff's claims, Plaintiff further contends that "Ocwen submitted a 16-page memorandum of law, but no declaration, affirmation or affidavit on the two factual issues of (1) whether the default was willful or negligent, and (2) whether the Plaintiff would be prejudiced if the default were vacated." *See* Pl.'s Opp'n at 6-7. However, the Court notes that, in a July 9, 2015 letter, Plaintiff wrote that she "would agree to vacating the default as to the Plaintiff's claim, but only upon an evidentiary showing ... by DBNTC that it has a meritorious defense against the Plaintiff's claim" and that she would "waive the other requirements normally associated with vacating a default...." *See* DE [45]. Nevertheless, and even assuming Plaintiff had not agreed to waive the requirement that Ocwen establish willfulness and prejudice, for the reasons that follow, the Court recommends that Ocwen's motion to vacate be granted and that default against DBNTC be vacated.

### 1. Whether DBNTC Acted Willfully

A finding of willfulness is appropriate where "there is evidence of bad faith" or that a defendant's default is the result of "egregious or deliberate conduct." *Holland v. James*, No. 05 Civ. 5346, 2008 WL 3884354, at *2 (S.D.N.Y. Aug. 21, 2008). In contrast, "[n]egligence or carelessness does not amount to willfulness." *Argus Research Grp., Inc. v. Argus Sec., Inc.*, 204 F. Supp. 2d 529, 531 (E.D.N.Y. 2002); *see also Car-Freshner Co. v. Air Freshners, Inc.*, No. 7:10-CV-1491, 2012 WL 3294948,

Sacks v. Deutsche Bank National Trust Company as..., Not Reported in Fed....

2016 WL 11480710

at *4 (N.D.N.Y. Aug. 10, 2012) ("[W]illfulness within this Circuit does not include careless or negligent errors even when the negligence is gross."). Where a litigant's conduct is egregious, "the court may find a default to have been willful where the conduct ... was not satisfactorily explained." *Sec. & Exch. Comm'n v. McNulty*, 137 F.3d 732, 738 (2d Cir. 1998). Courts generally "resolve any doubt about [a defendant's] willfulness in [the defendant's] favor." *Raheim v. New York City Health & Hosps. Corp.*, No. 96 Civ. 1045, 2007 WL 2363010, at *3 (E.D.N.Y. Aug. 14, 2007).

**\*7** Here, Ocwen has satisfied is burden in establishing that its conduct was not willful. According to Ocwen, "[a]t bottom, DBNTC was simply unaware of this lawsuit or of its time to respond until Plaintiff settled the New York Action with another DBNTC entity." *See* Ocwen's Mem. at 6. Although it is undisputed that "Plaintiff served DBNTC in the lobby of Deutsche Bank's offices at 60 Wall Street" on January 10, 2013, Ocwen asserts that "[i]t appears that Plaintiff made no effort to serve DBNTC's registered agent." *Id.*; *see also* DE [6]. To that end, according to Alward, she "was not made aware of the pendency of this litigation until November 24, 2014" when she received an email from counsel to another DBNTC entity informing her "of a pending complaint in the Eastern District of New York, which was filed in December of 2012, and in which no default had been entered." *See* Alward Decl. ¶ 4. Alward "immediately notified Ocwen and began preparing a responsive pleading on behalf of DBNTC," which was filed on December 12, 2014. *Id.* at ¶ 6; *see also* DE [12]. Although it is unclear based on the record before the Court as to why Ocwen did not take action earlier, "when there is a factual dispute regarding willfulness, the court should resolve it in favor of the party moving to set aside the default." *Pennacchio v. Powers*, No. 05-CV-985, 2010 WL 3767141, at *4 (E.D.N.Y. Aug. 9, 2010); *see also Flanagan v. Modern Concrete Corp.*, No. 07-CV-499, 2008 WL 2559377, at *3 (E.D.N.Y. June 23, 2008) ("Under the lenient standard of Rule 55(c), the Court must resolve any doubt about defendants' willfulness in favor of the defendants."). In any event, because there is no evidence that the delay in responding was strategic or otherwise in bad faith, DBNTC's conduct was not willful. *See Murray Eng'g, P.C. v. Windermere Props. LLC*, No. 12 Civ. 52, 2013 WL 1809637, at *5 (holding that the defendant did not act willfully where its "failure to answer was not a deliberate strategic decision"); *Pall Corp. v. Entegris, Inc.*, 249 F.R.D. 48, 56 (E.D.N.Y. 2008) (holding that the defendant did not act willfully in failing to answer where "it [was] clear that the failure to respond ... occurred as a result of an inadvertent mistake by [the defendant's] outside counsel").

In opposition, relying on *Frost Belt Int'l Recording Enters., Inc. v. Cold Chilln' Records*, 758 F. Supp. 131 (S.D.N.Y. 1990), Plaintiff argues, among other things, that "[t]he lack of any affidavit explaining the circumstances of a default judgment was sufficient for denial of a motion to vacate the default judgment." *See* Pl.'s Opp'n at 7. However, unlike *Frost Belt*, in which the defendant "fail[ed] to submit an affidavit from a single person with personal knowledge of the circumstances of its default," 758 F. Supp. at 135, as discussed above, Alward's declaration adequately explains the circumstances that led to DBNTC's failure to respond to the Complaint. [4] *See* Alward Decl. ¶¶ 2-8. Therefore, Plaintiff's contention that DBNTC's "[f]ailure to defend was obviously willful" lacks merit. *See* Pl.'s Opp'n at 7.

Based on the foregoing, the Court concludes that Ocwen did not act willfully in failing to answer Plaintiff's Complaint.

### 2. Whether Plaintiff Will Be Prejudiced

It is well-established that "[d]elay alone does not establish prejudice." *Enron Oil Corp.*, 10 F.3d at 98. Rather, a plaintiff must demonstrate "that delay will result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion." *Davis v. Musler*, 713 F.2d 907, 916 (2d Cir. 1983) (internal quotation omitted); *see also Ward v. Ramkalawan*, No. 11-CV-4295, 2013 WL 1149108, at *5 (E.D.N.Y. Feb. 11, 2013) ("Prejudice results when delay causes the loss of evidence, create[s] increased difficulties of discovery or provide[s] greater opportunity for fraud and collusion."). Moreover, "costs incurred with respect to countering a defendant's motion to vacate do not constitute prejudice." *Gesualdi v. Gayle Bard Landscapes, Inc.*, No. 10-CV-5762, 2011 WL 2457882, at *3 (E.D.N.Y. May 31, 2011) (Report and Recommendation), *adopted by* 2011 WL 2432936 (E.D.N.Y. June 16, 2011); *see also Pennacchio*, 2010 WL 3767141, at *4 ("Litigation costs, however, are insufficient evidence of prejudice in this context....").

Here, Ocwen has satisfied its burden in demonstrating that Plaintiff will not be prejudiced by the delay in answering the Complaint. According to Ocwen, and Plaintiff does not dispute, after commencing this action, "Plaintiff took no action to move this litigation forward for nearly two years." Ocwen's Mem. at 10. Indeed, after filing affidavits of service in January and February 2013, the docket reveals no meaningful activity in this action until Ocwen filed its Answer on December 12, 2014.[5] *See* DE [12]. To that end, Plaintiff did not actually seek entry of default until *after* Ocwen filed its Answer. *See* DE [17]. Where, as here, the plaintiff's own inactivity contributes to a delay, a finding of prejudice is inappropriate. *See, e.g., Linkov v. Golding*, No. 12-CV-2722, 2013 WL 5922974, at *5 (E.D.N.Y. Oct. 31, 2013) ("Plaintiff cannot claim prejudice from a delay to which he contributed."); *Flanagan*, 2008 WL 2559377, at *4 (holding that the plaintiff was not prejudiced where "[n]o action was taken for eight months"); *Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 993 (E.D.N.Y. 1995) (holding that the plaintiff was not prejudiced where discovery had not commenced).

**\*8** In opposition, Plaintiff asserts that "vacating the default would require Sacks to contend with an entirely different case from the one represented by the Complaint and the belated Answer." Pl.'s Opp'n at 12. To that end, Sacks argues that the cost to her "would be substantial, probably in excess of $175,000 after all depositions, transcripts, trials, appeals and attorneys' fees, in comparison to a cost of about $35,000 for a case based upon the Complaint and belated answer." *Id.* However, the cost of litigating an action is "insufficient evidence of prejudice," *see Pennacchio*, 2010 WL 3767141, at *4, and Plaintiff does not claim that the delay "will result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion." *Davis*, 713 F.3d at 916. Therefore, Sacks has not demonstrated that she will be prejudiced if the default is vacated.

Based on the foregoing, the Court concludes that Plaintiff will not be prejudiced by DBNTC's delay in answering the Complaint.

3. Whether DBNTC Has Meritorious Defenses To Plaintiff's Claims

Finally, with respect to the existence of meritorious defenses, "the defendant 'need not conclusively establish the validity of the defense(s) asserted' but need only present evidence of facts that, 'if proven at trial, would constitute a complete defense.' " *Schlatter v. China Precision Steel, Inc.*, 296 F.R.D. 258, 261 (S.D.N.Y. 2013) (quoting *Davis*, 713 F.2d at 916). However, "[a] defendant seeking to vacate an entry of default must present some evidence beyond conclusory denials to support his defense." *Enron Oil Corp.*, 10 F.3d at 98. Nevertheless, establishing a meritorious defense "is not a stringent burden." *U.S. Commodity Futures Trading Comm'n v. Musorofiti*, No. 05-CV-3917, 2007 WL 2089388, at *4 (E.D.N.Y. July 17, 2007).

Here, Ocwen has satisfied its burden in establishing that meritorious defenses exist such that the default should be vacated. Relevant for purposes of the instant motion, in its Answer, Ocwen asserts an affirmative defense claiming that "Plaintiff's claims are barred by the Doctrine of Unclean Hands." *See* DE [12]; Ocwen's Mem. at 9. According to Ocwen, Sacks paid the legal fees that her son incurred in relation to a criminal prosecution and civil actions concerning the allegedly fraudulent acquisitions of numerous mortgages on property, including the Mortgage on the Subject Property presently at issue. *See* Ocwen's Mem. at 7-8. Moreover, "regular payments were made on the Mortgage for nearly three years, while Robert Sacks was involved in a fraudulent scheme that led to his indictment." *Id.* at 8. In Plaintiff's affidavit that ultimately led to the dismissal of the New York Foreclosure Action described above, "Plaintiff swore that any power of attorney executed in favor of Robert Sacks was fraudulent" and that "she had no knowledge of Robert Sacks' activities until he was indicted in February 2010." *Id.* According to Ocwen, it "should have the opportunity to challenge these statements and to determine whether the monthly payments made from 2006 to the time of default in 2009 were made with funds traceable to Plaintiff." *Id.* Ocwen further argues that, if the funds used to make payments under the Mortgage on the Subject Property are traceable to Plaintiff, and "if DBNTC establishes that Plaintiff paid for legal defense of Robert Sacks, this indicates that Plaintiff had knowledge of the scheme to defraud various lenders, including DBNTC, by mortgaging various properties owned by Plaintiff." *Id.* The evidence before the Court is sufficient to support an inference that DBNTC has a meritorious defense against Plaintiff's Complaint. *See Schlatter*, 296 F.R.D. at 261 (holding that a meritorious defense existed where the plaintiffs "submitted nothing to counter [the defendant's] arguments on this point"); *Gonzalez v. City of New York*, 104 F. Supp. 2d 193, 197 (S.D.N.Y. 2000) (holding that the "proffered a meritorious

Sacks v. Deutsche Bank National Trust Company as..., Not Reported in Fed....

2016 WL 11480710

Case 9:19-cv-00609-DNH-ML    Document 95    Filed 01/10/24    Page 56 of 128

defense" where it presented "evidence of facts that, 'if proven at trial, would constitute a complete defense' ") (quoting *Enron Oil Corp.*, 10 F.3d at 98).

**\*9** In opposition, Plaintiff argues that DBNTC is precluded from contesting Plaintiff's quiet title action because of the six-year statute of limitations. *See* Pl.'s Opp'n at 2. According to Plaintiff, when the statute of limitations expired on September 10, 2015, "Deutsche Bank had not served an answer (with or without foreclosure counterclaims) in the instant action." *Id.* However, Ocwen filed the Answer in this action on December 12, 2014, in which it asserts counterclaims against Plaintiff for breach of contract, account stated, unjust enrichment, equitable mortgage, fraudulent transfer, and declaratory judgment. *See* Countercl. ¶¶ 12-32. Therefore, Plaintiff's contention that DBNTC does not have meritorious defenses fails.

Based on the foregoing, the Court concludes that DBNTC has meritorious defenses to Plaintiff's Complaint. Accordingly, having also concluded that DBNTC did not act willfully and that Plaintiff will not be prejudiced, the Court recommends that Ocwen's motion to vacate entry of default be granted.

### C. The Fidelity Motion

In Fidelity's motion in partial support of Ocwen's Motion to Vacate, Fidelity argues that "DBNTC possesses at least four meritorious defenses to Plaintiff's Complaint": (i) statute of limitations, (ii) laches, (iii) unclean hands, and (iv) estoppel. *See* Kaufman Decl. ¶ 6. According to Fidelity, it "takes no position on whether DBNTC's default is otherwise excusable." *See* Memorandum of Law in Partial Support of a Motion by Ocwen to Vacate a Certificate of Default, DE [60], at 1. Plaintiff opposes the Fidelity Motion on the grounds that Fidelity: (i) lacks standing because it is not protecting its own interests; (ii) has failed to comply with rules regarding submission of *amicus* motions; and (iii) has failed to establish that Ocwen has meritorious defenses to Plaintiff's Complaint. *See* Pl.'s Fidelity Opp'n at 6-14. However, having recommended that Ocwen's motion to vacate be granted based on Ocwen's own submissions, the Court need not address Fidelity's arguments in partial support thereof. *See, e.g., Piscitello v. Giannetti*, No. 15-CV-3989, 2016 WL 1559156, at *8 (E.D.N.Y. Apr. 18, 2016) (denying as moot a motion to vacate entry of default where resolution of another motion rendered the motion to vacate academic); *Convolve, Inc. v. Compaq Comp. Corp.*, No. 00 Civ. 5141, 2007 WL 415145, at *3 (S.D.N.Y. Feb. 7, 2007) (denying as moot a motion to strike an affidavit where the affidavit was not relied upon by the court). Therefore, the Court recommends that the Fidelity Motion be denied as moot.

### III. CONCLUSION

Based on the foregoing, the Court respectfully recommends that Plaintiff's motion to strike Ocwen's motion to amend be denied and that Ocwen's motion to amend its Answer be granted. The Court further recommends that Ocwen's motion to vacate entry of default be granted, and that Fidelity's motion in partial support thereof be denied as moot.

### IV. OBJECTIONS

A copy of this Report and Recommendation is being sent to counsel for all parties by electronic filing on the date below. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days. *See* 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6(a) and 6(d). Failure to file objections within this period waives the right to appeal the District Court's Order. *See Ferrer v. Woliver*, No. 05-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

### All Citations

Not Reported in Fed. Supp., 2016 WL 11480710

Sacks v. Deutsche Bank National Trust Company as..., Not Reported in Fed....

2016 WL 11480710

## Footnotes

1       Plaintiff does not specify whether AHM or AHMC issued the notice of default. *See* Compl. ¶ 32.

2       Pursuant to a March 6, 2013 Notice of Voluntary Dismissal, FDIC was dismissed and is no longer a party to this action. *See* DE [10].

3       Although the Servicing Agreement and Indenture Agreement, provide that the "Servicer" is defined as American Home Mortgage Servicing, Inc., *see* Indenture Agreement Appx. A; Servicing Agreement § 1.01, according to DBNTC Vice President Ronaldo Reyes, AHMSI changed its name to Homeward Residential, Inc. on May 29, 2012, and, on or about April 25, 2013, Homeward Residential, Inc. transferred servicing for the loans in the Trust to Ocwen. *See* Reyes Decl. ¶¶ 6, 7.

4       To the extent that Alward's declaration was not submitted with Ocwen's initial moving papers, it is not unreasonable to conclude that Ocwen had relied on Plaintiff's representation in its July 9, 2015 letter to the Court that it would not challenge the issues of willfulness or prejudice. *See* DE [45].

5       Plaintiff filed a Notice of Voluntary Dismissal dismissing Defendant Federal Deposit Insurance Corporation on March 6, 2013. *See* DE [10]. The docket reveals no further activity until Ocwen filed a Notice of Appearance and its Answer on December 12, 2014. *See* DE [11], [12].

---

**End of Document**                                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00609-DNH-ML    Document 95    Filed 01/10/24    Page 58 of 128
JUUL Labs, Inc. v. Kingston Snack Shop, Inc., Not Reported in Fed. Supp. (2022)
2022 WL 21309984

2022 WL 21309984
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

JUUL LABS, INC., Plaintiff,

v.

KINGSTON SNACK SHOP, INC., Defendant.

1:21-CV-1299 (TJM/CFH)
|
Signed September 23, 2022

**Attorneys and Law Firms**

Robert T. Parker, Law Office of R. Terry Parker, New York, NY, for Plaintiff.

Matthew D. Kennedy, Fitzpatrick, Hunt & Pagano, LLP, Stamford, CT, for Defendant.

**DECISION & ORDER**

Thomas J. McAvoy, Senior United States District Judge

**\*1**  Plaintiff filed this action on November 12, 2021. See dkt. # 1. Plaintiff alleges that Defendant unlawfully used a registered trademark for Plaintiff's "JUUL-branded electronic nicotine delivery systems ("ENDS") and other related products." Id. at ¶ 2. Defendant allegedly sold counterfeit JUUL products in the convenience store Defendant operated. Id. at ¶ 19. Plaintiff's Complaint brings federal claims for trademark infringement, false designation of origin, and unfair competition, and state law claims for trademark infringement, unfair competition, and deceptive commercial acts and practices.

Plaintiff served the Complaint on December 20, 2021. See dkt. # 8. Defendant did not answer or otherwise respond to the Complaint within the required time, and Plaintiff requested that the Clerk of Court enter default. See dkt. # 10. The Clerk entered default on February 10, 2021. See dkt. # 12. The Plaintiff thereafter filed a motion for default judgment. See dkt. # 14.

On June 24, 2022, Defendant filed a letter motion with the Court requesting leave to file a late answer to the Complaint and/or late opposition to the motion for default judgment. See dkt. # 16. Plaintiff opposed the motion. See dkt. # 18. The Court granted Defendant leave to file a motion pursuant to Rule 55(c) to address the motion for default judgment. See dkt. # 17. The Court noted that "[g]iven the judicial preference to resolve matters on the merits and not on procedural default, Defendant is granted leave to file a Rule 55(c) cross-motion to the pending motion for default judgment." Id. "Since the standard for determining whether to grant a motion for leave to serve a late answer considers essentially the same factors as a Rule 55(c) motion," the Court also granted Defendant "leave to file, as a cross-motion to the pending motion for default judgment, a motion for leave to serve a late answer." Id.[1]

Defendant filed the motion to vacate the entry of default and for leave to file a late answer to the Complaint pursuant to Federal Rule of Civil Procedure 55(c) on July 11, 2022. See dkt. # 19. Plaintiff opposes the motion. Federal Rule of Civil 55(c) provides that a "court may set aside an entry of default for good cause[.]" FED. R. CIV. P. 55(c). "[B]ecause defaults are generally disfavored and are reserved for rare occasions, when doubt exists as to whether default should be granted or vacated, the doubt should be resolved in favor of the defaulting party." Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 96 (2d Cir. 1993). Courts consider three factors in deciding whether to vacate an entry of default: "(1) whether the default was willful; (2) whether setting aside the default would prejudice the adversary; and (3) whether a meritorious defense is presented." Id. at 96. A motion for leave to

2022 WL 21309984

file a late answer relies on the same standard, since the effect of refusing to allow a party to file an answer would be default. Joe Hand Promotions, Inc. v. Kessler, No. 20cv894, 2021 WL 4262665 at *3, 2021 U.S. Dist. LEXIS 178296 at *7-8 (N.D.N.Y. Sept. 20, 2021) (citing Graves v. Corr. Med. Serv., No. 11cv1005, 2015 U.S. Dist. LEXIS 52736, 2015 WL 1823456, at *2 (W.D.N.Y. Apr. 22, 2015)).

**\*2** Defendant contends that its default was not willful. The Defendant's chief operating officer, Ibrahim Jamal, provides a declaration in support of the motion. See dkt.# 19-3. Jamal relates that he owns and operates a number of gas and convenience stores. Id. at ¶ 1. He and his brother have organized a number of corporations to operate these stores, some owned 100% by Jamal, some 100% by his brother. Id. at ¶ 2. Jamal is the Chief Operating Officer of the Defendant in this case, Kingston Snack Shop, Inc. Id. at ¶ 3. Plaintiff in this matter has brought lawsuits making similar lawsuits against fourteen other of the entities that Jamal and his brother own and operate. Id. at ¶ 6. The defendant in each of those cases has appeared and filed a timely answer. Id. at ¶ 7. Jamal reports that he ordinarily receives service for the different corporations through the Secretary of State of New York, who mails the process to him at an address in Ossining, New York. Id. at ¶¶ 9-10. That address is another gas station/convenience store that Jamal operates. Id. at ¶ 11.

Jamal reports that he was diagnosed with COVID-19 in November 2021. Id. at ¶ 13. He was hospitalized from December 4, 2021 through December 13, 2021, and did not return to work until mid-January 2022. Id. at ¶¶ 14-15. While Jamal suffered the health crisis, a man named Ossome Beker managed the store where Jamal received business mail. Id. at ¶ 16. Jamal expected that Becker would "be triaging any issues with the other stores, reviewing the incoming mail, and sending any important papers to me at the hospital or at home." Id. at ¶ 17. After he recovered, Jamal found out that Becker had not done a good job with Jamal's business affairs, perhaps because he did not speak English well. Id. at ¶ 18. Beker had not kept the papers related to the instant law suit, as well as past-due invoices. Id. at ¶ 19. Jamal did receive papers related to other lawsuits, and answered them. Id. at ¶ 21-23. Jamal eventually became aware of the lawsuit in early May 2022, when he received information about the other suits that involved his companies. Id. at ¶ 24. Jamal emphasizes that his failure to answer resulted from this situation, and that "there was never any intent to ignore the lawsuit and the default; had I known of this lawsuit, I would have surely done what I did in the others (ie., retain counsel to promptly appear and respond.")." Id. at ¶ 28.

Defendant further contends that Plaintiff will not be prejudiced by reopening the lawsuit, and that Defendant has a meritorious defense. Defendant has offered a number of affirmative defenses in answering the other lawsuits. Defendant asserts that the products in question were not counterfeits, but authorized by JUUL. Defendant also contends Plaintiff is not entitled to relief under federal trademark law, as Plaintiff manufactures the trademarked goods in question. Jamal also swears that his stores did not sell anything but genuine JUUL products.

Plaintiff responds that Defendant's conduct in failing to respond to the lawsuit was willful. Plaintiff points to additional correspondence sent to Defendant before the Defendant moved to vacate the default, which Defendant did not act upon, and notes that he has not pointed to any improper service or any improper process. Plaintiff also points out that Jamal's declaration does nothing to describe the role his brother played in the events in question. Plaintiff argues that Defendant's conduct demonstrates a willful failure to respond. Plaintiff further contends that Defendant has not offered a complete defense, and that the Complaint describes a careful investigation and strong evidence of trademark violations and other unfair trade practices. Under circumstances where a Defendant acted willfully and lacks a meritorious defense, Plaintiff argues, a lack of prejudice does not mean that a Defendant has good cause to set aside a default.

The Court will utilize the discretion provided to courts in this type of matter and grant the Defendant's motion and vacate the default. The Court finds that Defendant's conduct in failing to answer the Complaint in this matter was not willful. The Court is persuaded by Jamal's declaration, as well as the events in the other cases, that the failure to answer was an oversight and not part of an attempt to avoid service or responsibility in this matter. The Court accepts Jamal's representation that his illness disrupted his normal practice. The Court is persuaded in part because of the cases related to this one, where Defendants for which Jamal had responsibility filed timely responses to nearly identical actions. Those cases all appear to have been filed after this one, but the Court still fails to see why one who answered fourteen cases would willfully choose not to answer a fifteenth.

2022 WL 21309984

Moreover, the Court agrees that Defendant may have meritorious defenses in this action. The Court will not resolve any factual disputes at this point, whether those factual disputes relate to the nature of Defendant's conduct in this matter or would help to resolve gatekeeping legal questions. The Court also notes that Plaintiff has not pointed to any prejudice that would come from allowing Defendant to answer.

**\*3** Because the Court has struck the entry of default, the Court will permit Defendant to file an untimely answer to the Complaint. Defendant shall file an answer within twenty-one days of the date of this order.

In the alternative, Plaintiff argues that the Defendant should be required to pay Plaintiff's attorneys fees as a condition of vacating the entry of default. Courts have inherent power to condition vacating a default on certain conditions. Powerserve Int'l, Inc. v. Lavi, 239 F.3d 508, 515 (2d Cir. 2001). Courts have noted that placing conditions on the vacatur has the purpose of "mitigating–at least in part–the prejudice that might otherwise inhibit the vacatur." Criollo v. NY Fine Interiors, Inc., No. 19cv5794, 2022 WL 354847 at *1, 2022 U.S. Dist. LEXIS 21432 at *3 (E.D.N.Y. Feb. 7, 2022). Such power exists even under circumstances where courts would normally not award attorneys fees because a party had not " 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' " Id. at *2 (quoting Hirschfeld v. Bd of Elections in City of N.Y., 984 F.2d 35, 40 (2d Cir. 1993)).

The Court declines to order Defendant to pay Plaintiff's attorneys fees or place other conditions on vacating the default. The Court has concluded that Defendant did not act wilfully in failing to answer. The Court concludes that, at worst, Defendant was negligent in monitoring correspondence with the business. Such negligence, however, is party explicable due to Jamal's serious illness. The small size of Defendant's staff limited Defendant's ability to respond to process. Moreover, the Court finds that the larger circumstances of this case make sanctions unnecessary. This case is a subset of a larger set of cases all involving the same sorts of allegations. Defendant's conduct in those cases indicates to the Court a sincere intent to litigate all these matters. The default appears to the Court largely the result of unfortunate circumstances, and the Court will not sanction the Defendant in light of those circumstances.

As such:

1. Plaintiff's motion for default judgment, dkt. # 14, is hereby DENIED;

2. Defendant's motion to set aside the default entered in this case and for leave to file an untimely answer to the Complaint, dkt. # 19, is hereby GRANTED;

3 The Clerk of Court is hereby DIRECTED to strike the default entered in this case, dkt. # 12; and

4. Defendant is hereby DIRECTED to file an answer or otherwise respond to the Complaint within 21 days of the date of this order.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 21309984

## Footnotes

1    In opposing the instant motion, the Plaintiff argues that the Court should disregard Plaintiff's opposition to the motion for default judgment, as the Court's text order did not provide leave to oppose the motion. The Court notes that the motion for default judgment would become moot if the Court struck the entry of default. "A proper motion for default

JUUL Labs, Inc. v. Kingston Snack Shop, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 21309984

Case 9:19-cv-00609-DNH-ML    Document 95    Filed 01/10/24    Page 61 of 128

judgment requires a plaintiff to (1) show that the defendant was properly served with summons and complaint; (2) obtain the clerk's entry of default; and (3) provide an affidavit." <u>Young America's Found. v. Stenger,</u> No. 20cv822 (LEK/ML), 2021 WL 4123316 at *2, 2021 U.S. Dist. LEXIS 170769 at *4-5 (N.D.N.Y. Sept. 9, 2021).

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

**West v. Harkness, Not Reported in Fed. Supp. (2022)**

2022 WL 1555364

2022 WL 1555364
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jesse D. WEST, Plaintiff,

v.

John HARKNESS, #0304, Police Officer; and John Harriman, #0463, Police Officer, Defendants.

9:17-CV-0621 (GTS/DJS)
|
Signed 05/17/2022

**Attorneys and Law Firms**

JEFFREY PARRY, ESQ., OFFICE OF JEFFREY PARRY, Counsel for Plaintiff, 730 East Genesee Street, Fayetteville, NY 13066.

JARROD W. SMITH, ESQ., OFFICE OF JARROD W. SMITH, Co-counsel for Plaintiff, 11 South Main Street, P.O. Box 173, Jordan, NY 13080.

TODD M. LONG, ESQ., Assistant Corporation Counsel, HON. JOSEPH BARRY, Acting Corporation Counsel, City of Syracuse Counsel for Defendants, 233 East Washington Street, 300 City Hall, Syracuse, NY 13202.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this civil rights action filed by Jesse D. West ("Plaintiff") against City of Syracuse police officers John Harkness and John Harriman ("Defendants"), is Defendants' second motion for summary judgment. (Dkt. No. 150.) For the reasons set forth below, Defendants' motion is granted.

## I. RELEVANT BACKGROUND

### A. Relevant Procedural History

Surviving the Court's Decision and Order of September 21, 2021, are Plaintiff's claims against Defendants for unreasonable search and failure to intervene under the Fourth Amendment arising from the events that occurred inside a prisoner transport van on February 24, 2017. (Dkt. No. 124, at 2, 21-30.) [1]

### B. Parties' Arguments on Defendants' Second Motion for Summary Judgment

Generally, in their memorandum of law, Defendants argue that Plaintiff's claims for unreasonable search and failure to intervene should be dismissed for three reasons: (1) Defendants acted reasonably in light of the exigent safety risks existing at the time and Plaintiff's failure to comply with commands to submit to a search and stop reaching; (2) portions of Plaintiff's testimony are so inconsistent, contradictory and incomplete that they permit (and indeed require) the Court to render a credibility determination pursuant to *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005); and (3) in any event, Defendants are protected from liability as a matter of law by the doctrine of qualified immunity, because no reasonable police officer would have believed that the conduct alleged was unconstitutional in light of Plaintiff's combative and suggestive behavior, the reported information

West v. Harkness, Not Reported in Fed. Supp. (2022)

Case 9:19-cv-00609-DNH-ML    Document 95    Filed 01/10/24    Page 63 of 128

2022 WL 1555364

known to Defendants at the time of Plaintiff possessing a gun and menacing people with it, and the cumulative exigent safety risks existing at the time. (Dkt. No. 150, Attach. 21.)

Generally, in his opposition memorandum of law, Plaintiff argues that Defendants' motion should be denied for three reasons: (1) Defendants' search of Plaintiff was unreasonable as a matter of law, because his hands were cuffed behind his back at the time of the search and thus a simple pat frisk would have sufficed, but instead he was strip searched in a public place; (2) *Jeffreys*' exception (to the prohibition on rendering credibility determinations when deciding a summary judgment motion) does not apply to this case, because Plaintiff's testimony is accompanied by ample supporting evidence, and any inconsistencies in that testimony are explained by his little education and poor vocabulary; and (3) Defendants are not protected from liability as a matter of law by the doctrine of qualified immunity, because the Court already decided this issue on Defendants' first motion for summary judgment, which presented the same facts as does the current motion. (Dkt. No. 156.)

**\*2**  Generally, in their reply memorandum of law, Defendants assert three arguments: (1) most of Plaintiff's Local Rule 56.1 Response should be rejected because he fails (as he did when responding to Defendants' first motion for summary judgment) to properly respond to Defendants' Local Rule 56.1 Statement of Material Facts; (2) Plaintiff mischaracterizes the search in question as an established form of "strip search" and fails to acknowledge the perceived exigent circumstances existing at the time; (3) Plaintiff's response highlights even more examples of why the *Jeffreys* exception should be applied; and (4) Plaintiff's qualified immunity argument is misguided because the Court previously acknowledged that Defendants would have an opportunity to renew their request as to the claim that it reframed when deciding Defendants' first motion for summary judgment. (Dkt. No. 160.)

### C. Statement of Undisputed Material Facts

Generally, unless otherwise noted, the following facts have been asserted and supported by Defendants in their Statement of Material Facts and admitted by Plaintiff in his Response thereto (either expressly or due to his failure to support a denial with a citation to admissible record evidence). (*Compare* Dkt. No. 150, Attach. 20 [Defs.' Rule 56.1 Statement] *with* Dkt. No. 157 [Plf.'s Rule 7.1 Response].)

<u>Events Prior to Plaintiff's Arrest</u>

1. On February 23, 2017, Syracuse Police Department ("SPD") Officer Cody Nellis responded to 217 Aberdeen Terrace in Syracuse, New York, regarding a verbal domestic incident. Upon arrival, Officer Nellis spoke to S.V., who reported that she has "a full stay away order" against her ex-boyfriend, Plaintiff.

2. S.V. told Officer Nellis that Plaintiff had been calling her continuously for the previous 24 hours, and she showed Officer Nellis her cell phone, which showed more than 40 unanswered calls from a land-line telephone number assigned to 1313 Grant Boulevard in Syracuse, New York.

3. S.V. told Officer Nellis that Plaintiff had been physically violent with her in the past (with numerous physical altercations dating back several years) and that she finally had had enough of the abuse, so she had ended the relationship approximately a month before. S.V. also reported that, after she had left Plaintiff, he had started using drugs frequently and becoming increasingly hostile towards her. She described him as "going crazy."

4. S.V. told Officer Nellis that she had answered one of these phone calls from Plaintiff in an attempt to direct him to stop calling her. She reported that, during the call, Plaintiff had claimed that he had recently came into possession of a handgun from his cousin and that he was going to kill her, their child, and the police when they came for him, because he had "nothing else to live for" and was adamant about "going out with a bang." S.V. said that she believed Plaintiff was "very unstable" and that his threats were sincere.

West v. Harkness, Not Reported in Fed. Supp. (2022)

2022 WL 1555364

5. Thereafter, Officer Nellis obtained a sworn statement from S.V. regarding Plaintiff and her desire for prosecution against him.

6. Officer Nellis learned from S.V. that Plaintiff had been staying with family members at 1313 Grant Boulevard in Syracuse, New York. Officer Nellis advised her to get in touch with Vera House or other related services with regard to domestic violence. She said she would be unable to leave her parents' residence because she feared for their safety as well.

7. After speaking with S.V., Officer Nellis prepared a warrant application for Plaintiff's arrest based on evidence that he had violated a protective order. As a part of this process, SPD issued notice to the Onondaga County 9-1-1 Center to flag any potential calls in connection with Plaintiff.

SPD's Response to Report of Suspicious Person with a Weapon

8. The following day, February 24, 2017, at or around 5:06 PM, Officer Nellis and multiple other SPD units responded to 1313 Grant Boulevard regarding a Suspicious Person With a Weapon call.

 **\*3** 9. The caller, S.V., had reported to 911 that Plaintiff was standing outside 1313 Grant Boulevard with a gun and threatening to shoot everyone. S.V. had also reported that Plaintiff was on "molly" and had threatened to come "mess up her van," and that her friend had seen Plaintiff display what she believed to be a handgun earlier that day.

10. Around the time Officer Nellis arrived at 1313 Grant Boulevard, he was joined by SPD Officer Michael Shannon, Sergeant David Hart, and Defendant Harriman. After establishing a perimeter around the residence, the three officers approached the front door and ordered the occupants to exit.

11. Three individuals exited the residence, including Plaintiff's father (Jesse West Jr.), who gave the officers permission to enter the residence.

12. Officers Nellis and Shannon entered the residence and began clearing rooms. As Officer Nellis entered the kitchen area, he observed a closed door in the rear of the kitchen. When he attempted to open the door, it appeared to be held shut from the other side.

13. Officer Nellis called for assistance and was joined by Officer Shannon and Sergeant Hart, all three of whom drew their SPD-issued weapons (due to the nature of the call indicating that a weapon might be involved) and ordered the individual inside to exit with his hands in the air. When Plaintiff came out from the room, he was placed under arrest, handcuffed, and escorted outside.

14. Outside of the residence, as the officers attempted to place Plaintiff into the back of Defendant Harriman's nearly patrol vehicle, he "bucked" the officers. Plaintiff was, in his own words, "struggling to get free" because he was in pain.

15. Plaintiff was eventually brought to the ground by officers.

16. At approximately this time, Defendant Harkness arrived on the scene and observed Plaintiff laying on the pavement in a prone position "thrashing his body from side to side." Defendant Harkness then helped gain control of Plaintiff.

17. By the time Plaintiff was under control, an SPD prisoner transport van had arrived on scene. The prisoner transport van is larger than a patrol car and therefore much easier to place individuals inside.

18. Defendants Harkness and Harriman escorted Plaintiff to the transport van.

Case 9:19-cv-00609-DNH-ML     Document 95     Filed 01/10/24     Page 65 of 128

<u>Defendants' Search of Plaintiff</u>

19. SPD's operations policy titled "Arrest, Processing & Transporting Prisoners" (Art. III, Sec. 9.17) states, in pertinent part, that "[a]ll persons taken into custody will be thoroughly searched for weapons, evidence, means of escape, and/or contraband prior to being transported."

20. A mere "pat down" or "pat-frisk" search may be unable to detect weapons such as handguns, knives or sharp objects; thus, before transport, a more thorough search may be required, especially where the individual has exhibited violent behavior and/or is suspected of having weapons.

21. Before the arrival of the prisoner transport van, Plaintiff had not been searched beyond being pat-frisked.

22. In addition, at the time that Plaintiff's arrival at the transport van, both Defendants Harriman and Harkness were aware of the 911 call of February 24, 2017, about an individual with a weapon. In particular, they had been advised by an SPD dispatcher that Plaintiff had been standing outside with a gun and stating that he was going to shoot everyone–including police–if they showed up. They had also been advised that the 911 caller had complained that Plaintiff had displayed and pointed the gun at a woman who had driven by him.

**\*4** 23. The prisoner transport van is divided roughly in two sections: the front section for the driver and front seat passenger, and the rear section for the prisoners. The rear (or prisoner) section is at least ten feet long with two parallel benches running lengthwise. A metal grate wall separates the driver-and-front passenger section from the prisoner section.

24. While outside the van, near the open doors, Defendant Harriman stated (to one or more other officers) that Plaintiff had not been searched thoroughly and that he would need to be searched again before transport.

25. Upon seeing Defendants coming into the van for him, Plaintiff stated words to the effect of "That's not going to happen" or "Nobody is going to search me," [2] and he "slid" to the portion of the prisoner section that is separated from the front section by a metal grate wall.

26. Plaintiff leaned himself against the metal grate wall, away from approaching Defendants.

27. As Plaintiff's hands were cuffed behind his back, he tucked his head to his chest and grabbed onto his jeans. [3]

28. Defendant Harkness asked Plaintiff what he was reaching for; Plaintiff said that he had nothing; Defendant Harkness said that he had something; and Plaintiff said again that he had nothing. [4]

29. A struggle ensued between Plaintiff and Defendant Harkness. [5]

**\*5** 30. Upon seeing this struggle, Defendant Harriman climbed into the van to help Defendant Harkness.

31. During the physical contact, Defendant Harriman yelled at Plaintiff, "[S]top reaching!"

32. Defendant Harkness unfastened Plaintiff's belt and pulled his pants down while Defendant Harriman searched the interior of Plaintiff's pants and pockets. That search yielded negative results.

33. Defendant Harriman then directed his attention to the waistband of Plaintiff's boxer briefs.

34. Defendant Harriman ran his right hand along Plaintiff's waistband to confirm whether he was concealing anything inside his boxer briefs. [6] This search yielded negative results.

35. The parties dispute whether, either before or after doing so, Defendant Harriman also ran a bare hand between Plaintiff's buttocks and over his anus (although Plaintiff admits Defendants' factual assertion that at no time did Defendants or any officer "penetrate" Plaintiff's anus).

36. At the time of the search, Plaintiff was turned facing the wall, away from Defendants.

37. Based on Plaintiff's position during this search, and the fact that Defendants were standing between Plaintiff and the doors, it would have been extremely difficult for any bystander on the street to see him with his pants down.

38. Plaintiff has identified no witnesses (other than Defendants) to the search.

39. As Defendant Harriman started to follow Defendant Harkness out of the van, Plaintiff lunged at him and attempted to headbutt him. [7] In response, Defendant Harriman pushed his right forearm towards Plaintiff to deflect the blow.

40. Defendant Harriman then removed his pepper spray, pointed it at Plaintiff, and informed him that he would be sprayed if he did not sit down. [8] Plaintiff obeyed this command and Defendant Harriman exited the van.

41. Plaintiff was then transported by van to the Onondaga County Justice Center.

**\*6** 42. Plaintiff was charged with Resisting Arrest and Harassment in the Second Degree with regard to his conduct on February 24, 2017. He was also charged with Aggravated Harassment in the Second Degree and Criminal Contempt in the First Degree with regard to his conduct on February 23, 2017.

43. Under two addition case numbers, Plaintiff was further charged with Aggravated Harassment in the First Degree, Criminal Contempt in the First Degree, and Criminal Contempt in the Second Degree with regard to conduct involving S.V.

44. In his Rule 33 responses in this action, Plaintiff responded (through counsel) that he had been "rape[d]" by Defendant Harriman. In his second deposition, Plaintiff withdrew that response.

## II. GOVERNING LEGAL STANDARD

### A. Procedural Legal Standard

Because this Decision and Order is intended primarily for the review of the parties, the Court will incorporate by reference the procedural legal standard set forth in Part II of its Decision and Order of September 21, 2021. (Dkt. No. 18, at 18-21.)

### B. Substantive Legal Standard

Generally, the elements of a claim for an unreasonable search are the following: (1) the defendant willfully conducted a search of the plaintiff; and (2) the search was objectively unreasonable under the circumstances. In deciding whether the second element has been satisfied, a fact finder must consider the following: (a) the scope of the particular intrusion; (b) the manner in which it is conducted; (c) the justification for initiating it; and (d) the place in which it is conducted. *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

Generally, "[t]o establish such a claim of failure to intervene, a plaintiff must prove the following four elements: (1) that a constitutional violation was being committed against the plaintiff; (2) that the officer knew, or deliberately ignored, the fact

West v. Harkness, Not Reported in Fed. Supp. (2022)

2022 WL 1555364

that the constitutional violation was going to be, or was being, committed; (3) that the defendant had a reasonable opportunity to intervene and prevent the harm; and (4) that the defendant did not take reasonable steps to intervene." *Thomas v. City of Troy*, 293 F. Supp. 3d 282, 296 (N.D.N.Y. 2018) (citing *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 [2d Cir. 2001]; *Anderson v. Branen*, 17 F.3d 552, 557 [2d Cir. 1994].)

## III. ANALYSIS

### A. Defendants' First and Third Arguments

The Court begins its analysis by addressing Defendants' first and third arguments, which are summarized above in Part I.B. of this Decision and Order: (1) that they are entitled to judgment as a matter of law on Plaintiff's claims, because, based on the admissible record evidence, it is undisputed that Defendants acted reasonably in light of the exigent safety risks facing them at the time and Plaintiff's failure to comply with their commands to submit to a search and stop reaching, and (2) that, in any event, they are entitled to judgment as a matter of law on Plaintiff's claims, because no reasonable police officer would have believed that the conduct alleged was unconstitutional in light of Plaintiff's combative and suggestive behavior, the reported information known to Officers at the time of Plaintiff possessing a gun and menacing people with it, and the cumulative exigent safety risks (thus entitling Defendants to qualified immunity).

After carefully considering the matter, the Court must reject both arguments because neither one could succeed if a reasonable jury were to credit Plaintiff's testimony that, during the search of Plaintiff's boxer briefs, Defendant Harriman made "contact with" Plaintiff's anus (albeit without "penetration [of]" it) [9] "barehanded[ly]," [10] for between 20 and 40 seconds. [11] More specifically, the Court has trouble finding that exigent safety risks and Plaintiff's failure to comply with commands could and do justify, as a matter of law, such a barehanded, slow contact with his anus, as well as the idea that reasonable police officers could have believed such contact was constitutional (especially where, as here, they claim that no such contact occurred).

### B. Defendants' Second Argument

**\*7** Apparently anticipating this trouble, Defendants' second argument essentially asks the Court to disregard the above-described testimony under *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005). Generally, of course, credibility issues, which are questions of fact for resolution by a jury, may not be decided by a court on motion for summary judgment. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The Second Circuit, however, has recognized a very limited exception to this general rule in *Jeffreys*, 426 F.3d 549. In that case, the Second Circuit held that summary judgment may be awarded in the rare circumstance where there is nothing in the record to support the plaintiff's allegations of the defendants' constitutional violations, aside from his own contradictory and incomplete testimony, and, even after drawing all inferences in the light most favorable to the plaintiff, the court determines that "no reasonable person" could credit the his testimony. *Id.* at 554-55.

To apply the *Jeffreys* exception, the following three requirements must be met: (1) "the plaintiff must rely 'almost exclusively on his own testimony,' " (2) the plaintiff's "testimony must be 'contradictory or incomplete,' " and (3) the plaintiff's testimony must be contradicted by evidence produced by the defense. *Benitez v. Ham*, 04-CV-1159, 2009 WL 3486379, at *20-21 (N.D.N.Y. Oct. 21, 2009) (Mordue, J., adopting Report-Recommendation on clear-error review) (quoting *Jeffreys*, 426 F.3d at 554).

Here, Defendants specifically argue as follows: (1) Plaintiff relies exclusively on his own testimony, which is uncorroborated by any other evidence; (2) his testimony is incomplete in that he still does not know (a) which Defendant made contact with his anus, and which Defendant failed to intervene in that contact, (b) whether he expressed a verbal objection to the officers searching him, and (c) whether the officers said anything to him in the rear of the van immediately before and during the search; and (3) even if Plaintiff's testimony is complete, his testimony is internally contradictory in that (a) it inexplicably states he could not have reached toward the waistband of his pants because his hands were cuffed there, (b) it states both that there was a digital penetration of his anus and that there was no such penetration, and (c) it states that the contact lasted "slowly," for 30-40 seconds, for 20 seconds, for "a few seconds," and for an unknown length of time.

West v. Harkness, Not Reported in Fed. Supp. (2022)

2022 WL 1555364

### 1. Whether Plaintiff Is Relying Almost Exclusively on His Own Testimony

With regard to whether Plaintiff is relying "almost exclusively on his own testimony" (in attempting to prove that one of the Defendants made contact with his anus during their search of him inside the prisoner transport van on February 24, 2017), the Court finds that he is doing so. Granted, in addition to his own testimony, Plaintiff relies on the testimony of his aunt that, after the search, he had told her that one of the officers had stuck some sort of object "in his butt." (Dkt. No. 150, Attach. 11, at 7-8 [Depo. Tr. of Nedra Pettiford].) In addition, Plaintiff is free to rely on the testimony of Custody Department Sergeant Jeffrey Wick that a "rape kit" examination was performed at a hospital as a result of one or more unidentified statements made by him at, or on the way to, the Onondaga County Justice Center. (Dkt. No. 150, Attach. 19, at ¶¶ 5-8 [Affid. of Jeffrey Wick]; *accord*, Dkt. No. 150, Attach. 2, at 38-43, 97-98, 104 [Plf.'s First Depo. Tr.]; Dkt. No. 8, at 8, 9 [Plf.'s Verified Am. Compl.].)

However, Ms. Pettiford's testimony appears to be inadmissible hearsay, a fact that Plaintiff at one point expressly concedes. (Dkt. No. 157, at 25-27 [Plf.'s Response to Question of Fact No. 73].) [12] Moreover, the evidence regarding a "rape kit" examination appears conspicuously devoid of (1) testimony that the results of the examination were positive, and (2) testimony that the examination was even performed at Plaintiff's insistence. (Dkt. No. 150, Attach. 19, at ¶¶ 5-8 [Affid. of Jeffrey Wick]; Dkt. No. 150, Attach. 22, at 80-82 [Plf.'s Rule 50-h Hearing]; Dkt. No. 150, Attach. 2, at 38-43, 97-98, 104 [Plf.'s First Depo. Tr.]; Dkt. No. 8, at 8, 9 [Plf.'s Verified Am. Compl.].) Indeed, to the contrary, it appears the examination may have been required by Sergeant Wick out of an abundance of caution. (Dkt. No. 150, Attach. 19, at ¶¶ 5-8 [Affid. of Jeffrey Wick]; Dkt. No. 8, at 8 [Plf.'s Verified Am. Compl., swearing that "the Justice Center would not accept me until I went to the hospital and was checked out by a doctor and had a rape kit done by doctors"].) [13]

**\*8** In any event, even if Plaintiff could be found to be partially relying on either of the two above-referenced forms of evidence, the Court would (and does) still find that Plaintiff is relying on his own testimony "almost exclusively." In particular, as discussed above in Part III.A. of this Decision and Order, Plaintiff chiefly relies on his testimony that, during the search of his boxer briefs, Defendant Harriman made "contact with" his anus (albeit without "penetration [of]" it) "barehanded[ly]," for between 20 and 40 seconds.

### 2. Whether Plaintiff's Testimony Is "Contradictory or Incomplete"

With regard to whether Plaintiff's testimony is "contradictory or incomplete," the Court finds that it is. Granted, with regard to the testimony's purported incompleteness, the fact that Plaintiff does not know which of the two Defendants took which actions while searching his boxer briefs is immaterial, because (1) he was facing away from them when the contact occurred (and thus relieved of the duty to identify his alleged assailant), [14] and (2) in any event, Defendants themselves have provided evidence of which Defendant conducted the search of his boxer briefs (i.e., Defendant Harriman). *See, e.g., supra,* Statement of Undisputed Material Fact No. 34 in Part I.C. of this Decision and Order. Moreover, the fact that Plaintiff does not know whether he expressed a verbal objection to the officers searching him, and whether they said anything to him, is similarly immaterial, because no evidence has been adduced (or argument has been made) that Defendants requested permission to run a bare hand over his anus and that Plaintiff consented to that request.

However, the Court must reach a different conclusion regarding the internal contradictions in Plaintiff's testimony. More specifically, the Court finds three such internal contradictions. First, Plaintiff has testified that he could not possibly have reached his hands into the rear of his boxer briefs (and thus give Defendants reason to believe he harbored in them either a weapon or suicide-enabling drugs) because his hands were cuffed behind his back. (Dkt. No. 150, Attach. 22, at 60 [Plf.'s Rule 50-h Hearing, containing the following questions and answers: "Q. At any point were your hands at all near the waistband of your pants? A. No, sir. My hands was cuffed behind my back, sir."]; Dkt. No. 150, Attach. 10, at 7, 9 [Plf.'s Second Depo. Tr., testifying, "I don't understand how I was reaching with my hands cuffed behind my back.... How can I search for something

Case 9:19-cv-00609-DNH-ML    Document 95    Filed 01/10/24    Page 69 of 128

West v. Harkness, Not Reported in Fed. Supp. (2022)

2022 WL 1555364

when my hands is [sic] cuffed behind my back?"].) There is no indication that Plaintiff could *not* reach his cuffed hands inside the waistband of his boxer briefs; indeed, such a suggestion would appear undermined by Plaintiff's testimony that, when seated, he could reach down to under his knees. (Dkt. No. 150, Attach. 22, at 60 [Plf.'s Rule 50-h Hearing, testifying, "When I sat down, I put my hands under my knees, because they way they had cuffed me was tight"].) [15] Simply stated, Plaintiff's testimony that his hands were cuffed behind his back contradicts his testimony that he could not possibly have reached his hands into the rear of his boxer briefs (because they were cuffed there).

**\*9** Second, Plaintiff has testified both that there was digital penetration of his anus and that there was no such penetration. (*Compare* Dkt. No. 8, at 8, 9 [Plf.'s Verified Am. Compl., swearing that at the hospital he "had a rape kit done by doctors," and "I was took [sic] to the hospital to have the rape kit done"] *and* Dkt. No. 150, Attach. 22, at 80-82 [Plf.'s Rule 50-h Hearing, testifying, "I told her ... I just want the [rape] kit"] [16] *with* Dkt. No. 150, Attach. 2, at 56 [Plf.'s First Depo. Tr.] *and* Dkt. No. 15, Attach. 10, at 17-18 [Plf.'s Second Depo. Tr.].)

Third, and most importantly, Plaintiff has testified that the offending Defendant's bare hand "swiped" Plaintiff's anus only "one time" [17] but essentially lingered there for the following durations: "slowly," [18] 30-40 seconds, [19] 20 seconds, [20] "a few seconds," [21] long enough to "swipe" a credit card "from the top of the ass crack to the bottom," [22] and "I don't know" (whether the duration was less than one second, less than 10 seconds, a "consistent motion," or "a slow prolonged motion"). [23] Because of these contradictions in this testimony, the very act of determining whether a jury could reasonably find for Plaintiff based on the testimony necessarily involves a credibility assessment of the testimony. *See Jeffreys*, 426 F.3d at 554 ("[I]n the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for the plaintiff, ... and thus whether there are any genuine issues of material fact, without making some assessment of the plaintiff's account.") (internal citation and quotation marks omitted).

### 3. Whether Plaintiff's Testimony Has Been Contradicted by Evidence Produced by the Defense

**\*10** With regard to whether Plaintiff's testimony has been contradicted by evidence produced by the defense, the Court finds that it has. (*See, e.g.,* Dkt. No. 150, Attach. 17, at ¶ 15 [Harriman Decl., testifying, "[W]hile I searched Mr. West's waistband with my barehand, I did not make 'skin-to-skin' contact with his buttocks area. At all times my hand remained on the exterior surface of his boxer briefs. I have never, and would never, run my barehand 'skin-to-skin' in contact with a suspect's buttocks area out of concerns for safety and hygiene."]; Dkt. No. 150, Attach. 17, at ¶ 7 [Harkness Decl., testifying, "While I held Mr. West into position, Officer Harriman began to search the *inside of his pants near the waistband* of his boxers"] [emphasis added]; Dkt. No. 150, Attach. 23, at 2 [Def. Harriman's CNYLEADS Narrative Supplement 1, stating, "Knowing that the waistband is a common spot utilized by criminals to conceal weapons or other contraband I then directed my attention to the waistband of West's boxers which he was still wearing. I then ran my right hand along the exterior of the West's waistband to confirm that he was not still concealing anything, this too yielded [sic] negative results"].)

### 4. Result of Application of *Jeffreys* Exception

As a result, the Court finds that no reasonable jury could find that any such contact with Plaintiff's anus took longer than one or two seconds. This finding is highly material, because, when part of a search incident to a lawfully executed arrest that poses exigent safety risks, an officer's brief contact with an arrestee's genitalia (when unaccompanied by sexually offensive words, and when out of public view) is simply not unreasonable under the Fourth Amendment. *See, e.g., United States v. Levy,* 217 F. Supp.3d 643, 668 (E.D.N.Y. 2016) ("Once defendant was arrested on probable cause for possessing a firearm, the police required no further justification to carry out a search of his person incident to arrest ... The crack cocaine and marijuana found on defendant's person during this [strip] search [at the police station] are therefore admissible evidence at trial.") (citing *United*

*States v. Robinson*, 414 U.S. 218, 235 [1973]).[24] The Court emphasizes that Defendants unquestionably had grounds to believe that Plaintiff was concealing a weapon or other contraband inside the van based on (1) the four crimes for which he was arrested, (2) his particular characteristics (as communicated by S.V. and observed by Defendants), and (3) the circumstances of the arrest (which first involved "buck[ing]" and then involved declared resistence and physical evasion). *See Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986) ("We hold that the Fourth Amendment precludes prison officials from performing strip/body cavity searches of arrestees charged with misdemeanors or other minor offenses unless the officials have a reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest.").

Finally, the parties are respectfully advised that, even if the Court were to deny Defendants' second motion for summary judgment, it would find that the parties have narrowed the issues to be tried through their briefing of Defendants' two motions for summary judgment, and that it would be a waste of a jury's time to make them decide facts that have been undisputed by the parties. As a result, the Court would find that an Order pursuant to Fed. R. Civ. P. 56(g) would be warranted (accepting as undisputed at trial Paragraph Numbers 1-34 and 36-44 above in Part I.C. of this Decision and Order).

**\*11  ACCORDINGLY**, it is

**ORDERED** that Defendants' second motion for summary judgment (Dkt. No. 150) is **GRANTED**.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 1555364

## Footnotes

1    The Court notes that, although Plaintiff sometimes argues in his opposition memorandum of law that he is also asserting a claim of excessive force (*see, e.g.,* Dkt. No. 156, at 5, 8), that claim was converted to one of unreasonable search in the Court's Decision and Order of September 21, 2021, and neither Plaintiff nor Defendants successfully moved for reconsideration of that conversion. (Dkt. No. 132, at 5-6.)

2    Plaintiff's response that "I can't recall. I don't know.... I don't recall that" (Dkt. No. 150, Attach. 2, at 84 [Plf.'s First Depo. Tr.]) is insufficient to dispute the above-stated factual assertion. *See Genger v. Genger*, 663 F. App'x 44, 49 n.4 (2d Cir. 2016) (summary order) (noting that a statement that one "ha[d] no recollection" of a fact "does not constitute a denial"); *F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 75 (2d Cir. 2000) ("[V]ague denials and memory lapses ... do not create genuine issues of material fact."); *Davis v. City of Syracuse*, 12-CV-0276, 2015 WL 1413362, at \*2 (N.D.N.Y. Mar. 27, 2015) (Suddaby, J.) ("On a motion for summary judgment, denials of fact that are based on a lack of personal knowledge ... are insufficient to create a genuine dispute."); *Faruki v. City of New York*, 10-CV-9614, 2012 WL 1085533, at \*5 (S.D.N.Y. Mar. 30, 2012) ("Plaintiff's statement that she does not recall whether Defendants asked her to leave the store does not create a genuine dispute on that material issue."). In addition, Plaintiff's deposition testimony that such a search is "not the normal procedure" is not sufficient to dispute the above-stated factual assertion (and, indeed, such a belief at the time would explain his resistence to a search). (Dkt. No. 150, Attach. 2, at 84 [Plf.'s First Depo. Tr.].)

3    (Dkt. No. 150, Attach. 16, at ¶ 5 [Harkness Affid.].) Plaintiff's response, "I don't understand how I was reaching with my hands cuffed behind my back" does not controvert the above-stated factual assertion, especially given the proximity

West v. Harkness, Not Reported in Fed. Supp. (2022)

2022 WL 1555364

of his hands to the rear of his pants and/or waist band. (Dkt. No. 150, Attach. 10, at 7 [Plf.'s Second Depo. Tr.].) *See, supra,* cases cited in note 2 of this Decision and Order.

4     (Dkt. No. 150, Attach. 16, at ¶ 5 [Harkness Affid.]; Dkt. No. 150, Attach. 10, at 7 [Plf.'s Second Depo. Tr.].)

5     Plaintiff characterizes this struggle as the result of the officers "jump[ing] me," while Defendants characterize it as the result of Plaintiff "charging" at Defendant Harkness. (*Compare* Dkt. No. 150, Attach. 10, at 7 [Plf.'s Second Depo. Tr.] *with* Dkt. No. 150, Attach. 16, at ¶ 5 [Harkness Affid.] *and* Dkt. No. 150, Attach. 17, at ¶ 10 [Harriman Affid.].)

6     (Dkt. No. 150, Attach. 17, at ¶ 14 [Harriman Affid.].) Plaintiff's assertion that Defendant Harriman "credit card swipe[d] me" does not controvert the above-stated asserted fact. (Dkt. No. 150, Attach. 2, at 70 [Plf.'s First Depo. Tr.].)

7     (Dkt. No. 150, Attach. 17, at ¶ 47 [Harriman Affid.].) Plaintiff's denial of the headbutting attempt without a supporting record citation is ineffective. (Dkt. No. 157, at ¶ 47 [Plf.'s Rule 7.1 Response].) In addition, his response that he was never asked to deny this question in his Rule 50H Hearing does not constitute a citation to admissible record evidence controverting the above-stated factual assertion. (*Id.*) The Court notes that Plaintiff does not cite to an affidavit denying the headbutting attempt.

8     (Dkt. No. 150, Attach. 17, at ¶ 48 [Harriman Affid.].) Plaintiff's denial of the above-stated factual assertion without a supporting record citation is ineffective. (Dkt. No. 157, at ¶ 48 [Plf.'s Rule 7.1 Response].) In addition, his response that he was never asked about being threatened with pepper spray in his Rule 50H Hearing does not constitute a citation to admissible record evidence controverting the above-stated factual assertion. (*Id.*) The Court notes that Plaintiff does not cite to an affidavit denying the assertion.

9     (Dkt. No. 117, Attach. 2, at 21-22, 50, 55-56, 70 [Plf.'s First Depo. Tr., testifying that one of the defendants ran his "hand down the crack of my ass ... touch[ing] ... my rectum ... on the outside [of it] ... touching my anal [sic]" ... [running] his hand down my cheeks and touch[ing] my anal [sic] ..."]; Dkt. No. 122, Attach. 3, at 62, 65-66 [Plf.'s 50-h Hearing, testifying that the "swipe" involved "touching my rectum" or "rectal area"].)

10     (Dkt. No. 8, at 4, 6, 7, 9 [Plf.'s Verified Am. Compl., swearing that the touching was done "barehanded"]; Dkt. No. 122, Attach. 3, at 62, 66 [Plf.'s 50-h Hearing, testifying that the "swipe" was done with "bare hands" or "bare handed"]; Dkt. No. 117, Attach. 2, at 50, 56 [Plf.'s First Depo. Tr., testifying that one of the defendants ran his "bare hand down the inside of my buttocks, my butt cheeks, touching my rectum ... with his bare hands"].) The Court notes that a Verified Complaint has the force and effect of an affidavit or declaration for purposes of a motion for summary judgment. *See, e.g., Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d. Cir. 2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied*, 536 U.S. 922 (2002); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.").

11     (Dkt. No. 122, Attach. 3, at 62, 65-66 [Plf.'s 50-h Hearing, testifying that the "swipe" involved "touching my rectum" or "rectal area," and was done "slowly," taking "20 seconds"]; Dkt. No. 150, Attach. 10, at 14-15 [Plf.'s Second Depo. Tr., testifying that the defendant's physical contact with his anus lasted "about, like, 30 seconds, 40 seconds"].)

12     The Court notes that the material cited to support or dispute a fact on a motion for summary judgment must be able to "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

13     As a result, the Court has some trouble understanding how this evidence could have a "tendency to make [the search of his anus] more or less probable than it would be without the evidence" under Fed. R. Evid. 401.

14     "A plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene." *Jeffreys v. Rossi*, 275 F. Supp.2d 463, 474 (S.D.N.Y. 2003); *see, e.g., Gonzalez v. Waterbury Police Dep't*,

West v. Harkness, Not Reported in Fed. Supp. (2022)

2022 WL 1555364

199 F. Supp.3d 616, 622 (D. Conn. July 29, 2016) ("[T]estimony from the officers that they were in the immediate vicinity of the arrest, coupled with testimony by the plaintiff that he saw the faces of each of the defendants while he was being punched and kicked, was sufficient for a reasonable jury to conclude that the officers were liable *even though the plaintiff could not identify which officers struck him*.") (emphasis added); *Vesterhalt v. City of New York*, 667 F. Supp. 2d 292, 297-98 (S.D.N.Y. 2009) (denying summary judgment to defendant-officers where plaintiff testified that *she could not identify which officer had assaulted her* but defendant-officers testified they were all present during the assault, and thus "it is possible that all of the officers saw what happened" to her yet "failed to intervene") (emphasis added); *Skorupski v. Cnty. of Suffolk*, 652 F.Supp. 690, 694 (E.D.N.Y. 1987) (rejecting defendants' argument that they were entitled to summary judgment because *plaintiff cannot specify which of the officers struck him* and finding that all of the officers were potentially liable because they have an affirmative duty to intervene) (emphasis added).

15   There is also an indication that the discomfort of the cuffs may have caused Plaintiff to move around uneasily before the search, giving Defendants reason to believe he was reaching for something behind his back. (Dkt. No. 150, Attach. 22, at 74 ["So when I was sitting back it was hurting me, so for me to get comfortable, stood up, I put my hands right here."].)

16   (*Cf.* Dkt. No. 150, Attach. 15, at ¶ 4.b. [Plf.'s Rule 33 Response to Harriman's Interrogatories, identifying his injuries as including "rape"].) The Court notes that, although Plaintiff's interrogatory responses were not signed by him personally (as they must be under Fed. R. Civ. P. 33[b][1][A] and [b][5]), they were signed by his attorney, who was Plaintiff's agent. As a result, they may be used by Defendants as evidence. *See* Fed. R. Civ. P. 33(c) ("An answer to an interrogatory may be used to the extent allowed by the Federal Rules of Evidence."); Fed. R. Evid. 801(d)(2)(D) ("A statement that meets the following conditions is not hearsay: ... The statement is offered against an opposing party and ... was made by the party's agent or employee on a matter within the scope of that relationship and while it existed....").

17   (Dkt. No. 150, Attach. 10, at 16 [Plf.'s Second Depo. Tr., testifying, "He swiped me one time"].)

18   (Dkt. No. 150, Attach. 22, at 80-82 [Plf.'s Rule 50-h Hearing, testifying, "I wouldn't say insertion, I would say like I said, his fingers slowly rubbed against my rectal area"].)

19   (Dkt. No. 150, Attach. 10, at 14-15 [Plf.'s Second Depo. Tr., testifying that the defendant's physical contact with his anus lasted "about, like, 30 seconds, 40 seconds"].)

20   (Dkt. No. 150, Attach. 22, at 62, 65-66 [Plf.'s Rule 50-h Hearing, testifying that the "swipe" involved "touching my rectum" or "rectal area," and was done "slowly," taking "20 seconds"].)

21   (Dkt. No. 150, Attach. 10, at 16 [Plf.'s Second Depo. Tr., containing following questions and answers: "Q. Mr. West, what you're describing to me sounds like almost a split second or a – no longer than a few seconds.... A. Even if it was a few seconds, it's still wrong, though, like. What is you looking for?"].)

22   (Dkt. No. 150, Attach. 22, at 62-63 [Plf.'s Rule 50-h Hearing]; *cf.* Dkt. No. 150, Attach. 2, at 70 [Plf.'s First Depo. Tr., testifying, "That's what I meant by credit card swipe me, ran his hand down my cheeks and touched by anal [sic], and that was it"].)

23   (Dkt. No. 150, Attach. 10, at 15-16 [Plf.'s Second Depo. Tr., containing the following question and answer: "Q. How long did that swipe take? A. I don't – that, I don't know, I mean. I don't know that. I can't answer that question because I don't know"]; Dkt. No. 150, Attach. 22, at 64 [Plf.'s Rule 50-h Hearing, testifying, "I don't know no time limit"].)

24   *Cf. Scalpi v. Amorim*, 14-CV-2126, 2018 WL 1606002, at *18-19 (S.D.N.Y. Mar. 29, 2018) (granting defendant's motion for summary judgment on plaintiff's Fourth Amendment claim, because, during her search of plaintiff's groin area "lasting at most a few seconds," defendant had "no more than brief contact with Plaintiff's genital area"); *Garcia v. New York State Police Investigator Aguiar*, 138 F. Supp. 2d 298, 304 (N.D.N.Y. 2001) (McAvoy, J.) (granting defendants' motion for summary judgment on plaintiff's Fourth Amendment claim, because searching "the crotch area, pockets, and the legs," including "cleavage and under each breast," was reasonable under the Fourth Amendment); *Lamore v.*

*Vermont*, 12-CV-0059, 2013 WL 3560969, at *4 (D. Vt. July 11, 2013) (granting defendants' motion to dismiss plaintiff's Fourth Amendment claim under Fed. R. Civ. P. 12[b][6], because, even though the search "involved contact with [the plaintiff's] genitals," it did "not rise to the level of a Fourth Amendment claim").

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 5475293
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Charles McALLISTER also known as Charles McCallister, Plaintiff,

v.

Harold CALL, Vocational Supervisor, Mohawk Correctional Facility, Defendant.

No. 9:10–CV–610 (FJS/CFH).
|
Signed Oct. 28, 2014.
|
Filed Oct. 29, 2014.

**Attorneys and Law Firms**

Charles McAllister, Westbury, NY, pro se.

Hon. Eric T. Schneiderman, Office of the New York State Attorney General, The Capitol, Keith J. Starlin, AAG, of Counsel, Albany, NY, for Defendant.

## ORDER

SCULLIN, Senior District Judge.

 **\*1** Currently before the Court are Magistrate Judge Hummel's October 9, 2014 Report–Recommendation and Order, *see* Dkt. No. 81, and Plaintiffs objections thereto, *see* Dkt. No. 83.

Plaintiff, a former inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision, commenced this action pursuant to 42 U.S.C. § 1983. In his original complaint, Plaintiff asserted claims against Brian Fischer, Lucien J. LeClaire, Patricia LeConey, Carol Woughter, and John and Jane Does. Defendants moved for summary judgment. *See* Dkt. No. 49. By Report–Recommendation and Order dated July 6, 2012, Magistrate Judge Homer recommended that this Court dismiss all claims against the named individuals and direct Plaintiff to join Harold Call as a Defendant. *See* Dkt. No. 55. This Court accepted the Report and Recommendation and Order in its entirety and directed Plaintiff to file an amended complaint to "include only one cause of action a procedural due process claim in connection with his disciplinary hearing and one Defendant hearing officer Call ." *See* Dkt. No. 58 at 4–5.

Plaintiff thereafter filed his amended complaint and requested compensatory and punitive damages. *See* Dkt. No. 64, Amended Complaint at 4. In this amended complaint, Plaintiff alleged that Defendant violated his constitutional rights under the First, Eighth and Fourteenth Amendments. *See* Dkt. No. 64, Amended Complaint at ¶¶ 33, 34, 43.

On May 9, 2014, Defendant filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See* Dkt. No. 74. In a Report–Recommendation and Order dated October 9, 2014, Magistrate Judge Hummel recommended that this Court grant Defendant's motion in part and deny his motion in part. *See* Dkt. No. 81 at 33. Plaintiff filed objections to Magistrate Judge Hummel's recommendations. *See* Dkt. No. 83.

Where a party makes specific objections to portions of a magistrate judge's report and recommendation, the court conducts a *de novo* review of those recommendations. *See Trombley v. Oneill,* No. 8:11–CV–0569, 2011 WL 5881781, *2 (N.D.N.Y. Nov. 23, 2011) (citing Fed.R.Civ.P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C)). Where a party makes no objections or makes only conclusory or general objections, however, the court reviews the report and recommendation for "clear error" only. *See Salmini v. Astrue,* 3:06–CV–458, 2009 WL 1794741, *1 (N.D.N.Y. June 23, 2009) (quotation omitted). After conducting the appropriate review, a district court may decide to accept, reject, or modify those recommendations. *See Linares v. Mahunik,* No. 9:05–CV–625, 2009 WL 3165660, *10 (N.D.N.Y. Sept. 29, 2009) (quoting 28 U.S.C. § 636(b)(1)(C)).

Although Plaintiff's objections are, in most respects, general or conclusory, given his *pro se* status, the Court has conducted a *de novo* review of Magistrate Judge Hummel's Report–Recommendation and Order. Having completed its review, the Court hereby

**\*2** **ORDERS** that Magistrate Judge Hummel's October 9, 2014 Report–Recommendation and Order is **ACCEPTED in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendant's motion for summary judgment is **GRANTED in part** and **DENIED in part;** and the Court further

**ORDERS** that Plaintiff's First Amendment claims, his Eighth Amendment claims, and his challenge to the constitutionality of Directive 4913 are **DISMISSED;** and the Court further

**ORDERS** that, to the extent that Plaintiff has asserted claims against Defendant in his official capacity, those official-capacity claims are **DISMISSED;** and the Court further

**ORDERS** that Defendant's motion for summary judgment is **DENIED** with respect to Plaintiff's Fourteenth Amendment due process claims and with respect to Defendant's qualified immunity defense; and the Court further

**ORDERS** that this matter is referred to Magistrate Judge Hummel for all further pretrial matters; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

## REPORT–RECOMMENDATION AND ORDER [1]

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Charles McAllister ("McAllister"), a former inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), [2] brings this action pursuant to 42 U.S.C. § 1983 alleging that defendant Harold Call ("Call"), Vocational Supervisor, Mohawk Correctional Facility ("Mohawk"), violated his constitutional rights under the First, Eighth and Fourteenth Amendments. Am. Compl. (Dkt. No. 64) ¶¶ 33, 34; 4. McAllister initially commenced this civil rights action against defendants Brian Fischer, Lucien J. LeClaire, Patricia LeConey, Carol Woughter, and John and Jane Does. Defendants moved for summary judgment. Dkt. No. 49. By report and recommendation dated July 6, 2012, (1) all claims against identified defendants were dismissed; and (2) defendant was directed to join Call, who was identified in the motion papers as a John Doe defendant. Dkt. No. 55; Dkt. No. 58. The report and recommendation was accepted in its entirety, and McAllister was directed to file an amended complaint to "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing—and one Defendant—hearing officer Call." Dkt. No. 58 at 4. McAllister thereafter filed his amended complaint wherein he requested punitive and compensatory damages. Am. Compl. at 4. Presently pending is Call's motion for summary judgment on the amended complaint pursuant to Fed.R.Civ.P. 56.

2014 WL 5475293

Dkt. No. 74. McAllister did not respond. For the following reasons, it is recommended that Call's motion be granted in part and denied in part.

## I. Failure to Respond

The Court notified McAllister of the response deadline and extended the deadline for his opposition papers on two occasions. Dkt. No. 75; Dkt. No. 77; Dkt. No. 80. Call also provided notice of the consequence of failing to respond to the motion for summary judgment in his motion papers. Dkt. No. 74–1. Despite these notices and extensions, McAllister did not respond.

**\*3** Summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Thus, "[t]he fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." *Id.* at 486. Even in the absence of a response, defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). "A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist...." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (internal citations omitted); *see also Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 219 (2d Cir.2004) (same). The facts set forth in defendant's Rule 7.1 Statement of Material Facts (Dkt. No. 74–2) are accepted as true as to those facts that are not disputed in McAllister's amended complaint. N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.").

## II. Background

The facts are reviewed in the light most favorable to McAllister as the non-moving party. *See* subsection III(A) *infra.* At all relevant times, McAllister was an inmate at Mohawk. Am. Compl. ¶ 3.

On or about July 15, 2009, nonparty Correction Officer Femia, pursuant to authorization from nonparty Captain Dauphin, searched McAllister's personal property while McAllister was confined in a secure housing unit ("SHU").[3] Dkt. No. 74–3, Exh. A, at 14; Am. Compl. ¶¶ 5–6. Femia confiscated approximately twenty documents from McAllister's locker, including five affidavits that were signed by other inmates. Dkt. No. 74–3, Exh. A, at 14. As a result of the search, Femia issued McAllister a Tier III misbehavior report, alleging violations of prison rules 113.15[4] (unauthorized exchange) and 180.17 (unauthorized assistance).[5] *Id.;* Am. Compl. ¶ 7.

McAllister was assigned as his inmate assistant nonparty Correction Officer A. Sullivan. Am. Compl. ¶ 7; Dkt. No. 74–3, Exh. A, at 11. McAllister requested five inmate witnesses, documents, prison directives 4933 and 4982, and a facility rule book. Am. Compl. ¶ 8; Dkt. No. 74–3, Exh. A, at 11. He also asked Sullivan for permission to retrieve documents from his personal property. *Id.* The requested witnesses were those inmates whose signatures were affixed to the five confiscated affidavits. Dkt. No. 74–3, Exh. A, at 14. Sullivan retrieved the requested materials, and all inmate witnesses agreed to testify. *Id.* at 11.

On or about July 21, 2009, a Tier III disciplinary hearing was held before Call, who served as the hearing officer. Am. Compl. ¶ 10. McAllister pleaded not guilty to both alleged violations. Dkt. No. 74–3, Exh. A, at 38. McAllister objected to the misbehavior report as violative of prison directive 4932 because the copy he was given (1) provided insufficient notice of the charges against him and (2) differed from the report that Call read into the record. *Id.* at 39–41. McAllister stated that his copy did not list the names of the inmates to whom the confiscated affidavits allegedly belonged. *Id.* Call acknowledged the difference between the reports but concluded that the misbehavior report informed McAllister of the charges against him and the bases for the charges. *Id.* at 39, 41–42. McAllister also argued that his copy of the misbehavior report referred to confiscation of twenty documents from his cell, but did not identify the papers that were taken. *Id.* at 42. He contended that the misbehavior report's general

reference to "legal work" was insufficient to provide him with notice of the documents to which the report was referring because he had several volumes of legal work. *Id.* at 42, 59. In response to this objection, Call recited the body of the misbehavior report, which described the confiscated documents as "[a]rticles of paper which appear to be legal work including some signed affidavits" and asked McAllister, "[t]hat didn't ring a bell for you? How much paperwork did you have that fit that description?" *Id.* at 42. Call also expressed his belief that the affidavits qualified as legal work. *Id.* at 45, 57–58.

**\*4** McAllister next argued that he did not provide unauthorized legal assistance to another inmate in violation of rule 180.17 because the inmate affidavits were used as evidence to prove that the Division of Parole had a "practice" of "fail[ing] to respond to appeals over the last four years .... " Dkt. No. 74–3, Exh. A at 45–49, 56. These inmates were aware that their affidavits were created for, and to be used solely in support of, McAllister's case and that they were receiving no legal benefit. *Id.* at 48–49. McAllister further contended that he did not need permission from prison personnel to collect the affidavits. *Id.* at 64.

McAllister also argued that rule 113.15 is ambiguous because it does not list the specific items which, if found in an inmate's possession, would violate the rule. Dkt. No. 74–3, Exh. A, at 54. Finally, to the extent it can be determined from the hearing transcript, McAllister objected to the SHU procedures for handling his personal property. *Id.* at 70.

At the conclusion of the hearing, Call informed McAllister that he would be considering testimony from a confidential witness. Dkt. No. 73–3, Exh. A, at 13, 38, 73. McAllister objected to consideration of confidential testimony without being informed of the contents. *Id.* at 74. Finally, McAllister declined to call the inmates that he had requested as witnesses. *Id.* at 37, 71.

Call found McAllister guilty of violating prison rules 113.15 and 180.17. Dkt. No. 74–3, Exh. A, at 8–9, 76. He imposed a penalty of three months in SHU and three months loss of privileges. *Id.* at 8. Call relied upon the misbehavior report, the confidential testimony, the packet of legal work containing the other inmates' affidavits, and McAllister's testimony and statements. *Id.* at 9.

The disciplinary determination was reversed upon administrative appeal on the ground that the evidence failed to support a finding of guilt. Dkt. No. 74–3, Exh. B, at 79; Exh. C, at 81. In May 2010, McAllister commenced this action pursuant to 42 U.S.C. § 1983.

### III. Discussion [6]

McAllister argues that Call violated his rights under (1) the First Amendment, by (a) retaliating against him by finding him guilty and (b) hindering his access to the courts; (2) the Eighth Amendment, by imposing a three-month SHU assignment, plus ten additional days following reversal of the disciplinary hearing; and (3) the Fourteenth Amendment, because (a) he was given insufficient notice of the charges against him, (b) he was denied advance notice of the use of a confidential witness, (c) he was forced to spend approximately fifty-two days in SHU as a result of the misbehavior report, (d) Call failed to follow certain DOCCS directives and prison regulations, (e) Call demonstrated bias against him during the Tier III hearing and prejudged his guilt, and (f) he was denied equal protection.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

**\*5** The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

Where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191–92 (2d Cir.2008).

### B. Eleventh Amendment

Call argues that he is entitled to Eleventh Amendment immunity relating to McAllister's claims for money damages against him in his official capacity. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, because McAllister seeks monetary damages against Call for acts occurring within the scope of his duties, the Eleventh Amendment bar applies.

**\*6** Accordingly, it is recommended that Call's motion on this ground be granted.

### C. Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered personally involved if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon,* 58 F.3d at 873 (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [7] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

As to any constitutional claims beyond those surrounding the denial of due process at the Tier III hearing, the undersigned notes that evaluation of such is unnecessary as it is outside of the scope set forth in this Court's prior order. Dkt. No. 58 at 4. However, to the extent that Call acknowledges these claims and provides additional and alternative avenues for dismissal, McAllister fails to sufficiently allege Call's personal involvement in impeding his access to the courts, in violation of the First Amendment. McAllister argues that, as a result of Call's determination that he violated rules 113.15 and 180.17, his legal paperwork was confiscated, which impaired his ability to continue to represent himself in pending state and federal court claims. Am. Compl. ¶¶ 38–40. However, McAllister does not suggest that Call was personally involved in either the search and confiscation of paperwork that led to the filing of the misbehavior report nor the subsequent reduction in his paperwork pursuant to directive 4913. To the contrary, McAllister concedes that the paperwork was reduced pursuant to the directive.

McAllister also fails to sufficiently allege Call's personal involvement in the SHU procedures for storing property or in holding him in SHU for ten additional days following the reversal of the Tier III determination. Call stated that hr had no involvment with the storage of property in SHU. Dkt. No. 74–3, at 5. Call also contended that he "was not responsible for plaintiff's being held in SHU for additional days following the August 26, 2009 reversal of the disciplinary hearing decision of July 22, 2009." *Id.* McAllister does not allege Call's involvement in this delay. McAllister's sole reference to the ten-day delay is his claim that he "was not released from Special Housing until September 4, 2009, approximately 10 days after the reversal" Am. Compl. ¶ 43. This conclusory statement is insufficient to demonstrate Call's personal involvement in an extension of his time in SHU following the reversal of the Tier III determination. *Brown,* 647 F.Supp.2d at 200.

**\*7** Accordingly, it is recommended that Call's motion be granted insofar as McAllister alleges that Call: denied him access to the courts in violation of the First Amendment, was at all involved with the storage of his property while he was in SHU, and caused him to be held an additional ten days in SHU following administrative reversal of the Tier III determination.

### D. First Amendment

McAllister appears to argue that, in retaliation for his filing of grievances and lawsuits, Call found him guilty of the misconduct in the Tier III hearing and imposed SHU time. He suggests that his transfer to SHU, as a result of the Tier III determination, triggered enforcement of his compliance with directive 4913, which impeded his ability to proceed with active legal matters and resulted in dismissals. Am. Compl. ¶ 41. Thus, McAllister also argues that he was denied access to the courts. Am. Compl. ¶ 38. As a preliminary matter, McAllister's First Amendment retaliation and access claims are beyond the scope of the prior order of this Court directing McAllister to limit his amended complaint "include only one cause of action—a procedural due

process claim in connection with his disciplinary hearing." Dkt. No. 58, at 4. Regardless, McAllister fails to plausibly allege either retaliation or denial of access to the courts.

Courts are to "approach [First Amendment] retaliation claims by prisoners with skepticism and particular care." *See e.g., Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema, NA,* 534 U.S. 506 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. *Ashcroft,* 556 U.S. at 678; *South Cherry St., LLC v. Hennessee Group LLC,* 573 F.3d 98, 110 (2d Cir.2009). To survive a motion to dismiss, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Taylor v. Fischer,* 841 F.Supp.2d 734, 737 (W.D.N.Y.2012). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *See Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007).

 **\*8** Here, McAllister baldly states that Call's disciplinary determination was imposed in retaliation for his filing of grievances and lawsuits; however, McAllister does not identify these grievances and lawsuits nor does he claim that any of these were lodged against Call. *See generally Ciaprazi v. Goord,* No. 02–CV–915, 2005 WL 3531464, at \*9 (N.D.N.Y. Dec. 22, 2005) (dismissing the plaintiff's claim of retaliation where the plaintiff could "point to no complaints lodged by him against or implicating the conduct of [the] defendant ... who issued the disputed misbehavior report.") McAllister also provides no time frame for the apparent grievance and lawsuits. Thus, it cannot be discerned whether or how these unnamed grievances and lawsuits were a "motivating factor" in Call's Tier III determination. *Doyle,* 429 U.S. at 287 (internal quotation marks and citation omitted). McAllister's unsupported, conclusory claim fails to plausibly demonstrate that Call's determination was a product of retaliatory animus.

Undoubtedly, prisoners have a constitutional right to meaningful access to the courts. *Bounds v. Smith,* 430 U.S. 817, 824 (1977); *Lewis v. Casey,* 518 U.S. 343, 350 (1996) ("The right that *Bounds* acknowledged was the (already well-established) right of access to the courts."). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents[ ] or file them." *Lewis,* 518 U.S. at 350 (internal citations omitted). To establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). Second, the plaintiff must demonstrate that he suffered an actual injury. *Id.; Monsky v. Moraghan,* 123 F.3d 243, 247 (2d Cir.1997) (internal citations, quotation marks, and alterations omitted) (quoting *Lewis,* 518 U.S. at 329) ("In order to establish a violation of access to courts, a plaintiff must demonstrate that a defendant caused actual injury, *i.e.,* took or was responsible for actions that hindered a plaintiff's effort to pursue a legal claim"). Thus, a plaintiff must allege that the defendant was "responsible for actions that hindered his efforts to pursue a legal claim." *Davis,* 320 F.3d at 351 (internal quotation marks omitted).

Here, there is insufficient evidence to give rise to a genuine dispute of fact regarding either element of a denial of court access claim. As noted, McAllister merely states that, as a result of the property reduction pursuant to directive 4913, his "ability to continue litigation in Federal and State court caused adverse decisions by the court and dismissals." Am. Compl. ¶ 41. This claim is insufficient to demonstrate that Call was responsible for actions that hindered his legal claims. Insofar as McAllister's claim could be read to suggest that Call denied him access to the courts by confiscating his legal documents, as noted *supra,* McAllister fails to present any plausible facts to support a finding that Call was involved in the initial search of his property or in the later reduction of his property or that it was maliciously imposed by Call. As noted, the initial cell search which led to the misbehavior report was ordered by Captain Dauphin and executed by Correction Officer Femia. Similarly, McAllister concedes that his property was reduced pursuant to directive 4913. Although McAllister suggests that his transfer to SHU as a

result of the Tier III hearing triggered the application of directive 4913, he was transferred to SHU on July 9, six days before the initial cell search occurred. *Id.* ¶ 5. Thus, if McAllister were forced to comply with directive 4913 because of his transfer to SHU, he failed to demonstrate that the compliance arose from the SHU term ordered by Call rather than the unknown incident that resulted in his transfer to SHU on July 9. Further, McAllister failed to establish any actual injury because he did not specify which cases were allegedly dismissed as a result of the property reduction. *See Monsky,* 123 F.3d at 247.

**\*9** Accordingly, it is recommended that Call's motion for summary judgment be granted on this ground.

### E. Eighth Amendment

In his amended complaint, McAllister references the Eighth Amendment. Am. Compl. ¶ 31. However, McAllister's only reference to the Eighth Amendment is his assertion that Call's use of a confidential witness violated his Eighth Amendment right to be free from cruel and unusual punishment. However, in support of this argument, McAllister states only that this right was violated when Call stated, "[s]o, um there is a lot of stuff going on through my paperwork and I want to bring it to your attention before we move on ..." *Id.* ¶ 33; Dkt. No. 74–3, at 73. When read in context, it becomes clear that Call made this statement immediately before informing McAllister of his consideration of confidential information. Dkt. No. 73–3, at 73. Although, in referencing this portion of the hearing transcript McAllister alleges that he was subject to cruel and unusual punishment, it appears that McAllister intended to assert that the use of a confidential witness was a due process violation. Even if McAllister had intended to argue that use of a confidential witness violates the prohibition of cruel and unusual punishment, such a claim would necessarily fail because the Eighth Amendment protects an inmate's right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834 & 837 (1994). As McAllister makes no claim that he faced conditions of confinement imposing a risk to his health or safety and instead focuses his argument on notice of a confidential witness, giving McAllister due solicitude, his claim regarding the use of a confidential witness will be incorporated as part of the due process analysis below.

### F. Fourteenth Amendment

#### 1. Due Process

Well-settled law provides that inmates retain due process rights in prison disciplinary hearings." *Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (citing cases). However, inmates do not enjoy "the full panoply of rights" accorded to a defendant in a criminal prosecution. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). For a plaintiff to state a claim that he was denied due process at a disciplinary hearing, the plaintiff "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (per curiam) (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). To satisfy the first prong, a plaintiff must demonstrate that the deprivation of which he complains is an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted).

#### a. Denial of Liberty Interest

**\*10** In assessing whether an inmate plaintiff was denied procedural due process, the court must first decide whether the plaintiff has a protected liberty interest in freedom from SHU confinement. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). If the plaintiff demonstrates the existence of a protected liberty interest, the court is then to determine whether the deprivation

of this interest "occurred without due process of law." *Id.* at 351, citing *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460–61 (1989). Due process generally requires that a state afford an individual "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003). Although not dispositive, duration of disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000); *Blackshear v. Woodward,* No. 13–CV–1165, 2014 WL 2967752 (N.D.N.Y. July 1, 2014).

McAllister suggests that his confinement in SHU for forty-two to fifty-two days is a sufficient deprivation that requires procedural protections. Freedom from SHU confinement may give rise to due process protections; however, the plaintiff must allege that the deprivation imposed "an atypical and significant hardship." *Sandin,* 515 U.S. at 484; *Gaston v. Coughlin,* 249 F.3d 156, 162 (2d Cir.2001) (concluding that SHU confinement does not give rise to due process protections where inmate failed to demonstrate atypical hardship while confined). Although the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard (*Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999)), it has made clear that confinement in SHU for a period of one year constitutes atypical and significant restraint on inmates, deserving due process protection. *See e.g. Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (holding confinement in SHU exceeding 305 days was atypical); *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999) (concluding confinement for fewer than 101 days in SHU, plus unpleasant but not atypical conditions, insufficient to raise constitutional claim). Although the Second Circuit has generally held that confinement in SHU for 101 or fewer days without additional indicia of atypical conditions generally does not confer a liberty interest (*Smart v. Goord,* 441 F.Supp.2d 631, 641 (2d Cir.2006)), it has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealey* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards,* 364 F.3d 60, 65 (2d. Cir.2004) (citing, *inter alia, Ortiz,* 323 F.3d at 195, n. 1).

The undersigned notes that it is unclear what portion of McAllister's relatively brief time in SHU is attributable to the Tier III determination, because it appears that McAllister was already in SHU when the instant disciplinary report was filed. Am. Comp. ¶ 5; Dkt. No. 74–3, Exh. A, at 14. The undersigned also notes that there is no indication that McAllister endured unusual SHU conditions. The only reference McAllister makes to his time in SHU is that, upon his transfer to SHU, several bags of his paperwork were confiscated pursuant to directive 4913. *Id.* ¶ 37. However, review of directive 4913 reveals that the personal and legal property limit set forth in directive 4913 applies to the general prison population and inmates in other forms of segregated confinement. Dkt. No. 49–2, at 5–19. Thus, the fact that McAllister was forced to comply with directive 4913 does not indicate that he was subjected to conditions more severe than the normal SHU conditions or conditions imposed on the general prison population. Dkt. No. 74–3, Exh. A, at 14.

**\*11** Although the record is largely absent of detail of the conditions McAllister faced in SHU, there is also nothing in the record comparing the time McAllister was assigned and spent in disciplinary confinement with the deprivations endured by other prisoners "in the ordinary course of prison administration," which includes inmates in administrative segregation and the general prison population. *Welch v. Bartlett,* 196 F.3d 389, 394 (2d Cir.1999) (holding that, after *Sandin,* "the relevant comparison concerning duration is between the period of deprivation endured by the plaintiff and periods of comparable deprivation typically endured by other prisoners in the ordinary course of prison administration, including general population prisoners and those in various forms of administrative and protective custody"). Because "[t]he record does not reveal whether it is typical for inmates not being disciplined to spend similar periods of time in similar circumstances," Call's motion for summary judgment should be denied. *Id.* at 394 (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)).

Accordingly, it is recommended that defendant's motion for summary judgment on this ground be denied.

### b. **Procedural Due Process**

Assuming a liberty interest exists, it must be determined whether McAllister was denied due process at his Tier III hearing. Where disciplinary hearings could result in SHU confinement or loss of good time credit, "[i]nmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004) (citing *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999)); *see also Wolff,* 418 U.S. at 556; *Sira v. Morton,* 380 F.3d 57, 59 (2d Cir.2004).

### i. Notice

McAllister first appears to argue that he was denied procedural due process because the misbehavior report (1) violated unnamed DOCCS rules, regulations, and procedures, and (2) failed to provide him with adequate notice of the charges against him because it did not list the five inmates whose affidavits were confiscated and, thus, impacted his ability to prepare a defense to the charges. Am. Compl. ¶¶ 11–13, 16–17. Although inmates are entitled to advance written notice of the charges, "[t]his is not to suggest that the Constitution demands notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct ...." *Sira,* 380 F.3d at 72 (2d Cir.2004) (citing *Wolff,* 418 U.S. at 564). "[T]here must be sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Id.*

First, to the extent that McAllister's argues that the differing disciplinary reports violated unspecified DOCCS rules, regulations, and procedures (Am.Compl.¶¶ 12–13), this claim must fail. A section 1983 claim is not the "appropriate forum" in which to seek review of a violation of a prison regulation. *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulation or state law ... the allegations asserted must constitute violations of constitutional due process standards."). Next, McAllister fails to plausibly allege the existence of a question of fact whether the difference between the misbehavior reports deprived him of the ability to identify relevant evidence so that he could prepare a defense. Although McAllister's copy of the report was missing the names of the inmates whose affidavits were confiscated, it informed McAllister of the date, time, and location of the alleged violations; the rules alleged to have been violated; and a description of the documents that were confiscated. *Johnson v. Goord,* 305 Fed. Appx. 815, 817 (2d Cir.2009) (concluding where the inmate's copy of misbehavior report included details of alleged violation and charges against him, a sentence missing from the inmate's copy of report did not violate the inmate's due process rights). It is clear that the discrepancy between the misbehavior reports did not affect McAllister's ability to prepare and present a defense. Prior to the hearing, McAllister requested as witnesses the five inmates whose affidavits were found during the property search. Indeed, the record demonstrates that McAllister was able to both identify the documents referenced in the misbehavior report and address them at the hearing. Dkt. No. 74–3, Exh. A at 45, 47–48.

**\*12** Thus, because he received sufficient notice of the charges against him and was able to prepare and present a defense on his behalf, McAllister fails to raise a question of fact as to whether he was denied sufficient notice of the charges against him.

### ii. **Hearing Officer Bias/Pre-determination of Guilt**

McAllister also contends that his procedural due process rights were violated because Call was biased against him and prejudged his guilt. The Fourteenth Amendment guarantees inmates the right to the appointment of an unbiased hearing officer to address a disciplinary charge. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). An impartial hearing officer "does not prejudge the evidence" and is not to say "how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990); *see also Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard"). However, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of

the hearing." *Nelson v. Plumley,* No. 9:12–CV–422, 2014 WL 4659327, at \*11 (N.D .N.Y. Sept. 17, 2014) (quoting *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911414, at \* 5 (W.D.N.Y. Oct. 5, 2010) (quoting *Waldpole v. Hill,* 472 U.S. 445, 455 (1985)). However, "the mere existence of 'some evidence' in the record to support a disciplinary determination does not resolve a prisoner's claim that he was denied due process by the presence of a biased hearing officer." *See Smith v. United States,* No. 09–CV–729, 2012 WL 4491538 at \*8 (N.D.N.Y. July 5, 2012).

Prison officials serving as hearing officers "enjoy a rebuttable presumption that they are unbiased." *Allen,* 100 F.3d at 259. "Claims of a hearing officer bias are common in [inmate section] 1983 claims, and where they are based on purely conclusory allegations, they are routinely dismissed." *Washington v. Afify,* 968 F.Supp.2d 532, 541 (W.D.N.Y.2003) (citing cases). "An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Johnson v. Fernandez,* No. 09–CV–626 (FJS/ATB), 2011 WL 7629513, at \*11 (N.D.N.Y. Mar. 1, 2011) (citing *Francis,* 891 F.2d at 46).

McAllister first argues that Call prejudged his guilt. He supports this contention by pointing to moments during the Tier III hearing where Call expressed his belief that McAllister's possession of affidavits signed by other inmates was sufficient to support a violation of prison rules 113.15 and 180.17. Am. Compl., ¶¶ 13, 15, 23–25, 36. Here, however the challenged affidavits were not evidence that Call prejudged because he had the opportunity to review the affidavits and did so at the hearing. Although McAllister disagreed with Call's opinion that possession of such documents would be a *per se* violation of the rules, Call's assertion of belief in this matter was an opinion he reached following his personal review of this evidence. *See Johnson v. Doling,* No. 05–CV–376, 2007 WL 3046701, at \* 10 (N.D.N.Y. Oct. 17, 2007) (holding that where the "[p]laintiff was provided the opportunity to testify, [and] call and question witnesses .... [d]isagreement with rulings made by a hearing officer does not constitute bias"). Thus, it does not appear that Call prejudged this evidence.

**\*13** To support his claim that Call exhibited bias and partiality against him in the Tier III hearing, McAllister points out that, after he objected to the misbehavior report for failing to provide him sufficient notice of the documents confiscated, Call read the portion of the misbehavior report describing the documents as "[a]rticles of paper which appear to be legal work including some signed affidavits," and stated "that didn't ring a bell for you?" *Id.* ¶¶ 19, 32). When read in context, this statement does not establish bias on Call's part, rather it appears to be a genuine question. Though it may be said that Call could have couched this question in a kinder manner, this statement does not demonstrate bias. Moreover, that the Tier III determination was reversed on appeal, without more, is not evidence of bias or other due process violation. *Eng v. Therrien,* No. 04–CV–1146, 2008 WL 141794, at \*2 (N.D.N.Y. Jan. 11, 2008).

Thus, McAllister fails to plausibly allege the existence of question of fact whether Call prejudged his guilt or was otherwise biased in the Tier III hearing.

### iii. Failure to Investigate

McAllister next suggests that he was denied procedural due process because Call declined to interview the law library officer. Am. Compl. ¶ 29. Call permitted McAllister to present testimony on his behalf and afforded him the opportunity call witnesses. Had McAllister wished to hear testimony from the law library officer, he could have requested the law library officer as a witness. *Wolff,* 418 U.S. at 566 (inmates have a right to call witnesses in their defense at disciplinary hearings). That Call found it unnecessary to independently interview the law library officer—especially where McAllister did not demonstrate that his testimony would be relevant—does not result in a denial of due process because "[t]here is no requirement ... that a hearing officer assigned to preside over a disciplinary hearing conduct an independent investigation; that is simply not the role of a hearing officer." *Robinson v. Brown,* No. 9:11–CV–0758, 2012 WL 6799725, \*5 (N.D.N.Y. Nov. 1, 2012).

Accordingly, McAllister fails plausibly raise a due process violation based on Call's alleged failure to investigate.

### iv. **Confidential Witness**

To the extent it can be discerned, McAllister contends that he was denied due process because Call relied on confidential witness testimony, yet failed to provide him with advance notice of the confidential witness and refused to inform him of his or her identity or the nature of the testimony. Am. Compl. ¶¶ 30–34. The Second Circuit has held that a hearing officer must perform an independent assessment of a confidential informant's credibility for such testimony to be considered reliable evidence of an inmate's guilt. *Sira,* 380 F.3d at 78 (noting that, "when sound discretion forecloses confrontation and cross-examination, the need for the hearing officer to conduct an independent assessment of informant credibility to ensure fairness to the accused inmate is heightened.").

 **\*14** Here, the record provides no indication that Call independently assessed the credibility and reliability of the confidential witness. The confidential witness form merely states that Call "was provided confidential information relating to the misbehavior report ." Dkt. No. 74–3, at 13. Similarly, Call does not provide whether or how he performed an assessment of the witness's credibility. *Id.* at 4. Therefore, there exist questions of fact whether Call deprived McAllister of due process by relying on this testimony without an independent assessment of the witness's credibility.

To the extent that McAllister argues that he was denied due process by Call's decision to refuse to disclose the content of the confidential witness's testimony, the law in this circuit provides that where a prison official decides to keep certain witness testimony confidential, he or she "must offer a reasonable justification for their actions, if not contemporaneously, then when challenged in a court action." *Sira,* 380 F.3d at 75 (citing *Ponte v. Real,* 471 U.S. 491, 498 (1985)). Although "[c]ourts will not readily second guess the judgment of prison officials with respect to such matters ... the discretion to withhold evidence is not unreviewable...." *Id.* (citations omitted). Here, Call failed to provide his rationale for refraining to share the substance of this testimony, stating merely that McAllister could not be told the substance of the testimony because "it is by definition it is ... confidential." Dkt. No. 74–3, at 74. As Call presented no reason to justify withholding the identity or substance of the confidential witness's testimony, McAllister presents a viable due process claim based on the nondisclosure of this evidence. *Sira,* 380 F.3d at 76.

Accordingly, Call's motion for summary judgment should be denied on this ground.

### v. **Some Evidence**

"Once a court has decided that the procedural due process requirements have been met, its function is to determine whether there is some evidence which supports the decision of the [hearing officer]." *Freeman v. Rideout,* 808 F.2d 949, 954 (2d Cir.1986) (citations omitted). In considering whether a disciplinary determination is supported by some evidence of guilt, "the relevant question is whether there is any evidence in the record [before the disciplinary board] that could support the conclusion reached by the disciplinary board." *Superintendent v. Hill,* 472 U.S. 445, 455–56 (1985) (citations omitted); *Sira,* 380 F.3d at 69. The Second Circuit has interpreted the "some evidence" standard to require "reliable evidence" of guilt. *Luna,* 356 F.3d at 488.

In making his determination, Call relied upon McAllister's testimony and statements, testimony of a confidential witness, the misbehavior report, and the legal documents confiscated during the property search. Dkt. No. 74–3, at 4. As noted, based on the record provided, Call did not perform an independent assessment of the witness's credibility. Thus, Call's reliance on confidential testimony would be insufficient to support a finding of guilt. *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001) (determining that reliance on confidential informant's testimony insufficient to provide "some evidence" of guilt where there was no independent examination of indicia relevant to informant's credibility). The remaining evidence relied upon—McAllister's testimony, the misbehavior report, and the affidavits—does not constitute some evidence of guilt, as required by the Due Process clause.

**\*15** The affidavits alone do not constitute some evidence of guilt because mere possession of affidavits signed by other inmates would not violate prison rules 113.15 and 180.17 were it true that these documents were McAllister's property and drafted solely for his benefit. Similarly, although a written misbehavior report may serve as some evidence of guilt, such is the case where the misbehavior report charges the plaintiff for behavior that the author of the misbehavior report personally witnessed. *Creech v. Schoellkoph,* 688 F.Supp.2d 205, 214 (W.D.N.Y.2010) (citations omitted) (misbehavior report drafted by officer who personally observed plaintiff possess and transfer pieces of sharpened metal to another inmate constituted some evidence of guilt). In this case, where a determination of guilt would appear to turn on knowledge of the ownership of the documents and an understanding of the circumstances under which the papers were drafted, a misbehavior report which merely states that papers appearing to be legal work signed by other inmates were found in McAllister's property, it does not establish a per se violation of rules 113.15 and 180.17. *See Hayes v. Coughlin,* No. 87 CIV. 7401, 1996 WL 453071, at \*3 (S.D.N.Y. Aug. 12, 1996) ("if a misbehavior report can serve as 'some evidence' for a hearing decision and thereby insulate a hearing from review, there would be little point in having a hearing"); *see also Williams v. Dubray,* No. 09–CV–1298, 2011 WL 3236681, at \*4 (N.D.N.Y. July 13, 2011) (holding that there were questions of fact whether the determination was based upon some evidence of guilt where the hearing officer relied on misbehavior report that was based on a corrections officer's unsupported accounts, without additional evidence to support its charges). Thus, absent additional evidence that these papers belonged to other inmates or that McAllister drafted the documents for other inmates' use, the fact that the misbehavior report identified these documents as being found in McAllister's secured property does not constitute reliable evidence of guilt.

Finally, McAllister's testimony does not constitute reliable evidence of guilt. In response to the charge of violating rule 113.15, McAllister testified that the affidavits were his property because he drafted them solely as evidence in his personal litigation against the Department of Probation. Similarly, in defense of the charge for violating rule 180.17, McAllister repeatedly testified that he did not provide legal assistance to the inmates in question because the affidavits were written solely to serve as supporting evidence in his personal action, the inmates were aware that they would receive no legal benefit as a result, and he did not receive any compensation from the inmates. Regardless whether Call considered McAllister's testimony to be credible, without some other reliable evidence, such as, perhaps, a statement from one of the other inmates claiming that he signed the affidavit under the belief that McAllister would provide him with legal assistance, McAllister's testimony denying violations of the charged prison rules would not constitute some evidence of guilt.

**\*16** Accordingly, it is recommended that Call's motion for summary judgment be denied as to McAllister's procedural due process claim.

### c. **Directive 4913**

McAllister further argues that, as a result of the SHU placement, he suffered an unconstitutional deprivation of his legal and personal property because he was required to comply with the limits set forth in directive 4913. This Court has already ruled upon this claim when it was raised at earlier stages. In deciding Call's motion for summary judgment on the McAllister's first complaint, this Court held that the directive did not violate his Fourteenth Amendment rights:

> Directive # 4913 was reasonably related to valid institutional goals given DOCCS' responsibility to provide for the health and safety of its staff and inmates and the alternatives provided to inmates in being able to seek exceptions and choose which four or five draft bags of material would remain with them. Moreover, the rules were neutral and reasonably related to the ultimate goals of the facility, security and safety.

*McAllister v. Fischer,* 2012 WL 7681635, at \*12 (N.D.N.Y. July 6, 2012) (Dkt. No. 55, at 22–23), *Report and Recommendation adopted by* 2013 WL 954961 (N.D.N.Y. Mar. 12, 2013) (Dkt. No. 58), *appeal dismissed* 2d Cir. 13–111 (Jan. 13.2014). Further,

the Court concluded that directive 4913 "did not violate[ ] McAllister's Fourteen Amendment rights" and was "reasonably related to valid institutional goals." Dkt. No. 55, at 23–24; Dkt. No. 58. Thus, any such claim is barred by the law of the case. *Arizona v. California,* 460 U.S. 605, 618 (1983) (citations omitted); *see also United States v. Thorn,* 446 F.3d 378, 383 (2d Cir.2006) (internal quotation marks and citations omitted) ("The law of the case doctrine counsels against revisiting our prior rulings in subsequent stages of the same case absent cogent and compelling reasons ...."); *Arizona,* 460 U.S. at 618 (citations omitted); *Wright v. Cayan,* 817 F.2d 999, 1002 n. 3 (2d Cir.1987) (citations omitted) ("Even when cases are reassigned to a different judge, the law of the case dictates a general practice of refusing to reopen what has been decided.").

Accordingly, it is recommended that defendant's motion for summary judgment be granted on this ground.

### 2. **Equal Protection**

McAllister's only reference to an equal protection violation in the amended complaint is his conclusory claim that Call's reference to a confidential witness during the Tier III hearing was in violation of his right to equal protection. Am. Compl. ¶ 31. Further, in this Court's previous order, McAllister's equal protection claim was dismissed for failure to demonstrate, among other things, that he was part of a protected class or that he was treated differently from any similarly-situated inmates. Dkt. No. 58, at 4; Dkt. No. 55, at 24–25. Thus, any such claim would also be barred by the law of the case. *Thorn,* 446 F.3d at 383. Regardless, McAllister's equal protection claim must also fail for the reasons discussed *infra.*

 **\*17**  To establish an equal protection violation, a plaintiff must show that "he was treated differently than others similarly situated as the result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). McAllister has not identified, nor does the record disclose, any basis for a reasonable fact-finder to conclude that he was treated differently from similarly-situated individuals. Rather, plaintiffs only support for his equal protection claim is the following:

> Call, throughout the entire disciplinary hearing deprive [sic] plaintiff equal protection when he stated: "This is hearing officer Call, this is 2:21 as I was going through my paperwork I realized something that I wanted to point out to Mr. McAllister."

> Defendant Call discriminated against plaintiff when he stated: "I reviewed it this morning the 22nd when it was received again is confidential"

Am. Compl. ¶¶ 31–32. McAllister does not explain how these statements denied him equal protection. McAllister fails to plausibly suggest that he was treated differently from any similarly-situated individuals. Further, even if these statements demonstrate the existence of questions of fact regarding whether McAllister was treated differently from similarly-situated persons, he fails to identify disparity in the conditions "as a result of any purposeful discrimination directed at an identifiable suspect class." *See Dolberry v. Jakob,* No. 11–CV–1018, 2014 WL 1292225, at \*12 (N.D.N.Y. Mar. 28, 2014).

Accordingly, it is recommended that defendant's motion on this ground should be granted.

### G. **Qualified Immunity**

Call contends that, even if McAllister's claims are substantiated, he is entitled to qualified immunity. The doctrine of qualified immunity is an affirmative defense which "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan,* 555 U.S. 223, 244 (2009). Even if a disciplinary disposition is not supported by "some evidence," prison officials are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Luna,* 356 F.3d at 490 (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)) (internal quotation marks omitted). This assessment is made "in light of the legal rules that were clearly established at the time it was taken." *Wilson,* 526 U.S. at 614; *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). To determine whether a state official is entitled to qualified immunity for acts taken during the course of

his or her employment, a reviewing court is to determine: "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful." *Phillips v. Wright,* 553 Fed. Appx. 16, 17 (2d Cir.2014) (citing *Gonzalez v. City of Schenectady,* 728 F.3d 149, 154 (2d Cir.2013)).

 **\*18** First, as discussed, McAllister presented a viable due process claim that the determination was not based on some evidence of guilt because Call (1) relied on confidential witness testimony without making an independent assessment of the witness's credibility and (2) did not otherwise have sufficient reliable evidence to support his finding of guilt. McAllister has also raised issues of fact whether the remaining evidence relied upon—the misbehavior report, McAllister's testimony and statements, and the confiscated legal papers—provided reliable evidence of guilt.

Addressing the second prong of the analysis, there is a clearly-established right to procedural due process protections, including the right to have a disciplinary determination be based on some evidence of guilt. There is also a clearly-established right to an independent assessment of confidential witnesses performed where a hearing officer relies on the witness's testimony (*Vasquez v. Coughlin,* 726 F.Supp. 466, 472 (S.D.N.Y.1989) (right clearly established by 1986); see also *Sira,* 380 F.3d at 80). Further, although there is no bright-line for what suffices as "some evidence" in every prison disciplinary proceeding (*Woodard v. Shanley,* 505 Fed. Appdx. 55, 57 (2d Cir.2012)), there were questions of fact surrounding the allegedly reliable evidence demonstrating that McAllister was in possession of other inmates' legal documents or that he provided them with unauthorized legal assistance. *Cf. Turner v. Silver,* 104 F.3d 354, at \*3 (2d Cir.1996) (some evidence to support determination that the defendant violated rule against unauthorized legal assistance where documentary evidence indicated the plaintiff received payment from other inmates, author of misbehavior report testified regarding an interview with informant who implicated defendant, prison official testified that inmate told her he had been charged for law library services and inmate testified the same). Call both failed to perform an independent assessment of the confidential witness's credibility and provided no explanation for why both the identity of the witness and the substance of his or her testimony could not be disclosed to McAllister. *Sira,* 380 F.3d at 75 (citing *Ponte,* 471 U.S. at 498).

Thus, given the state of the law regarding the rights to which an inmate is entitled in his disciplinary hearing, it was not objectively reasonable for Call to have believed that (1) he need not perform an independent assessment of the witness credibility or (2) the misbehavior report, confiscated affidavits, and McAllister's consistent testimony and statements, without more, sufficiently supported a determination that McAllister violated rules 113.15 and 180.17.

Accordingly, defendant's motion for summary judgment should be denied on this ground.


IV. **Conclusion**

For the reasons stated above, it is hereby **RECOMMENDED** that defendant's motion for summary judgment (Dkt. No. 74) be

 **\*19** 1. **GRANTED** insofar as:

   a. dismissing plaintiff's First Amendment claims;

   b. dismissing plaintiff's Eighth Amendment claims;

   c. dismissing plaintiff's challenge to the constitutionality of Directive 4913;

   d. defendant's Eleventh Amendment immunity defense;

2. **DENIED** as to:

a. plaintiff's Fourteenth Amendment procedural due process claims;

b. defendant's qualified immunity defense.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'v of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Dated: October 9, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 5475293

## Footnotes

1    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    McAllister is no longer incarcerated and is currently under the supervision of DOCCS.

3    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. COMP.CODES R. & REGS. tit 7, § 300.2(b) (1999). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

4    Rule 113.15 provides that "[a]n inmate shall not purchase, sell, loan, give or exchange a personally owned article without authorization." 7 NYCRR 270.2.

5    Rule 180.17 provides that "[a]n inmate may not provide legal assistance to another inmate without prior approval of the superintendent or designee. An inmate shall not receive any form of compensation for providing legal assistance." 7 NYCRR 270.2.

6    All unpublished decisions referenced herein are appended to this report and recommendation.

7    Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N .Y.2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

2023 WL 3727447
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Charles J. SMITH, Plaintiff,

v.

Brian SULLIVAN, et al., Defendants.

No. 9:20-CV-659 (DNH/CFH)
|
Signed May 3, 2023

**Attorneys and Law Firms**

Charles J. Smith, 96-A-6765, Gouverneur Correctional Facility, Scotch Settlement Road, P.O. Box 480, Gouverneur, New York 13642, Plaintiff pro se.

LYNN MARIE KNAPP, ESQ., STACEY A. HAMILTON, ESQ., Assistant Attorneys General, Attorney General for the State of New York, The Capitol, Albany, New York 12224, Attorneys for defendants.

### REPORT-RECOMMENDATION AND ORDER [1]

CHRISTIAN F. HUMMEL, UNITED STATES MAGISTRATE JUDGE

**\*1** Plaintiff pro se Charles J. Smith ("plaintiff"), who was at all relevant times in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants Tier III Disciplinary Hearing Officer Lieutenant ("Lt.") Brian Sullivan ("Sullivan") and Sergeant ("Sgt.") Barkman ("Barkman") (collectively, where appropriate, "defendants"), violated his constitutional rights under the First, Eighth, and Fourteenth Amendments, as well under New York State law. See Dkt. No. 50 ("Sec. Am. Compl."). [2] Presently before the Court are defendants' motion for summary judgment brought pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56, see Dkt. No. 119; plaintiff's motion for summary judgment, see Dkt. No. 124; plaintiff's and defendants' responses in opposition to the other party's motion, see Dkt. Nos. 125, 129; and both parties' statements of material facts, see Dkt. Nos. 126, 134. Plaintiff also filed a response to defendants' statement of material facts. See Dkt. No. 135. For the reasons that follow, it is recommended that defendants' motion be granted, plaintiff's motion be denied, and plaintiff's second amended complaint be dismissed in its entirety.

### I. Procedural Issues

#### A. Defendant Patrick Mahar

In his second amended complaint, plaintiff named Correctional Officer ("C.O.") Patrick Mahar ("Mahar") as a defendant. See Sec. Am. Compl. at 3, 10-11. [3] Mahar died on October 9, 2021, and defendants filed a Statement Noting Death pursuant to Federal Rule of Civil Procedure 25 on March 25, 2022. See Dkt. No. 65; see also Dkt. No. 119-16 at 8. Under Rule 25, "[i]f a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative." Fed. R. Civ. P. 25(a)(1). "If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed." Id.

Far more than ninety days have passed since defendants filed the notice of Mahar's death and neither party moved to substitute another defendant. See Dkt. No. 65. Accordingly, it is recommended that the claims against defendant Mahar be dismissed. See Baron v. Miller, No. 3:13-CV-153 (FJS/DEP), 2015 WL 1788945, at *3 (N.D.N.Y. Apr. 20, 2015) ("[M]ore than ninety days have elapsed since the filing of notice of [the] defendant['s] [ ] death. During that time neither [the] plaintiff nor any other party has moved to substitute another representative of [the] defendant [ ] and/or the estate of [another] defendant [ ]. Accordingly, [the] plaintiff's claims against [the] defendant [ ] ... are subject to dismissal."). [4]

### B. Plaintiff's Memoranda of Law

#### 1. Local Rule 7.1

**\*2** Plaintiff's memorandum of law filed in support of his motion for summary judgment is sixty pages. [5] See Dkt. No. 124-1. His memorandum of law filed in support of his opposition to defendants' motion for summary judgment is twenty-eight pages. See Dkt. No. 125-1.

Local Rule 7.1 requires that a memorandum of law not exceed twenty-five, double-spaced pages "unless that party obtains leave of the judge hearing the motion prior to filing." L.R. 7.1(b)(1). Plaintiff did not seek permission from the Court to exceed the twenty-five-page limit.

"It is well established that a court is ordinarily obligated to afford a special solicitude to pro se litigants," because "a pro se litigant generally lacks both legal training and experience, and, accordingly, is likely to forfeit important rights through inadvertence if he is not afforded some degree of protection." Tracy v. Freshwater, 623 F.3d 90, 101 (2d Cir. 2010). However, a litigant's pro se status does not excuse non-compliance with the Local Rules. See Faretta v. California, 422 U.S. 806, 834, n.46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); Caidor v. Onondaga County, 517 F.3d 601, 605 (2d Cir. 2008) (citations omitted) ("We recognize that the right to appear pro se 'should not be impaired by harsh application of technical rules,' and therefore we 'make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training.' Nonetheless, 'pro se litigants generally are required to inform themselves regarding procedural rules and to comply with them.' ").

This Court is often reluctant to strike a pro se litigant's memorandum of law that exceeds the Local Rules' mandate in light of special solicitude. See Avent v. Platinum Plus Auto Prot., No. 1:19-CV-1494 (BKS/DJS), 2021 WL 706643, at *4 (N.D.N.Y. Feb. 23, 2021) ("[O]ut of solicitude to his pro se status the Court will, on this occasion, consider [the p]laintiff's [forty-one-page] brief in its entirety."); Sidney v. Caron, No. 9:09-CV-1326 (GTS/ATB), 2012 WL 4380392, at *2, n.2 (N.D.N.Y. Sept. 25, 2012) (considering entirety of thirty-five-page memorandum of law); Solomon v. Hum. Servs. Coal. of Tompkins Cnty. Inc., No. 5:11-CV-226 (GTS/ATB), 2012 WL 3996875, at *3, n.2 (N.D.N.Y. Sept. 11, 2012) ("Although [the p]laintiff's opposition memorandum of law blatantly violates the Court's 25–page limit on such memoranda (which [the p]laintiff had previously been advised through her receipt of a courtesy copy of the District's Pro Se Handbook and Local Rules of Practice), the Court will ignore that violation, out of an extension of special solicitude to her as a pro se civil rights litigant.").

Here, given plaintiff's pro se status and because defendants were afforded the opportunity to respond to plaintiff's motion for summary judgment, the Court will consider the excess pages from plaintiff's memoranda of law. See Dkt. Nos. 124-1, 125-1; see also Catz v. Precision Glob. Consulting, No. 19-CV-7499 (ER), 2021 WL 1600097, at *4 (S.D.N.Y. Apr. 23, 2021) (collecting cases) ("While it is within the Court's discretion to strike memoranda for failing to abide by the Court's Individual Practices, courts throughout the Second Circuit have typically exercised such discretion only when the opposing party is prejudiced by the violation or did not have the opportunity to respond in its own memorandum."). However, plaintiff is cautioned that regardless of his pro se status, he must comply with the Local Rules in the future.

## 2. Raising New Claims

**\*3**  Defendants argue that in plaintiff's motion for summary judgment, he raises claims that were not asserted in his second amended complaint. See Dkt. No. 129 at 5. Specifically, defendants assert that plaintiff raises the following claims in his motion which are not before the Court: due process claims; a malicious prosecution claim; a cruel and unusual punishment claim; and a sufficiency of the evidence claim. See id. at 5-7 (citations omitted).

In his statement of material facts, [6] plaintiff contends, "[t]here is no mention – according to Dkt. 49 – that indicates that the Court reviewed the Second Amended Complaint (if at all) and found/decided that" only certain claims remained. Dkt. No. 134 at 4, ¶ 11. In his "Opposition to Def.'s Statements of Material Facts" plaintiff states that his "Second Amended Complaint was not yet reviewed nor decided as to what claims survived." Dkt. No. 135 at 1. Specifically, plaintiff notes that "[i]n 2nd amended complaint there exist[s] a claim against Def. Barkman (see page A7 of that complaint) for 8[th] Amendment violations (and 'supervisory liability') that does not appear in prior (the 1[st]) amended nor original complaint...." Id.

" '[I]t is black letter law that a party may not raise new claims for the first time in opposition to summary judgment' and this principle applies to cross-motions for summary judgment as well[.]" Zdziebloski v. Town of E. Greenbush, No. 1:15-CV-0298 (LEK/CFH), 2017 WL 1968672, at \*9 (N.D.N.Y. May 11, 2017) (additional citation omitted) (quoting Brandon v. City of New York, 705 F. Supp. 2d 261, 278 (S.D.N.Y. 2010)); see also Valentine Properties Assocs., LP v. U.S. Dep't of Hous. & Urb. Dev., 785 F. Supp. 2d 357, 372 (S.D.N.Y. 2011) (collecting cases to support the contention that it "is impermissible[ ]" for claims to be "raised for the first time in [a p]laintiffs' motion papers."), aff'd, 501 F. App'x 16 (2d Cir. 2012) (summary order); Murray v. Palmer, No. 9:03-CV-1010 (DNH/GLS), 2008 WL 2522324, at \*22 (N.D.N.Y. June 20, 2008) ("[A] pro se plaintiff's papers in opposition to a motion for summary judgment may not be [ ] read [to effectively amend the pleading], in large part due to prejudice that would inure to the defendants through having the pleading changed after discovery has occurred and they have gone through the expense of filing a motion for summary judgment.").

Similarly, when a court has previously dismissed certain claims, courts will not then consider those claims at the summary judgment stage. See Heyliger v. Trombley, No. 9:14-CV-00603 (TJM/TWD), 2016 WL 11480156, at \*10 (N.D.N.Y. June 9, 2016) ("Inasmuch as [the p]laintiff's 'First Amendment right to free speech' and 'substantive due process claims' were previously dismissed ... upon initial review, the Court recommends denying [the p]laintiff's motion for summary judgment as to these claims."), report and recommendation adopted, 2016 WL 4029346 (N.D.N.Y. July 27, 2016); Hosp. Auth. of Rockdale Cnty. v. GS Cap. Partners V Fund, L.P., No. 09-CV-8716 (PAC), 2013 WL 840851, at \*8 (S.D.N.Y. Mar. 6, 2013) (noting that the defendant cannot reassert previously dismissed arguments in light of information learned through discovery because "[d]iscovery cannot change the prior determinations...."); Jones v. Vill. of Bath Police Dep't, No. 08-CV-00517 (RJA/JJM), 2011 WL 4748342, at \*1, n.2 (W.D.N.Y. Sept. 15, 2011) ("[The p]laintiff also alleges unspecified violations of the Americans with Disabilities Act, but these claims were previously dismissed ... [.]"), report and recommendation adopted, 2011 WL 4748297 (W.D.N.Y. Oct. 5, 2011).

**\*4**  Finally, although " '[i]t is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect,' '[i]n rare circumstances, courts in the Second Circuit will consider prior pleading[.]' A court will do so only 'when the plaintiff directly contradicts the facts set forth in his original complaint.' " Diaz v. Loc. No. 241, Transp. Workers Union of Am., Univ. Div., No. 17-CV-8898, 2019 WL 3765924, at \*2 (S.D.N.Y. Aug. 9, 2019) (alterations in original) (quoting Int'l Controls Corp. v. Vesco, 556 F.2d 665, 668 (2d Cir. 1977); 2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assurance Co., 96 F. Supp. 3d 182, 206 (S.D.N.Y. 2015)). "Thus, '[w]here ... an amended pleading is not in 'direct' contradiction with the original pleading, courts apply the general rule recognizing that an amended pleading completely replaces the original pleading.' " Id. (citation omitted); see also Brooks v. 1st Precinct Police Dep't, No. 11-CV-6070 (MKB), 2014 WL 1875037, at \*3 (E.D.N.Y. May 9, 2014).

Plaintiff filed his original complaint on June 12, 2020. See Dkt. No. 1. After reviewing the complaint under 28 U.S.C. § 1915A, the Court permitted certain claims to proceed and dismissed others with and without prejudice. See Dkt. No. 4 at 29. The Court instructed plaintiff that should he wish to pursue any of the claims dismissed without prejudice, an amended complaint would "supersede and replace the original complaint in its entirety[.]" Id. at 30, n.15. Plaintiff then filed an amended complaint on August 17, 2020. See Dkt. No. 8. The Court reviewed the amended complaint and permitted specific claims to proceed and dismissed others without prejudice. Dkt. No. 9 at 19-20. Defendants answered the amended complaint. See Dkt. No. 27.

On July 14, 2021, plaintiff moved to "supplement" his amended complaint. Dkt. No. 33. The Court instructed plaintiff that he must file a formal motion to amend. The Court entered a Text Order, which was sent to plaintiff via regular mail, and which denied plaintiff's motion to supplement and stated that his "proposed amended pleading must be a complete pleading, which will supersede the original pleading in all respect. Plaintiff's proposed amended pleading shall not incorporate by reference any portion of any prior pleading." Dkt. No. 35 (citation omitted); see L.R. 15.1(a). On August 30, 2021, plaintiff moved to amend his amended complaint. See Dkt. No. 38. Plaintiff attached his proposed second amended complaint. See Dkt. No. 38-1. In his motion, plaintiff asked that his proposed second amended complaint "be also supplemental pleading therein the Amended Complaint. And if not, then it's to remain as an Amended Complaint over my opposition as to what it should be constituted as." Dkt. No. 38 at 5, ¶ 7.

On December 9, 2021, the Court granted in part and denied in part plaintiff's motion to amend. See Dkt. No. 49. The Court reviewed plaintiff's proposed second amended complaint and stated that it was "materially similar to the amended complaint, with a few exceptions." Id. at 6. The Court explained that in his second amended complaint, plaintiff sought to name additional defendants—DOCCS Commissioner Anthony Annucci and Superintendent of Greene Correctional Facility ("Greene C.F.") Smith; he no longer named "Counselor Yannone or the official identified in the amended complaint as 'John Doe' " as defendants; and he clarified the spelling of defendant Barkman's name. Id. at 6-7. The Court stated that

> the proposed second amended complaint re-asserts the following claims for relief that survived the Court's review of the amended complaint in accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b): (1) First Amendment retaliation claims against defendants Barkman (formerly "Parkman") and Mahar; (2) an Eighth Amendment failure-to-protect claim against defendant Mahar, and a related state law tort claim; (3) an Eighth Amendment conditions-of-confinement claims against defendant Sullivan, and a related state law tort claim; and (4) Fourteenth Amendment equal protection claims against defendants Barkman and Sullivan.

**\*5** Id. at 11-12. The Court granted plaintiff's motion "insofar as plaintiff seeks to re-assert the aforementioned claims (and clarify the spelling of one of the named defendants)." Id. at 12. The Court then denied plaintiff's motion "insofar as plaintiff seeks to assert an Eighth Amendment conditions-of-confinement claim against defendant Barkman[,]" DOCCS Commissioner Annucci, and Greene C.F. Superintendent Smith. Id. at 14-15. The Court informed plaintiff that his second amended complaint "supersede[d] and replace[d] the previously filed amended complaint and will be the operative pleading." Id. at 16. The Court separately docketed plaintiff's second amendment complaint and defendants answered the second amended complaint. See Sec. Am. Compl.; Dkt. No. 53.

Based on the foregoing, plaintiff's contention that the Court did not review his second amended complaint and state which claims survived, is incorrect. See Dkt. No. 134 at 4, ¶ 11; Dkt. No. 135 at 1. The Court explicitly stated which claims were reasserted in plaintiff's second amended complaint and survived review, denied plaintiff's request to add other claims, and informed him that the second amended complained replaced the previously filed complaints. See Dkt. No. 49 at 11-16.

Plaintiff's motion for summary judgment, statements of material facts, and responses, focus largely on alleged due process violations. See Dkt. No. 124-1 at 19-24, 27-34, 42-45; Dkt. No. 125-1 at 7, Dkt. No. 125-2 at 1. In his first amended complaint, plaintiff asserted a due process claim, alleging that a disciplinary hearing was held after the statutorily allowed time and that he was held in the Special Housing Unit ("SHU") without a hearing. See Dkt. No. 8 at 7-8. The Court, in reviewing plaintiff's first amended complaint, noted that he raised due process claims, but dismissed those claims for failure to state a claim upon which relief could be granted. See Dkt. No. 9 at 7, 9, 10, 14. Plaintiff did not reallege the due process allegations in his second amended complaint. See generally Sec. Am. Compl. To be sure, in his second amended complaint, plaintiff mentioned a "[d]enial of due process" and that Sullivan "refused to hear [his] re[a]soning" at a disciplinary hearing. Id. at 3, 14. However, the Court did not conclude that this was sufficient to assert a due process claim. Rather, the Court interpreted plaintiff's second amended complaint to raise only certain claims, none of which were a due process claim. See Dkt. No. 49 at 12. Likewise, plaintiff argues that he included an Eighth Amendment claim against defendant Barkman in his second amended complaint. See Dkt. No. 135 at 1. The undersigned agrees that plaintiff raised an Eighth Amendment conditions of confinement claim against Barkman in his second amended complaint. See Sec. Am. Compl. at 12. However, the Court explicitly reviewed that claim and denied plaintiff's motion to amend. See Dkt. No. 49 at 13-14. Plaintiff did not appeal or otherwise contest the Court's decision.

As plaintiff was informed numerous times that an amended complaint would supersede all previously filed complaints, his second amended complaint does not in any way contradict his original or first amended complaint, and he did not challenge or seek reconsideration of the Court's decision on his motion to amend, the Court will not consider claims that the Court previously dismissed or denied amendment, or that were not previously raised. See Heyliger, 2016 WL 11480156, at *10; Diaz, 2019 WL 3765924, at *2; Zdziebloski, WL 1968672, at *9. The undersigned will address only those claims that survived this Court's review and that relate to the two remaining defendants: (1) a First Amendment retaliation claim against Barkman; (2) an Eighth Amendment conditions of confinement claim against Sullivan, and a related state law tort claim; and (3) Fourteenth Amendment Equal Protection claims against Barkman and Sullivan. See Sec. Am. Compl.; Dkt. No. 49. Thus, it is recommended that plaintiff's motion for summary judgment be denied on all claims which are not properly before the Court.

## II. Summary Judgment Standard

**\*6** "[T]he Court must construe the evidence in the light most favorable to the non-moving party, and may grant summary judgment only where 'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.' " Hicks v. Craw, 405 F. Supp. 3d 374, 380 (N.D.N.Y. 2019) (citing Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999); quoting FED. R. CIV. P. 56(a)). "Material facts are those that 'might affect the outcome of the suit under the governing law.' An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)).

The moving party has the burden of showing the absence of a genuine dispute of material fact by citing to "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c). A fact is material if it "might affect the outcome of the suit," as determined by the governing substantive law; a "dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

If the moving party meets this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248 (citation omitted); see Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court ... must resolve all ambiguities and draw all reasonable inferences against the movant." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986) (citing Quarles v. Gen. Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985) (per

curiam)); see also Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted) (alteration in original) ("[M]ere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist.").

Where a party seeks judgment against a pro se litigant, or a pro se litigant moves for summary judgment, the Court must afford the pro se litigant special solicitude. See Treistman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006) (per curiam). As the Second Circuit explained,

[t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," that a pro se litigant's submissions must be construed "liberally," and that such submissions must be read to raise the strongest arguments that they "suggest[.]" At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, or arguments that the submissions themselves do not "suggest," that we should not "excuse frivolous or vexatious filings by pro se litigants," and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law[ ]" ....

Id. (citations omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) (citations and quotation marks omitted) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds pro se, ... a court is obligated to construe his pleadings liberally.").

 **\*7** "The same standard[s] apply" when both parties have moved for summary judgment. See Morales v. Quintel Ent., Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citing Terwilliger v. Terwilliger, 206 F.3d 240, 244 (2d Cir. 2000)). "[E]ven when both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party." Id. (citing Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993)). "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration" Id. (citing Schwabenbauer v. Bd. of Educ., 667 F.2d 305, 314 (2d Cir. 1981)).

### III. Factual Background

#### A. Undisputed Facts

On March 26, 2020, a DOCCS memorandum was issued from the Deputy Commissioner for Correctional Facilities to "All Superintendents." Dkt. No. 119-3; see also Dkt. No. 124-2 at 4. The memorandum stated,

[i]n an effort to mitigate the spread of COVID-19, we previously provided direction to the HUB Superintendents to minimize or eliminate, where possible, double bunking in the medium security facilities. As we continue to mitigate the spread of this virus, double-cell housing will be limited where possible, contingent upon space availability. All internal facility moves, including within the same housing unit, are suspended absent exigent circumstances or upon the completion of a disciplinary confinement sanction.

Dkt. No. 119-3; see also Dkt. No. 124-2 at 4. Another memorandum was issued on June 30, 2020, which stated, "[t]his is a follow up to the NY FORWARD memorandum dated, May 28, 2020[,] which calls for the gradual resuming of internal movement and, also supersedes the memorandum dates, March 26, 2020[,] which suspended internal moves." Dkt. No. 119-4. The June memorandum instructed that "[a]lthough we are gradually resuming internal movement, the use of double bunked cells in medium security facilities should remain limited, to the extent possible." Id.

While housed in the D-1 general population dorm at Greene C.F. on April 12, 2020, plaintiff and another inmate were involved in a fight. See Dkt. No. 126-1 at 1-2, ¶¶ 1, 10; see also Dkt. No. 134 at 2-3, ¶¶ 1, 4. Following the altercation, plaintiff and the other inmate were separated into two different rooms. See Dkt. No. 126-1 at 2, ¶ 11; Dkt. No. 119-2 at 39-41, 43-45. Plaintiff was escorted by a female officer into the "I.D. process room." Dkt. No. 124 at 17, ¶ 17; Dkt. No. 119-2 at 43. Plaintiff was then taken to the infirmary. See Dkt. No. 126-1 at 2, ¶ 12; Dkt. No. 119-6; Dkt. No. 119-2 at 45. Defendant Barkman did not take plaintiff to the infirmary or see his injury report. See Dkt. No. 119-5 at 2-3, ¶¶ 10, 12; Dkt. No. 119-2 at 45-52. Plaintiff requested Tylenol for a severe headache following the fight, but the nurse indicated that he "denies injuries. No injuries noted." Dkt. No. 119-6. After returning from the infirmary, defendant Barkman told plaintiff, "we're SHU-ing you. We're putting you in the SHU." Dkt. No. 119-2 at 53. Barkman did not say anything to plaintiff while he transferred plaintiff to the SHU. See id.; see also 126-1 at 4, ¶ 26; Dkt. No. 134 at 4-5, ¶¶ 12, 14.

C.O. Mahar wrote a misbehavior report against plaintiff for the fight, which stated that he observed plaintiff "striking [another] inmate in the head and body with closed fists. [Plaintiff] was the aggressor in the altercation. [He] gave a verbal order to break it up to which both inmates complied + separated. The area supervisor and response team arrived and escorted the inmates of the unit...." Dkt. No. 119-7; see also Dkt. No. 126-1 at 3, ¶ 14. Plaintiff was "moved at another housing unit," as authorized by Lt. Mahoney. Dkt. No. 119-7. Sgt. P. Csorba authored a memorandum to Lt. Mahoney which reiterated C.O. Mahar's account of the fight, noted that plaintiff was the aggressor, and stated that he, Sgt. Csorba, "was notified, responded with staff, and escorted both inmates off unit with no further incident. [The other inmate] stated that [plaintiff] hit him for no reason, and they began fighting. [Plaintiff] was uncooperative with questioning." Dkt. No. 119-8; see also Dkt. No. 126-1 at 3, ¶ 15. A disciplinary hearing was held concerning the misbehavior report and plaintiff pleaded guilty. See Dkt. No. 126-1 at 3, ¶ 16; Dkt. No. 134 at 5, ¶ 15; Dkt. No. 119-9.

**\*8** When he was transferred to the SHU on April 12, 2020, plaintiff was placed in a cell by himself. See Dkt. No. 124 at 18-19, ¶ 18; Dkt. No. 119-2 at 57. That same day, plaintiff was moved to a second cell by himself. See Dkt. No. 119-2 at 58. Plaintiff was then given a cell mate, but the cell mate was removed either "minutes" or "a few hours" later. Dkt. No. 124 at 21, ¶ 22; Dkt. No. 119-2 at 58-61.

On April 14, 2020, officers came to plaintiff's cell to inform him that he was getting a bunk mate, but "they said never mind and took [the other inmate] to another cell." Dkt. No. 124 at 22, ¶ 25; see also Dkt. No. 119-2 at 64. Plaintiff then wrote a grievance stating that his cell was not properly set up, complaining about being double bunked, and asserting that he "must remain single celled" because it is impossible to social distance in the cell and because he was not being "matched up" properly with an inmate his same age and religious affiliation. Dkt. No. 119-15 at 6; see also Dkt. No. 124-2 at 20. A few days later, plaintiff was moved to a third cell by himself. See Dkt. No. 119-2 at 66-68.

On April 23, 2020, Sgt. Faison interviewed plaintiff about his April 14, 2020, grievance. See Dkt. No. 119-15 at 12. During the interview, plaintiff "emphasized that he wanted to pursue the grievance more on the grounds of potentially being subjected to double bunking[.]" Id. Plaintiff "acknowledged that he ha[d] not been housed with another inmate as implied in the grievance and ha[d] been assigned to a cell alone since his arrival." Id. Sgt. Faison informed plaintiff that he had no intention of double bunking plaintiff, but that did not prevent another officer from doing so. See Dkt. No. 124 at 23-24, ¶ 27; Dkt. No. 119-2 at 173-74.

On May 3, 2020, C.O. B. Joseph Robinson came to plaintiff's cell and informed him that he was being assigned a bunk mate. See Dkt. No. 119-13; Dkt. No. 124-2 at 33. Plaintiff testified in his deposition that he went to the recreation pen door to wait for it to be opened so he could step outside, as ordered, but that he told the officer he wanted to speak with a sergeant because he was not supposed to be double bunked. See Dkt. No. 119-2 at 69-70. The other inmate was not placed in plaintiff's cell. See Dkt. No. 119-13. C.O. Robinson authored a misbehavior report against plaintiff for refusing a double bunk assignment and a direct order, interfering with a correctional officer, and a movement violation. See id.; see also Dkt. No. 126-1 at 5, ¶ 33; Dkt. No. 134 at 5, ¶ 16. Plaintiff wrote a grievance on May 3, 2020, complaining that correctional officers were trying to make him share a cell. See Dkt. No. 119-15 at 7; Dkt. No. 124-2 at 29.

2023 WL 3727447

On May 7, 2020, the Inmate Grievance Resolution Committee responded to plaintiff's grievances concerning the double bunking and concluded that plaintiff "was single celled at the time of investigation. There is no indication in this investigation that [plaintiff] would not be double bunked. Double bunking is at the discretion of staff." Dkt. No. 119-15 at 9; see also Dkt. No. 124-2 at 31.

On May 9, 2020, plaintiff was moved to a different cell. See Dkt. No. 124 at 28, ¶ 33. The officer that moved him stated, "[y]ou are moving to 49 cell to double bunk. If you do not comply when I return to transfer you to that cell, I will issue a misbehavior report." Id, see also Dkt. No. 119-2 at 74-75. Plaintiff was given a face mask for the first time during this transfer, and he was instructed to wear it. See Dkt. No. 119-2 at 158-59. Once plaintiff was in the new cell, he realized there was another inmate already occupying the cell. See id. at 73.

 **\*9**  A disciplinary hearing was held before defendant Sullivan on May 13, 2020, concerning the May 3, 2020, misbehavior report. See Dkt. No. 126-1 at 5, ¶ 32; Dkt. No. 134 at 6, ¶ 17; Dkt. No. 119-14; Dkt. No. 124-2 at 47; Dkt. No. 125-3 at 12-17. During the hearing, plaintiff pleaded not guilty to the charges and stated, "I saw a woman come to my gate and she began to say something, and I began to speak to her and she walked off. I said what is this a set up or something, looks like a set up. And she just walked off and wasn't even listening to me." Dkt. No. 119-14 at 3. Plaintiff continued, "[s]o, I said alright just walk back in and sat down and Ahh, continued on what I was doing." Id. Sullivan asked plaintiff if he understood "that this is a double cell facility" and plaintiff affirmed his understanding. Id. Plaintiff explained that he was "double bunking right now with somebody." Id. Sullivan responded, "[y]eah, well what went on after this incident matters none to me, this incident is what matters to me. That is what I need to resolve." Id. Plaintiff then reiterated his position that he was listening to the correction officer when she came to his cell and he "began to say something back to her, but she walks off and says I refuse." Id. Plaintiff was found guilty of refusing a direct order, a movement regulation violation, and of refusing double celling. See Dkt. No. 126-1 at 5, ¶ 37; Dkt. No. 134 at 6, ¶ 20; Dkt. No. 119-14 at 5; Dkt. No. 124-2 at 43-45.

During plaintiff's incarceration in the SHU, neither defendant Barkman nor Sullivan made the decision as to what cell plaintiff was going to be housed in, or whether he would have a cell mate. See Dkt. No. 119-5 at 3-5, ¶¶ 12, 15-16, 21; Dkt. No. 119-12 at 2-3, ¶¶ 4, 7, 9. Plaintiff was moved back into the general population during the last week of May 2020. See Dkt. No. 124 at 30, ¶ 37. Plaintiff's bunk mate left the cell "about four days before" plaintiff. Dkt. No. 119-2 at 77.

On May 14, 2020, plaintiff appealed the denial of grievances to the superintendent and the superintendent denied the appeal. See Dkt. No. 119-15 at 9-10. The Superintendent wrote his decision on May 28, 2020, and indicated that plaintiff "has since been released from keep lock and returned to [general population]. Therefore, the issue is now moot." Id. at 10. Plaintiff appealed to the Central Office Review Committee ("CORC") and CORC denied the appeal. See id. at 1, 10; see also Dkt. No. 124-2 at 75. CORC explained, in part, "that no incarcerated individual has the right to a specific housing location and [ ] that the grievance program is not intended to support an adversary process." Dkt. No. 119-15 at 1.

Plaintiff was placed into quarantine on January 20, 2021, after being exposed to an individual who tested positive for COVID-19. See Dkt. No. 124-2 at 50, 52, 54; see also Dkt. No. 119-2 at 143-44. Plaintiff tested negative at that time. See Dkt. No. 124-2 at 54. Plaintiff tested positive for Tuberculosis in June 2021. See id. at 55-57; see also Dkt. No. 119-2 at 147. Plaintiff tested positive for COVID-19 on January 5, 2022. See Dkt. No. 124-2 at 71; see also Dkt. No. 119-2 at 143, 148.


### B. Disputed Facts

Defendant Barkman declares that following the April 12, 2020, fight between plaintiff and another inmate he "did not order that the two inmates be brought to separate holding rooms in the inmate identification office[ ]" and he never discussed the fight with plaintiff. Dkt. No. 119-5 at 2, ¶¶ 6, 8. He declares that "[t]he only involvement [he] had with [ ] plaintiff on April 12, 2020,

was escorting him from general population to the SHU, after his fight with another inmate, at the direction of Lt. Mahoney who was the Watch Commander on duty at the time." Id. at 4-5, ¶ 19.

In plaintiff's affidavit submitted in support of his motion for summary judgment, he attests that following the fight, when he was in the identification room, a sergeant came to speak with him and he "recognized this sergeant as Def. Barkman[.]" Dkt. No. 124 at 17, ¶ 17. Plaintiff states that Barkman asked plaintiff what happened, left to speak to the other inmate, returned, and told plaintiff that the fight was a misunderstanding, and they were going to separate him and the other inmate into separate dorms. See id. at 17-18, ¶ 17.

**\*10** Defendant Sullivan declares that when plaintiff was brought to the May 13, 2020, disciplinary hearing he "did not know what cell [plaintiff] was occupying[.]" Dkt. No. 119-12 at 2, ¶ 5. He also declares that following his ruling on the hearing, he "had no involvement in any decision related to what cell [ ] plaintiff was brought to after the hearing." Id. at 3, ¶ 7.

In his response to defendants' statement of material facts, plaintiff contends that before Sullivan began a disciplinary hearing, he had to " 'personally' obtain the informed whereabouts to what location inmate is locked so that he himself can know where to go to conduct hearing and what cell ... he is to give to escort officers to bring inmate before him to have hearing done[.]" Dkt. No. 135 at 2. Plaintiff states that "[t]he inmate's confinement location cell number is on the paperwork [Sullivan] must tote with him ... to the hearing." Id. at 2-3.

### IV. Analysis

#### A. Personal Involvement

Defendants declare that they had no personal involvement in the decisions to place plaintiff in the SHU or in a cell with another inmate. See Dkt. No. 119-5 at 3-5, ¶¶ 15, 19, 21; Dkt. No. 119-12 at 2-3, ¶¶ 4, 8-9. Plaintiff does not dispute that neither defendant made those decisions. Plaintiff submits a "Declaration in Support of Opposition to Def.s request for summary judgment order" which is signed and written "under penalty of perjury[.]" Dkt. No. 125-3 at 1, 10. In this declaration, plaintiff states that his claims do not involve "a specific decision made by other officers, but instead ... concern[ ] conduct specifically relating to Sullivan and Barkman duties and powers as [ ] officers to sufficiently perform [their] duties and to intervene on/in matters of wrong-doings by other staff...." Id. at 8-9, ¶ 15. In his memorandum of law in support of his opposition, plaintiff states

> it matters less or at all, as to whether defendant Barkman and or Sullivan were involved with a certain decision to SHU plaintiff. For that is not my claim nor argument. But instead my claim/argument is that both Barkman and Sullivan are supervisory officials who has supervising powers over the SHU, chosed to not intervene – per interdepartmental memo/instructions/executive orders to remedy such double bunking once they did in fact (and upon making SHU ROUNDS) become aware that inmates – such as Smith – were being subject to double bunking.

Dkt. No. 125-1 at 12. In plaintiff's motion for summary judgment, he asserts that "[n]owhere in all of the entirety of the discovery given me by [d]efendants and their attorney does it reveal[ ] who it was that had me moved to, and or ordered me placed in SHU 49B with another bunky/inmate." Dkt. No. 124-1 at 57. He states, "although there may be some implication ... that is may have been Sgt. Faison who ordered me moved in with another inmate ..., it just can not be determined at this point due to [d]efendant's manipulative discovery and concealing of information." Id.

In their motion for summary judgment and in the context of discussing the merits of each of plaintiff's claims, defendants reiterate that they had no personal involvement in deciding where plaintiff was housed. See Dkt. No. 119-16 at 11, 14, 17, 21.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). "Thus, a [§] 1983 plaintiff must allege a tangible connection between the acts of the defendant and the injuries suffered." Burroughs v. Petrone, 138 F. Supp. 3d 182, 220 (N.D.N.Y. 2015) (citations and quotation marks omitted).

 *11  In his motion for summary judgment, plaintiff cites Colon v. Coughlin, which "set forth five theories of liability that could apply to supervisory officials." Morrow v. Vanderwerff, No. 9:19-CV-555 (DNH/DJS), 2022 WL 526218, at *3 (N.D.N.Y. Jan. 6, 2022) (citing Colon v. Coughlin, 58 F.3d 865 (2d Cir. 1995)), report and recommendation adopted, 2022 WL 523745 (N.D.N.Y. Feb. 22, 2022); see also Dkt. No. 124-1 at 56. However, in Ashcroft v. Iqbal, the Supreme Court held that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 556 U.S. 662, 676 (2009); see also Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020). This holding "engendered conflict within [the Second] Circuit about the continuing vitality of the supervisory liability test set forth in Colon." Reynolds v. Barrett, 685 F.3d 193, 205, n.14 (2d Cir. 2012) (citation omitted). In resolving this conflict, "the Second Circuit has instructed that a "[p]laintiff allege and establish that [ ] [d]efendants violated his rights 'by [their] own conduct, not by reason of [their] supervision of others who committed the violation.' " Morrow, 2022 WL 526218, at *3 (quoting Tangretti, 983 F.3d at 619). "For supervisory [d]efendants, a mere linkage to the unlawful conduct through the prison chain of command ... is insufficient to show his or her personal involvement in that unlawful conduct." Id. (citation and quotation marks omitted). "The alleged failure to remedy a wrong ... is insufficient after Tangreti[ ] to establish [ ] personal involvement." Id. (citation omitted).

In his second amended complaint, plaintiff alleged that Barkman retaliated against him by placing him in the SHU, that Sullivan and Barkman treated him differently than other inmates by placing him with another inmate in a SHU cell, and that Sullivan subjected him to unlawful conditions of confinement because of the COVID-19 pandemic. See Sec. Am. Compl. at 11-12, 14. Plaintiff's claims fail as a matter of law because there is no dispute that Barkman and Sullivan were not personally involved in the decision to place plaintiff in the SHU with another inmate.

The evidence in the record, including plaintiff's own testimony and assertions, indicate that Barkman did not make the decision to send plaintiff to the SHU and that neither defendant made the decision that plaintiff would share a cell with another inmate. See Dkt. No. 125-1 at 12; Dkt. No. 124-1 at 57; Dkt. No. 119-5 at 3-5, ¶¶ 15, 19, 21; Dkt. No. 119-12 at 2-3, ¶¶ 4, 8-9; see also Colon v. Gunsett, No. 22-CV-635 (VB), 2023 WL 2139790, at *8 (S.D.N.Y. Feb. 21, 2023) ("[M]erely escorting an inmate is insufficient to establish personal involvement in a constitutional violation."); Douglas v. Annucci, No. 14-CV-6018 (CJS), 2022 WL 2306934, at *8 (W.D.N.Y. June 27, 2022) ("[The p]laintiff has not shown that any [ ] defendant was actually involved in the decision to transfer him to Elmira, or in the decision to require him to leave Elmira's protective custody area each day and walk through general population....").

Plaintiff's testimony and assertions that Barkman and Sullivan did not correct other officers' orders are insufficient to establish defendants' personal involvement. See Morrow, 2022 WL 526218, at *3; Colon, 2023 WL 2139790, at *8; Douglas, 2022 WL 2306934, at *8. Accordingly, it is recommended that defendants' motion for summary judgment be granted, and plaintiff's motion be denied for lack of personal involvement. However, as plaintiff and defendants focus their motions on the merits of each of plaintiff's claims, the undersigned will address each in turn.

### B. First Amendment Retaliation Claim Against Barkman

In his unsworn second amended complaint, plaintiff alleged that after he was taken to the infirmary, he filled out an injury report stating that he "had a swelling to [his] head and a splitting head ache[.]" Sec. Am. Compl. at 12. Plaintiff alleged that Barkman

was shown plaintiff's injury report and "within minutes" Barkman handcuffed plaintiff and took him to the SHU. Id. The other inmate involved in the fight was not taken to the SHU. See id.

**\*12** "To prevail on a First Amendment retaliation claim, an inmate must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action." Hayes v. Dahlke, 976 F.3d 259, 272 (2d Cir. 2020) (citations omitted). "Courts properly approach prisoner retaliation claims 'with skepticism and particular care,' because 'virtually any adverse action taken by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.' " Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (citation omitted).

" '[O]ral complaints made to corrections officers' may serve as the basis for a First Amendment retaliation claim." Zielinski v. Annucci, 547 F. Supp. 3d 227, 233 (N.D.N.Y. 2021) (citation omitted) (alteration in original). "The same is true of formal grievances and lawsuits filed against prison officials." Id. Additionally, "requesting medical attention may be considered a protected activity." Ruggiero v. Cnty. of Orange, No. 19-CV-3632 (VB), 2020 WL 5096032, at \*6 (S.D.N.Y. Aug. 28, 2020). "[W]hen faced with such a claim, district courts in the Second Circuit frequently assume, but do not decide, that requests for medical attention are protected by the First Amendment for the purpose of analyzing the merits of a retaliation claim.' " Id. (quoting James v. Gage, 15-CV-106 (KMK)), 2019 WL 6251364, at \*6 (collecting cases) (citing Maxwell v. City of New York, 108 F. App'x 10, 12 (2d Cir. 2004) (summary order) (agreeing with district court's assumption that a "request medical attention can be considered a constitutionally protected statement")). But see Gilmore v. Blair, No. 9:18-CV-463 (GLS/DJS), 2020 WL 5792467, at \*8 (N.D.N.Y. June 30, 2020) ("Courts have not recognized a freestanding right to request medical attention as a protected activity sufficient to support a retaliation claim."), report and recommendation adopted, No. 9:18CV463 (GLS/DJS), 2020 WL 5775203 (N.D.N.Y. Sept. 28, 2020). Reasonable research has not revealed a case addressing whether filling out an injury report following an inmate-against-inmate fight constitutes protected activity.

As to the adverse action prong of a retaliation claim, "[a]n act in retaliation for the exercise of a constitutional right is actionable under [§] 1983 even if the act, when taken for different reasons, would have been proper." Franco v. Kelly, 854 F.2d 584, 590 (2d Cir. 1988) (citation omitted). "[R]etaliatory conduct must be the type that would deter 'a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.' " Hayes, 976 F.3d at 272 (citation omitted). The Court "look[s] to the specific circumstances in which retaliation claims arise, 'bearing in mind that prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse.' " Id. (citation omitted). The Second Circuit has stated, "[i]n the prison context, the harm could include such an adverse action as placing a plaintiff in keeplock for a period of weeks." Gill v. Pidlypchak, 389 F.3d 379, 383 (2d Cir. 2004); see also Smith v. Hash, No. 9:04-CV-0074 (LEK/ DRH), 2006 WL 2806464, at \*6 (N.D.N.Y. Sept. 28, 2006) ("It is reasonably possible that other inmates would fail to exercise their constitutional right to file grievances for fear that they would be transferred to SHU. Thus, [the plaintiff's] alleged transfer to SHU in retaliation for filing a grievance could be considered an adverse action."); Hamilton v. Fisher, No. 9:10-CV-1066 (MAD/RFT), 2012 WL 987374, at \*14 (N.D.N.Y. Feb. 29, 2012) (citation omitted) ("An 'alleged transfer to SHU ... could be considered adverse action.' "), report and recommendation adopted, 2012 WL 987122 (N.D.N.Y. Mar. 22, 2012).

**\*13** Defendants do not directly address whether plaintiff engaged in protected activity by reporting or attempting to report any injuries while he was in the infirmary following the April 12, 2020, fight. See generally Dkt. No. 119-16. Rather, defendants argue that plaintiff has failed to "demonstrate a triable issue of fact that Defendant Barkman took adverse action against him" and "there is no causal connection between the protected activity (reporting injuries while at the infirmary) and the adverse action (Plaintiff sent to the SHU)." Id. at 17-18.

The Court need not determine whether plaintiff reporting his injuries constitutes protected activity because there is no admissible record evidence demonstrating that Barkman knew about plaintiff's report or decided to place plaintiff in the SHU in retaliation for that report. Barkman declares under the penalty of perjury that he did not go to the infirmary with plaintiff, ever see plaintiff's injury report, or make the decision to place plaintiff in the SHU. See Dkt. No. 119-5 at 3, ¶¶ 12, 15. Plaintiff testified that he did not remember who took him to the infirmary, that there was no one else in the infirmary besides the escorting officer and the

nurse, and that Barkman never said anything to him about his medical report or injuries. See Dkt. No. 119-2 at 40-41, 43-44, 47, 52-53. Rather, plaintiff states in his affidavit submitted in support of his motion for summary judgment that following the fight and being examined by medical staff, "Deputy Superintendent of Security 'Murphy' was notified. And apparently overrided [sic] Barkman's decision to put me in a separate dorm but instead, ordered Def. Barkman to place me in the SHU." Dkt. No. 124 at 18, ¶¶ 17-18. Additionally, the misbehavior report authored by C.O. Mahar after the fight indicates that plaintiff was "moved at another housing unit" which was "authorized by Lt. Mahoney." Dkt. No. 119-7. Based on the foregoing, it is undisputed that Barkman did not take adverse action against plaintiff or that any such action was causally related to plaintiff's injury report. Thus, plaintiff's retaliation claim fails as a matter of law, and it is recommended that defendants' motion for summary judgment be granted on this claim.

### C. Eighth Amendment Conditions of Confinement Claim against Sullivan

"The Second Circuit, in addressing the needs protected by the Eighth Amendment, has stated that sentenced prisoners are entitled to 'adequate food, clothing, shelter, sanitation, medical care and personal safety.' " Rasheen v. Adner, 356 F. Supp. 3d 222, 240 (N.D.N.Y. 2019) (quoting Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd on other grounds sub nom. Bell v. Wolfish, 441 U.S. 520 (1979)). "To demonstrate that the conditions of [one's] confinement constitute cruel and unusual punishment, the plaintiff must satisfy both an objective test and a subjective test." Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citation omitted). The plaintiff "must allege that: (1) objectively, the deprivation the inmate suffered was 'sufficiently serious that he was denied the minimal civilized measure of life's necessities,' and (2) subjectively, the defendant official acted with 'a sufficiently culpable state of mind ..., such as deliberate indifference to inmate health or safety.' " Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) (quoting Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001)). "To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." Id. (citation omitted). "To meet the subjective element, the plaintiff must show that the defendant acted with 'more than mere negligence.' " Id. (citation omitted). " '[T]he prison official must know of, and disregard, an excessive risk to inmate health or safety.' " Id. (citation omitted). "Evidence that a risk was 'obvious or otherwise must have been known to a defendant' may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk." Id. (quoting Brock v. Wright, 315 F.3d 158, 164 (2d Cir. 2003)).

**\*14**  "This Court has agreed with many 'other courts that an inmate can face a substantial risk of serious harm in prison from COVID-19 if a prison does not take adequate measures to counter the spread of the virus.' " Smith v. Miller, No. 9:20-CV-1435 (GTS/CFH), 2021 WL 6503602, at \*11 (N.D.N.Y. Nov. 18, 2021) (citation omitted), report and recommendation adopted, 2022 WL 160312 (N.D.N.Y. Jan. 18, 2022); see also Fernandez-Rodriguez v. Licon-Vitale, 470 F. Supp. 3d 323, 351 (S.D.N.Y. 2020) (citations omitted) ("COVID-19 stands with the roster of infectious diseases from which 'correctional officials have an affirmative obligation to protect inmates.' ... Inmates are particularly vulnerable to this disease.... Many courts have found that prisons exposed to the novel coronavirus present conditions that meet the objective prong of the constitutional analysis."). "The relevant inquiry is whether a [moving party] has shown a substantial risk of serious harm from COVID-19 at a correctional facility in light of the countermeasures that the facility has in place." Morales v. Brann, No. 1:20-CV-10126 (VEC/SDA), 2022 WL 18108561, at \*4 (S.D.N.Y. Dec. 15, 2022) (citing Chunn v. Edge, 465 F. Supp. 3d 168, 201 (E.D.N.Y. 2020)), report and recommendation adopted, 2023 WL 35255 (S.D.N.Y. Jan. 4, 2023).

Research has not revealed a case in which a court has concluded that the objective risk of harm prong was satisfied solely because the plaintiff was not able to social distance in a cell during the COVID-19 pandemic. However, courts have concluded that there is sufficient evidence of a substantial risk of harm from COVID-19 when there is evidence of individuals in the prison testing positive for COVID-19, a failure to quarantine symptomatic or positive individuals, or the existence of a medical condition that increased the plaintiff's risk of harm from exposure. See Chunn, 465 F. Supp. 3d at 201 (discussing the objective prong of an Eighth Amendment claim in the context of a preliminary injunction and explaining that courts that have found the objective prong to be likely satisfied "relied on evidence of elevated COVID-19 risks compared to the outside community[ ]"; "evidence that the jail 'currently has the highest rate of new coronavirus infections in the country[ ]' "; "undisputed data showing

that 'the infection rate in [Department of Corrections] facilities was over seven times the infection rate of the District of Columbia at large[ ]' "; "the fact that it was 'undisputed that there is an active and serious outbreak of COVID-19' at the facility in question"; and "evidence of high infection rates[ ]"); Pierce v. Rodriguez, No. 3:20-CV-1755 (SVN), 2023 WL 2646825, at *8-9 (D. Conn. Mar. 27, 2023) (concluding that there was a dispute of material fact as to the objective prong because the plaintiff represented that inmate workers who moved through the prison were not being separated from nonworkers and infected inmates were not being moved out of the cell block); Elliston v. Caron, No. 3:21-CV-1272 (JAM), 2022 WL 1471305, at *2 (D. Conn. May 10, 2022) (finding objective element satisfied because the plaintiff "alleges that he was forced to stay with infected inmates, without masks or cleaning supplies, as COVID-19 spread throughout the prisons."); Toussaint v. Guadarama, No. 3:21-CV-32 (MPS), 2021 WL 1648648, at *4 (D. Conn. Apr. 27, 2021) ("The plaintiff has plausibly alleged that the conditions that he endured ... involving exposure to other inmates who had exhibited COVID-19 symptoms, posed a serious risk of harm to his health, particularly given his age and his underlying medical conditions, including diabetes[.]").

On the other hand, courts have concluded that there is insufficient evidence of a substantial risk of harm where the plaintiff only asserted general allegations of an increased risk from COVID-19 without specific instances of increased exposure, positive tests, or evidence of an underlying medical condition. See Shomo v. De't of Corr. & Cmty. Supervision, No. 21-CV-00128 (PMH), 2022 WL 1406726, at *12 (S.D.N.Y. May 4, 2022) (granting motion to dismiss for failure to state a claim because the "[p]laintiff has not, however, alleged that he was ever exposed to COVID-19, let alone that any such exposure resulted from [the d]efendants' 'deliberate indifference.' [The p]laintiff does not allege how, when, where, or for how long he faced a risk of contracting COVID-19, or any facts specific to himself at all. [The p]laintiff has only been housed at Fishkill since the onset of the COVID-19 pandemic. However, he makes conclusory allegations about COVID-19 in 'every' DOCCS facility."); Burke v. Baker, No. 5:21-CV-265 (GWC/KJD), 2023 WL 1801927, at *10 (D. Vt. Feb. 7, 2023) (citations omitted) ("[The p]laintiff's Complaint [ ] does not plead sufficient facts to meet the objective element of a deliberate-indifference claim.... [The p]laintiff alleges that he tested positive for COVID-19 in July 2020, but he speculates that his apparent exposure to the virus resulted from off-duty conduct by facility staff.... [The p]laintiff generally alleges only that CoreCivic staff 'were/are ... grossly negligent in that they all failed to require other Vermont inmates to be vaccinated in close living conditions of confinement' and that staff did not adequately separate vaccinated and unvaccinated inmates."), report and recommendation adopted, 2023 WL 2423232 (D. Vt. Mar. 9, 2023); Braithwaite v. Suffolk Cnty. New York, No. 22-CV-3750 (JS/AYS), 2022 WL 16837341, at *8 (E.D.N.Y. Nov. 9, 2022) ("[The p]laintiff's allegations make clear that Suffolk County implemented safety measures in response to the COVID-19 Pandemic. Moreover, those measures apparently protected [the p]laintiff from contracting the virus, as—by his own allegations—he was exposed to the virus in the Jail on five occasions and, following a period of quarantine, tested negative each time."), appeal docketed, No. 23-108 (2d. Cir. Jan. 24, 2023); Harper v. Cuomo, No. 9:21-CV-0019 (LEK/ML), 2021 WL 1821362, at *7 (N.D.N.Y. Mar. 1, 2021) (citations omitted) ("[The p]laintiffs have not shown a clear likelihood of success in demonstrating that they face 'a substantial risk of serious harm' based on the conditions at Adirondack, given the measures that prison officials have instituted to address COVID-19 and the low COVID-19 positivity rate that those measures have attained at Adirondack."), report and recommendation adopted, 2021 WL 1540483 (N.D.N.Y. Apr. 20, 2021).

**\*15** Here, there is insufficient record evidence to create a dispute of material fact as to whether plaintiff faced a substantial risk of serious harm. First, DOCCS put into place countermeasures in response to COVID-19; it instructed that double bunking be minimized or eliminated, where possible, and that internal facility moved be suspended "absent exigent circumstances or upon the completion of a disciplinary confinement sanction." Dkt. No. 119-3. During his disciplinary hearing and in his response to defendants' motion for summary judgment, plaintiff acknowledged that the SHU was a double bunk facility. See Dkt. No. 119-14 at 3; see also Dkt. No. 124 at 49, n.22. Second, while in the SHU, plaintiff was often housed in a cell by himself. See Dkt. No. 119-2 at 57-58, 60-62, 66-67. Defendants do not proffer an explanation as to why plaintiff was moved from a cell by himself to a cell with another inmate amidst the COVID-19 pandemic. See generally Dkt. No. 119-16. However, when he was moved into a cell with another inmate, he was given a mask and instructed to wear it. See Dkt. No. 119-2 at 157-59. Third, and most importantly, there is no record evidence that the other inmates plaintiff was required to bunk with were ever sick, that plaintiff or the other inmates refused to wear their masks, that inmates housed in the SHU or elsewhere were symptomatic or testing positive at the time plaintiff was required to double bunk, or that Greene C.F. was failing to quarantine positive or symptomatic individuals.

Plaintiff attaches to his motion for summary judgment two pages of information which indicate that "[a]s of December 17, 2021, DOCCS has reported 7,882 positive tests among incarcerated people since the beginning of the pandemic.... 37 people who are incarcerated and 15 staff members have died due to Covid-19." Dkt. No. 124-2 at 83. [7] A chart, which does not include headings, contains statistics from April 2021 to November 2021. See id.

First, the chart and statistics do not say anything about May of 2020, which is when plaintiff was forced to double bunk. See Dkt. No. 124-2 at 83. Second, the information does not pertain specifically to Greene C.F., but discusses DOCCS facilities in general. See id. As such, it is not evidence sufficient to create a dispute of material fact as to the conditions plaintiff endured.

Next, plaintiff testified in his deposition that he took "[h]igh blood pressure pills." Dkt. No. 119-2 at 11. However, there are no allegations or evidence concerning when plaintiff started taking the medication, how it affected him, or whether he was at an increased risk of harm from COVID-19 because of any medical condition. Plaintiff also testified that in June of 2021, he tested positive for Tuberculosis. See Dkt. No. 119-2 at 147; see also Dkt. No. 124-2 at 55. There is no evidence in the record to indicate that plaintiff had Tuberculosis during the two weeks he was double bunked in the SHU that would have placed him at an increased risk of serious illness had he contracted COVID-19; rather, plaintiff tested negative for tuberculosis in July 2020. See Dkt. No. 124-2 at 58; see also Brown v. City of New York, No. 21-CV-4632 (PGG/SLC), 2023 WL 2908661, at *10 (S.D.N.Y. Jan. 30, 2023) (citation omitted) (explaining that the plaintiff's "medical records ... do not show any symptoms nor diagnosis of asthma, and therefore, 'he has not shown [that] he has a condition or conditions that put him at increased risk of serious illness should he be infected[.]' "), report and recommendation adopted, 2023 WL 2496089 (S.D.N.Y. Mar. 14, 2023).

Finally, plaintiff stated in his affidavit in support of his motion for summary judgment, that in the cell that he shared with another inmate, "the vents were so clogged it looked like maggots was in them, window was broken[,] and the lights never worked." Dkt. No. 124 at 31, n.31; see also Dkt. No. 124-1 at 25-26. Plaintiff testified that the cell was "sloppy," "the vents are cut off, and the lights are always off." Dkt. No. 119-2 at 76. Plaintiff did not state these allegations in his second amended complaint and defendants did not address these assertions in their response to plaintiff's motion. See generally Sec. Am. Compl.; Dkt. No. 129.

"The Second Circuit has held that poor air quality in a facility for a prolonged period can be an unconstitutional condition of confinement." McTerrell v. Koenigsmann, No. 1:18-CV-01028 (EAW), 2019 WL 2511426, at *12 (W.D.N.Y. June 18, 2019) (citing Benjamin v. Fraser, 343 F.3d 35, 52 (2d Cir. 2003) (holding "the presence of large numbers of inoperable windows, clogged or dirty ventilation registers and exhaust vents in showers and cells, and poor air quality" was a violation of the plaintiffs' constitutional rights), overruled on other grounds by Caiozzo v. Koreman, 581 F.3d 63, 71 (2d Cir. 2009)). "However, '[w]here the exposure is for a short period of time, courts have found no Eighth Amendment violation.' " Id. (quoting Clay v. Lee, No. 13-CV-7662 (KMK), 2019 WL 1284290, at *6 (S.D.N.Y. Mar. 20, 2019) (collecting cases)). Whether unsanitary conditions constitute "cruel and unusual depends on both the duration and the severity of the exposure." Willey v. Kirkpatrick, 801 F.3d 51, 68 (2d Cir. 2015).

*16 Courts have dismissed claims concerning unsanitary conditions when a plaintiff has alleged only general statements concerning the severity and/or duration of the alleged conditions. See Hamilton v. Westchester Cnty., No. 18-CV-8361 (NSR), 2020 WL 917214, at *7 (S.D.N.Y. Feb. 25, 2020) ("[The p]laintiff's complaints of poor ventilation resulting in unbearable heat, difficulty breathing, and rust dripping in his cell, in combination, are troubling.... Without any additional information as to the duration of the conditions [the p]laintiff alleges, the Court cannot determine that they pose an objectively unreasonable risk to [the p]laintiff's health."), aff'd in part, vacated in part, remanded, 3 F.4th 86 (2d Cir. 2021); Baltas v. Magia, et al., No. 3:20-CV-1177 (MPS), 2021 WL 2206966, at *11 (D. Conn. June 1, 2021) (dismissing conditions of confinement claim because the plaintiff "provides no factual substantiation for his assertion that his deprivation based on poor ventilation is exacerbated by the COVID-19 pandemic; and he provides no facts indicating that he is likely to contract COVID-19 due to the use of the recycled air system."); Figueroa v. Cnty. of Rockland, No. 16-CV-6519 (NSR), 2018 WL 3315735, at *7 (S.D.N.Y. July 5, 2018) (dismissing the claim although the plaintiff alleged that he was in intake housing for ninety days and while there, experienced bite marks, there was no ventilation, feces was being thrown; but "this Court cannot ascertain whether [the p]laintiff was in the

same cell with [the inmate throwing feces] while he was throwing his feces (as there are 16 cells in intake housing) or how often he would do so, whether the cleaning supplies were cleaned after they were used to clean up [the feces], and the amount of time [the p]laintiff was exposed to the conditions in the bathroom shower."); Jackson v. Sullivan Cnty., No. 16-CV-3673 (JCM), 2018 WL 1582506, at *4 (S.D.N.Y. Mar. 27, 2018) ("The presence of mold in a shower for a limited duration, without more, does not violate contemporary standards of decency or establish an objectively unreasonable risk of serious damage to future health or safety."). But see Walker v. Schult, 717 F.3d 119, 126 (2d Cir. 2013) (concluding that the plaintiff plausibly alleged as Eighth Amendment violation because "[h]e alleged that for approximately twenty-eight months, he was confined in a cell with five other men, with inadequate space and ventilation, stifling heat in the summer and freezing cold in the winter, unsanitary conditions, including urine and feces splattered on the floor, insufficient cleaning supplies, a mattress too narrow for him to lie on flat, and noisy, crowded conditions that made sleep difficult and placed him at constant risk of violence and serious harm from cellmates.").

Plaintiff did not allege the unsanitary conditions in his second amended complaint and even if he had, such allegations are conclusory as to the severity of the conditions and are insufficient to create a dispute of material fact. See Sec. Am. Compl. Undoubtedly, "[t]t is ... by now common knowledge—that COVID-19 is a highly dangerous disease that poses a significant risk of severe illness and death, particularly for" those with underlying chronic health conditions. Martinez-Brooks v. Easter, 459 F. Supp. 3d 411, 440 (D. Conn. 2020). However, plaintiff does not allege why he was on high blood pressure medication, when he started taking medication, that any condition placed him at increased risk of harm from COVID-19, or that he had Tuberculosis at the time he was required to share a cell with another inmate. See generally Sec. Am. Compl. Although plaintiff was required to share a cell with another inmate and was unable to maintain six-feet of social distance at all times, he was provided with a face mask and instructed to wear it, there is no evidence that he or the other inmate were symptomatic or exposed to COVID-19, and there is no evidence that there was an increase in positive cases that the prison was failing to quarantine. See Dkt. No. 119-2 at 74-7, 76-77. Additionally, plaintiff does not allege, nor is there evidence in the record that indicates that the clogged vent created an unreasonable risk to plaintiff's health. As such, plaintiff has failed to satisfy the objective prong of a conditions of confinement claim.

Even if the District Court Judge were to disagree as to the objective prong, summary judgment in favor of defendant Sullivan is warranted because plaintiff has failed to satisfy the subjective prong of a conditions of confinement claim. To satisfy the subjective prong, plaintiff must show that Sullivan "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the [plaintiff] even though the defendant[ ] knew, or should have known, that the condition posed an excessive risk to health or safety.' " Smith, 2021 WL 6503602, at *11 (citations omitted).

There is no admissible evidence in the record demonstrating that Sullivan knew anything beyond the fact that plaintiff was sharing a cell with another inmate as of the May 13, 2020, hearing. See Dkt. No. 119-14 at 3. For example, there is no evidence that Sullivan knew whether (1) plaintiff had underlying health conditions that made him more vulnerable to COVID-19, (2) plaintiff was instructed to and was wearing his mask while in the cell, (3) there were empty cells plaintiff could have been moved to, (4) there was an increase in the number of positive cases of COVID-19, (5) the prison was appropriately quarantining symptomatic or positive individuals, or (6) the vent in plaintiff's cell was clogged or dirty. Without evidence of any such knowledge, plaintiff has failed to establish a dispute of material fact as to whether Sullivan disregarded an excessive risk to plaintiff's health. See Pierce, 2023 WL 2646825, at *10 ("[The p]laintiff has proffered evidence from which a reasonable jury could find that [the d]efendants knew there were inmates with COVID-19 in B-Block and disregarded the associated risk when they transferred him there."); Nazario v. Thibeault, No. 3:21-CV-216 (VLB), 2022 WL 2358504, at *6 (D. Conn. June 30, 2022) ("[The p]laintiff has alleged sufficient facts that his exposure to COVID-19 resulted from [the d]efendant's deliberate indifference to survive summary judgment.... [The p]laintiff specifically contends that, despite Osborn's quarantine protocols, [the d]efendant was aware that [the p]laintiff and the other laundry workers were moved into a housing unit with COVID-19 positive and/or symptomatic inmates. He also asserts that [the d]efendant did not provide the laundry workers with proper PPE to safely perform their duties."); Toussaint, 2021 WL 1648648, at *4 (concluding that the plaintiff had sufficiently alleged a deliberate indifference claim because the plaintiff alleged that the defendants knew inmates were symptomatic or positive for

COVID-19 and that the plaintiff was older and had diabetes but refused to transfer the plaintiff from the block). As there is no evidence in the record that Sullivan knew of a substantial risk to plaintiff's health and disregarded that risk, it is recommended that defendants' motion for summary judgment be granted, and plaintiff's Eighth Amendment claim against defendant Sullivan be dismissed.

### D. Fourteenth Amendment Equal Protection Claims against Barkman and Sullivan

**\*17**  The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "Essential to that protection is the guarantee that similarly situated persons be treated equally." Rasheen v. Adner, 356 F. Supp. 3d 222, 242 (N.D.N.Y. 2019). "In order to establish an equal protection violation, the plaintiff[ ] must show that [he or she was] treated differently than other people in similar circumstances and must establish that such unequal treatment was the result of intentional and purposeful discrimination." Id. (citation omitted). "[A] valid equal protection claim may be brought by a 'class of one,' 'where the plaintiff alleges that [he or] she [ ] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.' " Id. (quoting Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam); see also Bizzarro v. Miranda, 394 F.3d 82, 86 (2d Cir. 2005) (citation and emphasis omitted) (explaining that the Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' "). "[C]lass-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." Clubside, Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir. 2006).

Plaintiff alleges that he was treated differently than the other inmate that he fought with on April 12, 2020, because he was taken to the SHU and the other inmate was not. See Sec. Am. Compl. at 12. In his declaration in support of his opposition to defendants' motion, he refers to himself as a "class of one" plaintiff. Dkt. No. 125-3 at 2, ¶ 3. In his motion for summary judgment, plaintiff states that "the General Population inmate[s] were not placed in double bunks[ ] while forcing SHU inmates to double bunk." Dkt. No. 124 at 58; see also Dkt. No. 125-1 at 11.

First, plaintiff has not asserted that he was discriminated against on the basis of a being a member of a constitutionally protected class. Second, plaintiff has not produced admissible evidence supportive of a class of one theory—"that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination[ ]" and "that the difference in treatment was not reasonably related to any 'legitimate penological interests.' " Reynolds v. Quiros, 990 F.3d 286, 300 (2d Cir. 2021) (quoting Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005)).

Inmates in the general population are not similarly situated to inmates housed in the SHU. See Stevens v. Cuomo, No. 9:21-CV-0306 (GLS/ML), 2021 WL 3165364, at *8 (N.D.N.Y. July 27, 2021) ("[G]eneral population inmates are not similarly situated to SHU inmates."), appeal dismissed, No. 21-2093, 2022 WL 3703317 (2d Cir. Feb. 28, 2022). Further, insofar as plaintiff was transported to the SHU by Barkman following the April 12, 2020, fight, and the other inmate was not, the record demonstrates that plaintiff was the aggressor in the fight (an accusation to which he pleaded guilty at the disciplinary hearing). See Dkt. Nos. 119-7, 119-8, 119-9; see also Gomez v. Chill, No. 11-CV-6844 (CM/JLC), 2015 WL 1853110, at *12 (S.D.N.Y. Apr. 17, 2015) (comparing Salahuddin v. Jones, 992 F.2d 447, 449 (2d Cir. 1993) (per curiam) (finding legitimate penological interest where the plaintiff was in the SHU for fighting another inmate), with Salahuddin v. Goord, 467 F.3d 263, 276-77 (2d Cir. 2006) (denying summary judgment where "[t]he defendants do argue that denying [the plaintiff] the ability to observe these religious rites was reasonable in light of their legitimate penological—interest a compelling interest—in protecting inmate safety. After all, the defendants point out, [the plaintiff] was put in disciplinary keeplock for conspiring to assault another inmate who was also a member of the Muslim community at Woodbourne.")), report and recommendation adopted, 2015 WL 3862709 (S.D.N.Y. June 9, 2015).

2023 WL 3727447

Plaintiff has not produced any evidence to support the contention that he was transferred to the SHU because of an intent to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person. See Hamilton v. New York State Dep't of Corr. & Cmty. Supervision, No. 9:18-CV-1312 (MAD/CFH), 2021 WL 5095962, at *17 (N.D.N.Y. Aug. 18, 2021) (citation omitted) ("[A] aside from [the p]laintiff's conclusory assertion made in opposition that defendants 'purposefully act[ed] with malice,' the record is bereft of any evidence that supports [the] plaintiff's speculative assertion that inmates of other religions were placed on call-out lists."), report and recommendation adopted sub nom. Hamilton v. Annucci, 2021 WL 4316747 (N.D.N.Y. Sept. 23, 2021).

 **\*18** Similarly, as to Sullivan, there is no evidence that Sullivan selectively treated plaintiff different than any other SHU inmate. See Ruggiero v. Fischer, 807 F. App'x 70, 74 (2d Cir. 2020) (summary order) (affirming grant of summary judgment because the plaintiff "made no showing at all that he was treated differently from SHU inmates at other institutions[ ]" and "did not attempt to identify a specific comparator at Southport or another facility with whom he had a high degree of similarity."). Plaintiff testified that while he was in the SHU, he was required to bunk with another inmate once for a few minutes to a couple of hours, and then for a couple of weeks. See Dkt. No. 119-2 at 58-61, 73-74, 76-77. Sullivan did not decide for plaintiff to be double bunked when other SHU inmates were not double bunked. In fact, the other inmates that plaintiff shared a cell with, were also double bunked. See Dkt. No. 119-2 at 58-61, 73-74, 76-77. Plaintiff has not presented any evidence that Sullivan's actions were done with an intent to discriminate against plaintiff on the basis of impermissible considerations. See Shakur v. Sieminski, No. 3:07-CV-1239C, 2009 WL 2151174, at *8 (D. Conn. July 15, 2009) (determining that the plaintiff "presents no evidence showing racial discrimination, intent to inhibit his exercise of any constitutional right or any malicious intent to injure.... [The plaintiff] has identified and presented evidence of no other inmates with similar disciplinary history who were treated differently under the same circumstances.").

To the extent plaintiff states that Sullivan and Barkman were a part of a conspiracy and acted with malice or ill intent, there is no admissible record evidence to indicate that either defendant acted maliciously or in any way other than by following orders to transfer plaintiff to the SHU and by sanctioning him for misbehavior. See Dkt. No. 125-1 at 12, 21-24. Based on the foregoing, plaintiff's Equal Protection claims fail as a matter of law. It is recommended that defendants' motion for summary judgment as to plaintiff's Equal Protection claims be granted and those claims be dismissed.


### E. State Law Tort Claim

As the undersigned recommends granting defendants' summary judgment motion on the federal claims, the undersigned also recommends granting defendants' motion for summary judgment on plaintiff's related state law tort claim.

28 U.S.C. § 1367(c)(3) instructs that "the district courts may decline to exercise supplemental jurisdiction over a [state-law] claim ... if ... the district court has dismissed all claims over which it has original jurisdiction...." 28 U.S.C. § 1367(c)(3). "The decision is a discretionary one, and its justification 'lies in considerations of judicial economy, convenience[,] and fairness to litigants[.]' " Allen v. Cnty. of Cayuga, No. 9:17-CV-0018 (MAD/TWD), 2018 WL 11469532, at *14 (N.D.N.Y. June 25, 2018) (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)), report and recommendation adopted, 2018 WL 11469516 (N.D.N.Y. Aug. 13, 2018). However, "[t]he Second Circuit has instructed 'if [all] federal claims are dismissed before trial ... the state claims should be dismissed as well.' " Id. (quoting Castellano v. Bd. of Tr., 937 F.2d 752, 758 (2d Cir. 1991)).

As the undersigned recommends dismissing all of plaintiff's federal claims, it is also recommended that the Court decline to exercise supplemental jurisdiction over plaintiff's state law tort claim. See MacInerney v. Allen, No. 5:21-CV-0818 (LEK/ML), 2022 WL 561649, at *4 (N.D.N.Y. Feb. 24, 2022) ("Having found that all of [the p]laintiff's federal claims are subject to dismissal, I recommend that, to the extent that [the p]laintiff has asserted any state law claims, the Court decline to exercise jurisdiction over those claims."), report and recommendation adopted, 2022 WL 1025841 (N.D.N.Y. Apr. 6, 2022).

### F. Qualified Immunity

"Qualified immunity shields government officials from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial, lawsuits." Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995). A correction officer is "entitled to qualified immunity from civil liability for actions performed in the course of their duties insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Whitley v. Miller, 57 F. Supp. 3d 152, 162 (N.D.N.Y. 2014) (citations and quotation marks omitted); see also Hartline v. Gallo, 546 F.3d 95, 102 (2d Cir. 2008). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier v. Katz, 533 U.S. 194, 201 (2001), receded on other grounds by Pearson v. Callahan, 555 U.S. 223, 236 (2009).

**\*19** Here, the Court need not address qualified immunity as an alternative ground to defendants' summary judgment motion because plaintiff has not established a dispute of material fact as to whether defendants violated his constitutional rights. See Warren v. Corcoran, No. 9:09-CV-1146 (DNH/ATB), 2011 WL 5599587, at \*8 (N.D.N.Y. Oct. 20, 2011) ("This court need not address qualified immunity with respect to [the] plaintiff's various causes of action because ... he has not established any alleged violations of his constitutional rights."), report and recommendation adopted, 2011 WL 5599620 (N.D.N.Y. Nov. 17, 2011); Atkinson v. Huntington, No. 9:15-CV-0065 (MAD/TWD), 2016 WL 8735651, at \*10, n.15 (N.D.N.Y. Aug. 19, 2016) ("In light of my recommendations that [the d]efendants' motion be granted in its entirety based on the merits, I find it unnecessary to address [the d]efendants' alternative qualified immunity arguments."), report and recommendation adopted, 2016 WL 4991616 (N.D.N.Y. Sept. 19, 2016).

### V. Conclusion

**WHEREFORE**, based on the foregoing, it is hereby:

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 119) be **GRANTED**; and it is further

**RECOMMENDED**, that plaintiff's motion for summary judgment (Dkt. No. 124) be **DENIED**; and it is further

**RECOMMENDED**, that plaintiff's second amended complaint (Dkt. No. 50) be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE**; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72. [8]

### All Citations

Slip Copy, 2023 WL 3727447

Smith v. Sullivan, Slip Copy (2023)
2023 WL 3727447

## Footnotes

1       This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and
        N.D.N.Y.L.R. 72.3(c).

2       Plaintiff initially sought to bring this action against numerous other individuals. See Dkt. No. 1. Following the Court's
        initial review of plaintiff's complaint, the review of his amended complaint, and a ruling on his motion to amend his
        amended complaint, the Court dismissed a number of claims and defendants. See Dkt. Nos. 4, 8, 9, 38, 49. The operative
        complaint is plaintiff's second amended complaint. See Dkt. No. 50.

3       Citations to the record are to the pagination generated at the top of each page by CM/ECF.

4       Generally, all unpublished decisions cited in this Report-Recommendation and Order are provided to plaintiff. However,
        in light of the number of unpublished cases that have been cited, the Court will not provide plaintiff with copies of cases
        that adopt cited Report-Recommendations and Orders.

5       This includes a cover page, table of contents, table of authorities, and "preliminary statement." See Dkt. No. 124-1 at
        1-9. Plaintiff's tables of contents and authorities and "preliminary statement" are included twice. See id. at 10-17.

6       Plaintiff submitted two statements of materials facts. Plaintiff first attached to his motion for summary judgment a
        statement of material fact pursuant to "Local Rule 7.1." Dkt. No. 124 at 1. The relevant Local Rule for a statement
        of material facts is Local Rule 56.1, which was formerly Local Rule 7.1(a)(3). See L.R. 56.1. After defendants filed
        their statement of material facts, see Dkt. No. 126-1, the Court granted plaintiff twenty days to respond. See Dkt. No.
        128. Plaintiff also then sought and received permission from the Court to file a statement of material facts. See Dkt.
        Nos. 132, 133.

7       At the top of the first page, plaintiff writes what could possibly be the author of the information: the Parole Preparation
        Project. See Dkt. No. 124-2 at 83.

8       If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-
        day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to
        you to serve and file objections. See FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday,
        Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or
        legal holiday. See id. § 6(a)(1)(C).

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 3722137

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Charles J. SMITH, Plaintiff,

v.

Brian SULLIVAN et al., Defendants.

9:20-CV-659

|

Signed May 30, 2023

**Attorneys and Law Firms**

CHARLES J. SMITH, Plaintiff, Pro Se, 96-A-6765, Gouverneur Correctional Facility, Scotch Settlement Road, P.O. Box 480, Gouverneur, NY 13642.

HON. LETITIA JAMES, New York State Attorney General, LYNN MARIE KNAPP, ESQ., STACEY A. HAMILTON, ESQ., Ass't Attorneys General, Attorneys for Defendants, The Capitol, Albany, NY 12224.

## <u>ORDER ON REPORT & RECOMMENDATION</u>

DAVID N. HURD, United States District Judge

**\*1** On June 12, 2020, *pro se* plaintiff Charles J. Smith ("plaintiff"), then an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") at Greene Correctional Facility, filed this 42 U.S.C. § 1983 action alleging that corrections officials and others violated his rights under the U.S. Constitution and state law. Dkt. No. 1. Along with his complaint, plaintiff also sought leave to proceed *in forma pauperis* ("IFP Application"). Dkt. Nos. 2, 3.

On July 30, 2020, this Court granted plaintiff's IFP Application, conducted an initial review of the pleading, dismissed many of plaintiff's claims, and permitted a few others to proceed. Dkt. No. 4. Thereafter, plaintiff filed an amended complaint, Dkt. No. 8, which was reviewed for sufficiency and again permitted to proceed in part, Dkt. No. 9. And after some procedural disputes and a discovery hearing, plaintiff sought leave to further amend his pleading, Dkt. No. 38, which was granted in part and denied in part, Dkt. No. 49, and his second amended complaint was accepted for filing as modified by the Court's Order, Dkt. No. 50. A period of discovery followed. Dkt. Nos. 57–115.

On November 22, 2022, defendants moved under Federal Rule of Civil Procedure ("Rule") 56 for summary judgment on all of plaintiff's remaining claims. Dkt. No. 119. Plaintiff opposed, Dkt. No. 125, and cross-moved for summary judgment in his own favor, Dkt. No. 124. Those motions were fully briefed and the matter was referred to U.S. Magistrate Judge Christian F. Hummel. Dkt. Nos. 126–139. Thereafter, Judge Hummel advised by Report & Recommendation ("R&R") that defendants' motion be granted, plaintiff's motion be denied, and plaintiff's operative complaint be dismissed in its entirety with prejudice. Dkt. No. 140.

Plaintiff has not filed objections. Dkt. No. 140. The time period in which to do so has expired. *See id.* Upon review for clear error, the R&R is accepted and will be adopted in all respects. *See* FED. R. CIV. P. 72(b).

Therefore, it is

ORDERED that

2023 WL 3722137

1. The Report & Recommendation is ACCEPTED;

2. Defendants' motion for summary judgment is GRANTED;

3. Plaintiff's motion for summary judgment is DENIED; and

4. Plaintiff's operative complaint is DISMISSED with prejudice.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2023 WL 3722137

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.  2

Diaz v. Local No. 241, Transport Workers Union of..., Not Reported in Fed....

2019 WL 3765924

2019 WL 3765924
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Anicasia DIAZ, Ludwig Alonso, Julia Deleon, Maria Gomez, Fredeswinda
Morciglio, Mariola Truszkowski, and Pedro Quinones, Plaintiffs,

v.

LOCAL NO. 241, TRANSPORT WORKERS UNION OF AMERICA, UNIVERSITY
DIVISION, and Columbia University in the City of New York, Defendants.

17cv8898
|
Signed 08/09/2019

**Attorneys and Law Firms**

Stuart Lloyd Lichten, Lichten & Bright, P.C., New York, NY, for Plaintiffs.

Steven Charles Farkas, Colleran, O'Hara & Mills L.L.P., Woodbury, NY, for Defendant Local No. 241.

Mark Anthony Hernandez, Mary Ellen Donnelly, Noorin Hamid, Putney Twombly Hall & Hirson LLP, New York, NY, for
Defendant Colombia University.

OPINION & ORDER

WILLIAM H. PAULEY III, Senior United States District Judge:

**\*1** Plaintiffs Anicasia Diaz, Ludwig Alonso, Julia DeLeon, Maria Gomez, Fredeswinda Morciglio, Mariola Truszkowski, and
Pedro Quinones (collectively, "Plaintiffs") bring this action under § 301 of the Labor Management Relations Act ("LMRA")
against Defendants Local No. 241, Transport Workers Union of America, University Division ("Local 241") and Columbia
University (collectively, "Defendants"). Plaintiffs contend that Local 241 breached its duty of fair representation and that
Columbia violated its collective bargaining agreement with Local 241. Columbia moves to dismiss the Amended Complaint
pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, Columbia's motion to dismiss is granted in
part and denied in part.

BACKGROUND

Plaintiffs are members of Local 241 and are employed by Columbia as "Heavy Cleaners." (Am. Compl., ECF No. 24 ("AC"), ¶¶
6–12.) Local 241 is the exclusive bargaining agent for Plaintiffs. (AC ¶ 13.) Plaintiffs' employment is governed by a collective
bargaining agreement between Local 241 and Columbia, effective April 1, 2016 through March 31, 2020 (the "CBA"). (AC ¶
15.) Article 6, Section 3(h) of the CBA provides: "All overtime assignments will be distributed as equally as possible by job
classification and seniority on a rotating list and appropriately recorded. Lists will be posted in an area accessible to employees.
Each appropriate group will decide on the proper administration of such lists." (AC ¶ 16.)

Plaintiffs contend that overtime assignments have not been distributed "as equally as possible" in violation of Article 6, Section
3(h). (AC ¶ 17.) Instead, Plaintiffs assert that overtime assignments are distributed preferentially to relatives and friends of

Case 9:19-cv-00609-DNH-ML    Document 95    Filed 01/10/24    Page 112 of 128

Diaz v. Local No. 241, Transport Workers Union of..., Not Reported in Fed....

2019 WL 3765924

union officials. (AC ¶ 17.) Moreover, Plaintiffs allege that overtime lists were not posted until approximately January 2018, and when they were, they understated overtime hours worked by union officials' relatives and friends. (AC ¶ 20.)

On August 15, 2017, Plaintiffs wrote a letter to Local 241 and Columbia complaining that overtime was distributed unequally. (AC ¶ 22.) While Local 241 did not respond, Columbia replied that it was "not aware of any violation of the CBA as it relates to overtime distribution." (AC ¶ 22.) On October 25, 2017, Plaintiffs filed a grievance with both Local 241 and Columbia, alleging that "[o]vertime assignments are not distributed equally," that "[r]elatives and friends of union officials are given preference for overtime assignments," and that overtime "[l]ists are not posted." (AC, Ex. A.) Two days later, Local 241 responded that Columbia was "the proper party that should receive a grievance under the CBA." (AC ¶ 24.) That same day, Columbia advised Plaintiffs it had forwarded their grievance to Local 241. (AC ¶ 25.) On October 30, 2017, Plaintiffs informed Local 241 that they were "willing to allow the union to engage in a good faith investigation of their claims, to be followed by appropriate actions in response." (AC ¶ 26.) Local 241 never acknowledged Plaintiffs' proposal and has failed to explain why it refused to act on Plaintiffs' grievance. (AC ¶ 27.)

DISCUSSION

I. Legal Standard

**\*2**  On a motion to dismiss, a court accepts all facts alleged in the complaint as true and construes all reasonable inferences in a plaintiff's favor. ECA Local 134 IBEW Joint Pension Tr. Fund of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009). The complaint must nevertheless "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotation marks omitted). Indeed, to survive a motion to dismiss, the Court must find the claim rests on factual allegations sufficient to "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); see also Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.") "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." S. Cherry St. LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009) (quoting Iqbal, 556 U.S. at 679).

II. Threshold Matters

Before deciding whether the Amended Complaint states a plausible claim for relief, this Court addresses two issues raised in Columbia's motion to dismiss: (1) whether the Amended Complaint is the operative pleading in this action, and (2) whether the Court may consider extraneous documents appended to Columbia's motion.

  A. Operative Pleading

To begin, Columbia urges this Court to disregard the Amended Complaint and treat the original complaint filed on November 17, 2017 (the "Original Complaint") as the operative pleading. (Mem. of Law in Supp. of Def.'s Mot. to Dismiss, ECF No. 42 ("Def.'s MTD"), at 6.) Columbia argues that the Original Complaint included allegations demonstrating that Plaintiffs knew of and complained about the purported overtime inequities as early as 2008. (See Def.'s MTD, at 7–8.) And because claims under § 301 of the LMRA are governed by a six-month statute of limitations that "begins to run when a plaintiff knows or reasonably should know that the [u]nion has breached its duty of fair representation," Columbia believes Plaintiffs' claims—as alleged in the Original Complaint—are time-barred. (Def.'s MTD, at 10 (quoting Flanigan v. Int'l Bhd. of Teamsters, Local No. 671, 942 F.2d 824, 827 (2d Cir. 1991)) (emphasis removed).) Columbia voiced this statute of limitations defense in a January 16, 2018 pre-motion letter and during a February 9, 2018 pre-motion conference. This Court afforded Plaintiffs an opportunity to amend their complaint. (See Def.'s MTD, at 7.)

The Amended Complaint omits the allegations Columbia asserts render Plaintiffs' claims stale. For instance, Columbia notes that the Amended Complaint removes Plaintiffs' initial contention that overtime assignments had been distributed inequitably

"for at least a decade" and deletes a previously-included 2016 example of such inequitable distribution concerning Quinones and Morciglio. (Def.'s MTD, at 7.) In place of those allegations, the Amended Complaint states that "overtime assignments, up until the present day, have not been as equally distributed as possible" and includes a 2017 example of inequitable distribution. (Def.'s MTD, at 7 (emphasis added).) The Amended Complaint also excludes Plaintiffs' original contention that "Plaintiffs sent a letter and distributed a petition in 2008 and filed grievances in 2010 and 2016." (Def.'s MTD, at 7–8.) These adjustments— according to Columbia—are an impermissible attempt to plead around the time bar. (Def.'s MTD, at 8.)

While "[i]t is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect," Int'l Controls Corp. v. Vesco, 556 F.2d 665, 668 (2d Cir. 1977), "[i]n rare circumstances, courts in the Second Circuit will consider prior pleadings," 2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assurance Co., 96 F. Supp. 3d 182, 206 (S.D.N.Y. 2015). A court will do so only "when the plaintiff directly contradicts the facts set forth in his original complaint." 2002 Lawrence R. Buchalter Alaska Tr., 96 F. Supp. 3d at 206 (quotation marks omitted); see Dozier v. Deutsche Bank Tr. Co. Ams., 2011 WL 4058100, at *4 (S.D.N.Y. Sept. 1, 2011) (disregarding plaintiff's statement in second amended complaint that defendant did not create a tax reserve fund where defendant alleged the opposite in previous pleadings); Wallace v. N.Y.C. Dep't of Corr., 1996 WL 586797, at *1–2 (E.D.N.Y. Oct. 9, 1996) (discrediting amended complaint alleging a "policy" of wrongful conduct where plaintiff previously alleged that injuries resulted from an "aberration"). Thus, "[w]here ... an amended pleading is not in 'direct' contradiction with the original pleading, courts apply the general rule recognizing that an amended pleading completely replaces the original pleading." Brooks v. 1st Precinct Police Dep't., 2014 WL 1875037, at *3 (E.D.N.Y. May 9, 2014).

**\*3** Plaintiffs' alterations do not warrant the "rare" action of disregarding the Amended Complaint. Columbia has not shown that Plaintiffs' alterations "directly contradict" the Original Complaint, "[a]nd the mere fact that ... [P]laintiff[s] [have] chosen to omit, for strategic reasons ... fact[s] alleged in an earlier pleading does not entitle the Court to consider [those] fact[s] once it has accepted the amended pleading for filing." Vasquez v. Reilly, 2017 WL 946306, at *4 (S.D.N.Y. Mar. 9, 2017); see 2002 Lawrence R. Buchalter Alaska Tr., 96 F. Supp. 3d at 205–06 (refusing to take judicial notice of prior allegations allegedly showing plaintiffs' claims were time-barred because "[p]laintiffs merely removed certain allegations from their Complaint and First Amended Complaint instead of alleging directly contradictory facts"); Brooks, 2014 WL 1875037, at *3 ("Plaintiff's Amended Complaint omits a fact that was included in his original Complaint, but does not 'directly contradict' any factual allegations made in the original Complaint. The Court therefore finds that the Amended Complaint replaces the original complaint and because Plaintiff does not include the date of the incident in his Amended Complaint, the Court cannot determine whether Plaintiff's action is time-barred.").

Ironically, Columbia concedes that the "the Amended Complaint is devoid of any substantive factual changes." (Def.'s MTD, at 8.) Indeed, the Original and Amended Complaints state the same core facts, namely: (1) Defendants preferentially allocated overtime assignments to relatives and friends of Local 241 officials; (2) overtime lists were not posted until January 2018, and when they were posted, they understated the overtime hours worked by union officials' relatives and friends; and (3) in October 2017, Plaintiffs' filed a grievance with Columbia and Local 241, which was ignored. And while "[t]his Court sympathizes with [Columbia's] argument that [Plaintiffs] made certain factual changes in the [A]mended [C]omplaint expressly to avoid dismissal of their ... claim[s] [on statute of limitations grounds]," Kermanshah v. Kermanshah, 580 F. Supp. 2d 247, 267 (S.D.N.Y. 2008), "[i]t is not uncommon for litigants to amend pleadings in response to deficiencies pointed out by an adversary or even by the Court, either before a dispositive motion is filed or in response to a ruling on a motion that grants leave to replead," Streit v. Bushnell, 424 F. Supp. 2d 633, 639 (S.D.N.Y. 2006). This Court therefore concludes that the Amended Complaint replaced the Original Complaint as the operative pleading.

## B. Extraneous Documents Considered

Columbia appends several exhibits to its motion to dismiss and asks this Court to consider them. Columbia asserts that these documents are "integral to [Plaintiffs'] claim[s]" and demonstrate that the claims are untimely. (Def.'s MTD, at 4–5.) Generally, "this Court may not properly consider materials outside the [c]omplaint without treating the motion [to dismiss] as one for summary judgment." Okla. Firefighters Pension and Ret. Sys. v. Lexmark Int'l, Inc., 367 F. Supp. 3d 16, 28 (S.D.N.Y. 2019)

Case 9:19-cv-00609-DNH-ML    Document 95    Filed 01/10/24    Page 114 of 128

Diaz v. Local No. 241, Transport Workers Union of..., Not Reported in Fed....

2019 WL 3765924

(citing Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002)). For purposes of this rule, however, the complaint includes "the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 64 (2d Cir. 2010) (quotation marks omitted). To be incorporated by reference, the plaintiff must make a "clear, definite and substantial reference to the documents." Helprin v. Harcourt, Inc., 277 F. Supp. 2d 327, 330–31 (S.D.N.Y. 2003). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." Chambers, 282 F.3d at 153 (emphasis added) (quotation marks omitted). "A court may [also] take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." Glob. Network Comm'ns, Inc. v. City of N.Y., 458 F.3d 150, 157 (2d Cir. 2006) (quotation marks omitted); see also Kavowras v. N.Y. Times Co., 328 F.3d 50, 57 (2d Cir. 2003) (approving district court's consideration of plaintiff's National Labor Relations Board charge in deciding a motion to dismiss). With these principles in mind, the Court addresses each exhibit in turn.

 **\*4** Exhibits A and B are copies of the Original and Amended Complaint, respectively. This Court has already found that the Amended Complaint supersedes the Original Complaint. As such, this Court declines to consider Exhibit A.

Exhibit C is a November 30, 2006 news article, accusing Local 241 president-elect, Enzo Rodriguez, of engaging in favoritism and misappropriation of overtime. The article is neither incorporated by reference nor integral to the Amended Complaint. Accordingly, this Court declines to consider it.

Exhibit D is an August 14, 2008 letter to Local 241 signed by—among others—Diaz and Quinones. The letter asserts that overtime is distributed unfairly. Again, the letter is neither incorporated by reference nor integral to the Amended Complaint. The Court therefore declines to consider Exhibit D.

Exhibit E is an unfair labor practice charge Diaz filed with the National Labor Relations Board ("NLRB") on May 26, 2010, alleging that Local 241 failed to process a grievance concerning overtime distribution. Exhibit G is a similar NLRB charge filed by Alonso on July 1, 2016, alleging that Local 241 failed to help its members enforce the overtime assignment provision of the CBA. Exhibit H is another NLRB charge filed by Alonso on July 1, 2016—this time against Columbia—alleging that it failed to abide by the overtime assignment provision in the CBA. Exhibit I is an affidavit from Alonso accompanying the charge attached as Exhibit H. The Court will consider these exhibits—but not for the truth of the matters asserted therein—because in this Circuit it is well-settled that courts may take judicial notice of NLRB charges at the motion to dismiss stage. Ode v. Terence Cardinal Cooke (HCC), 2008 WL 5262421, at \*1, n.1 (S.D.N.Y. Dec. 12, 2008) ("Judicial notice may be taken of the NLRB proceeding on this motion to dismiss without converting it into a motion for summary judgment." (citing Kavowras, 328 F.3d at 57)).

Exhibit F is an unsigned July 26, 2010 grievance submitted to Local 241 from unspecified "union members" alleging unfair distribution of overtime. Exhibit J is a similar grievance submitted on July 5, 2016 by Alonso. These grievances were neither attached to the Amended Complaint nor incorporated by reference. And Columbia offers no argument as to how Plaintiffs "relied heavily upon" them in drafting the Amended Complaint. Okla. Firefighters, 367 F. Supp. 3d at 28–29. The Court declines to consider Exhibit F.

Exhibit K is a copy of Article 6 of the CBA, which Plaintiffs quote and cite in the Amended Complaint. (See AC ¶¶ 16, 23.) The Court will consider Exhibit K. See, e.g., Helprin, 277 F. Supp. 2d at 330–31 (considering extraneous agreement as part of the complaint where the complaint made substantial references to the agreement and quoted certain paragraphs verbatim, and the complaint was based on interpreting certain provisions of the agreement).

Exhibit L consists of two separate e-mails from Columbia dated August 30 and October 27, 2017. A portion of the August 30 email is quoted in the Amended Complaint, and a portion of the October 27 email is paraphrased. But the emails contain self-serving statements by Columbia that are inappropriate for this Court to consider on a motion to dismiss. Moreover, Columbia

Case 9:19-cv-00609-DNH-ML    Document 95    Filed 01/10/24    Page 115 of 128

Diaz v. Local No. 241, Transport Workers Union of..., Not Reported in Fed....

2019 WL 3765924

offers no argument as to how these emails are incorporated by reference or integral to the Amended Complaint. This Court declines to consider Exhibit L.

### III. Plaintiffs' Hybrid § 301 Claim

**\*5** "In order to provide individual employees with recourse when a union breaches its duty of fair representation in a grievance or arbitration proceeding, the Supreme Court has held that an employee may bring suit against both the union and the employer. Such suit ... is known as a hybrid § 301/fair representation claim." Carrion v. Enter. Ass'n, 227 F.3d 29, 33 (2d Cir. 2000) (per curiam). To establish a hybrid § 301 claim, a plaintiff must show (1) "that the union breached its duty of fair representation vis-à-vis the union members," and (2) "that the employer breached a collective bargaining agreement." White v. White Rose Food, 237 F.3d 174, 178 (2d Cir. 2001). "[T]he [u]nion's breach is a prerequisite to consideration of the merits of plaintiff's claim against" the employer. Young v. U.S. Postal Serv., 907 F.2d 305, 307 (2d Cir. 1990). "If a plaintiff cannot make this threshold showing, [the] hybrid section 301/duty of fair representation action fails[ ] and neither the union nor the employer can be held liable." Jordan v. Viacom Outdoor Grp., 475 F. Supp. 2d 440, 444 (S.D.N.Y. 2007) (citing DelCostello v. Int'l Bros. of Teamsters, 462 U.S. 151, 164–65 (1983)).

### A. Breach of the Duty of Fair Representation

A claim for breach of the duty of fair representation contains two elements. First, plaintiffs must show that the "conduct toward [them] is arbitrary, discriminatory, or in bad faith." Sanozky v. Int'l Ass'n of Machinists and Aerospace Workers, 415 F.3d 279, 282 (2d Cir. 2005) (per curiam) (quoting Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 44 (1998)). "Plaintiffs must then demonstrate a causal connection between the union's wrongful conduct and their injuries." Spellacy v. Airline Pilots Ass'n-Int'l, 156 F.3d 120, 126 (2d Cir. 1998).

"A union acts in bad faith when it acts with an improper intent, purpose, or motive," or where it engages in "fraud, dishonesty, and other intentionally misleading conduct." Spellacy, 156 F.3d at 126. A union discriminates where it, "without a legitimate purpose, take[s] action favoring some of its members at the expense of others." Ramey v. Dist. 141, Int'l Ass'n of Machinists and Aerospace Workers, 378 F.3d 269, 276–77 (2d Cir. 2004) (quotation marks omitted). And "[a] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness, as to be irrational." Sanozky, 415 F.3d at 282–83 (quoting Air Line Pilots Ass'n Int'l v. O'Neill, 499 U.S. 65, 67 (1991)). "This wide range of reasonableness gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." White, 237 F.3d at 179 (quotation marks omitted). "An inquiry into whether a union has breached the duty of fair representation by acting either arbitrarily, in bad faith, or discriminatorily is context specific and fact-sensitive." Acosta v. Potter, 410 F. Supp. 2d 298, 308 (S.D.N.Y. 2006), and courts are afforded "broad parameters of judgment that necessarily vary from context to context." Ryan v. N.Y. Newspaper Printing Pressmen's Union No. 2, 590 F.2d 451, 455 (2d Cir. 1979).

"A union's failure or refusal to pursue a grievance on its own does not constitute a breach of the duty of fair representation unless that failure or refusal may be 'fairly characterized as so far outside of a wide range of reasonableness that it is wholly irrational or arbitrary.' " Vera v. Saks, 424 F. Supp. 2d 694, 705 (S.D.N.Y. 2006) (citation omitted) (quoting Air Line Pilots Ass'n, Int'l, 499 U.S. at 67). That is, "[a] union acts arbitrarily in failing to initiate or process a grievance when it 'ignores or perfunctorily presses a meritorious claim.' " Thomas v. Little Flower for Rehab. & Nursing, 793 F. Supp. 2d 544, 548 (E.D.N.Y. 2011) (quoting Samuels v. Air Transp. Local 504, 992 F.2d 12, 16 (2d Cir. 1993)); see also Scott v. N.Y. Health & Human Servs. Union, 2003 WL 359534, at *6 (S.D.N.Y. Feb. 6, 2003) ("What a union may not do is arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion. Thus, the question before this Court is, did [the union] ignore [plaintiff's] claim?" (citation and quotation marks omitted)); Gold v. Local Union No. 888 U.F.C.W., 758 F. Supp. 205, 207–08 (S.D.N.Y. 1991) ("Several courts have held that the failure to fairly and adequately pursue an investigation of a grievance may ... constitute a breach of the duty of fair representation."). A union does not act arbitrarily, however, where it "fails to process a meritless grievance, engages in mere negligent conduct, or fails to process a grievance due to error in evaluating the merits of the grievance." Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1153–54 (2d Cir. 1994). "Accordingly, to find a breach of the

Case 9:19-cv-00609-DNH-ML  Document 95  Filed 01/10/24  Page 116 of 128

Diaz v. Local No. 241, Transport Workers Union of..., Not Reported in Fed....

2019 WL 3765924

duty of fair representation ... the Court must determine whether the Plaintiff[s] [have] plausibly alleged that: (1) the Plaintiff[s] had a meritorious grievance; (2) Local [241] was aware of the grievance; and (3) Local [241] acted arbitrarily in failing to process the Plaintiff[s'] grievance." Thomas, 793 F. Supp. 2d at 548; see Moore v. Roadway Express, Inc., 2008 WL 819049, at *5 (E.D.N.Y. Mar. 25, 2008).

**\*6** Plaintiffs allege that overtime was inequitably distributed to relatives and friends of Local 241 officials, and they have substantiated that allegation by comparing the overtime hours received by Quinones and Morciglio with those allotted to relatives of Local 241's former president. (AC ¶¶ 17–18.) Plaintiffs filed their grievance concerning inequitable distribution of overtime with Local 241 on October 25, 2017. (AC ¶ 23.) And since "[o]n a motion to dismiss, the Court is required to accept the facts as true," this Court concludes that "Plaintiff[s] [have] plausibly alleged that [their] grievance was meritorious." Thomas, 793 F. Supp. 2d at 548. Moreover, the Amended Complaint alleges that Local 241 responded only once to Plaintiffs' grievance by informing Plaintiffs that they should have filed it with Columbia. (AC ¶ 24.) Plaintiffs claim they did precisely that, but then Columbia did an about-face and forwarded the grievance to Local 241. (AC ¶ 25.) Days later, Plaintiffs inquired whether Local 241 would investigate the grievance, but never received a response. (AC ¶¶ 26–27.)

As pled, Local 241's "failure to perform any investigation after notice of a grievance plausibly alleges a breach of the duty of fair representation." Thomas, 793 F. Supp. 2d at 548; see also Yearwood v. N.Y. Presbyterian Hosp., 2013 WL 4713793, at *4 (S.D.N.Y. Aug. 20, 2013) ("[P]laintiff alleges that he had a meritorious claim against the [employer] for his wrongful termination and that the Union arbitrarily refused to pursue that claim after initiating arbitration. These allegations may not be true ... but that factual determination is not made on a pre-answer motion to dismiss."); Moore, 2008 WL 819049, at *5 ("Local 707 very well may have acted within its discretion by choosing not to pursue plaintiff's complaints.... At this preliminary stage, however, the court cannot hold that plaintiff's claims are implausible. Assuming, as the court must, that ... Local 707 failed to conduct even a minimal investigation, plaintiff has stated a claim that Local 707 breached its duty of fair representation.").

Finally, Plaintiffs satisfy the second element of a duty of fair representation claim. Though not explicitly stated, the Amended Complaint can be fairly read to allege that Plaintiffs were denied overtime hours and compensation that they would have otherwise received had Local 241 investigated or processed their grievance.

B. Breach of the CBA

Plaintiffs also allege that Columbia breached the CBA. Columbia is a party to the CBA, which, in Article 6, Section 3(h), states that "[a]ll overtime assignments will be distributed as equally as possible by job classification and seniority on a rotating list." (AC ¶ 16.) Section 3(h) further requires overtime "[l]ists [to] be posted in an area accessible to employees." (AC ¶ 16.) In violation of these provisions, Plaintiffs allege that overtime for Heavy Cleaners at Columbia was not distributed as equally as possible. Again, assuming the truth of Plaintiffs' allegations and drawing all reasonable inferences in their favor, this Court finds that Plaintiffs have adequately alleged Columbia breached the CBA.

Accordingly, Plaintiffs sufficiently plead a hybrid claim under § 301 of the LMRA, predicated on (1) Local 241's failure to investigate or process Plaintiffs' October 2017 grievance, and (2) Columbia's breach of Article 6, Section 3(h) of the CBA.

IV. Plaintiffs' Claim Concerning Local 241's Own Distribution of Overtime Hours

In addition to claiming that Local 241 failed to investigate or process Plaintiffs' October 2017 grievance, Plaintiffs also claim that Local 241 breached its duty of fair representation through its own inequitable distribution of overtime hours to family and friends of union officials. [1]

**\*7** Plaintiffs cannot use Local 241's purported breach of the duty of fair representation in distributing overtime as a predicate hook to plead a hybrid § 301 claim against Local 241 and Columbia. And to the extent that Plaintiffs seek to do so, that hybrid § 301 claim is dismissed. Indeed, "[a] hybrid claim is intended to resolve, along with employer breach, a union's failure to represent an employee during the grievance process." Calderara v. Int'l Longshoremen's Ass'n, 2017 WL 6397747, at *3 (S.D.N.Y. Dec.

Diaz v. Local No. 241, Transport Workers Union of..., Not Reported in Fed....

2019 WL 3765924

Case 9:19-cv-00609-DNH-ML     Document 95     Filed 01/10/24     Page 117 of 128

13, 2017) (emphasis added); see also Carrion, 227 F.3d at 33 ("[T]o provide individual employees with recourse when a union breaches its duty of fair representation in a grievance or arbitration proceeding ... an employee may bring suit against both the union and the employer."). Here, Plaintiffs' claim that Local 241 breached its duty of fair representation in distributing overtime does not concern Local 241's handling of Plaintiffs' grievance. Plaintiffs acknowledge as much in their opposition, noting that if "Columbia has ceded administrative control over overtime to Local 241, the biased handling of that responsibility in itself states a claim" for a breach of the duty of fair representation. (Pls.' Mem. of Law in Opp. to Mot. to Dismiss (ECF No. 43), at 13.) Accordingly, Local 241's purported breach in distributing overtime hours cannot support a hybrid § 301 claim.

This Court instead construes Plaintiffs' claim concerning Local 241's inequitable distribution of overtime as a separate and independent claim for breach of the duty of fair representation asserted only against Local 241. See Caldarera, 2017 WL 6397747, at *3 (construing plaintiffs' suit as alleging both a hybrid § 301 claim and a separate claim for breach of the duty of fair representation under the LMRA). And since Local 241 has not moved to dismiss, this Court need not address the sufficiency of these allegations as pled in the Amended Complaint.

V. Timeliness

Finally, Columbia contends that Plaintiffs' claims are time-barred based on (1) allegations included in the Original Complaint, and (2) the exhibits Columbia appended to its motion to dismiss. As noted above, supra Part II.B, the Court will not consider Exhibits A, C, D, F, and J. To the extent that Columbia's statute of limitations arguments rely on these exhibits, they are rejected. The Court addresses Columbia's remaining timeliness arguments—predicted on Exhibits E, G, H, and I—below.

Plaintiffs' claims are governed by a six-month statute of limitations, "which begins to run when the employee knew or should have known of the breach of the duty of fair representation." White v White Rose Food, 128 F.3d 110, 114 (2d Cir. 1997). And "[i]n the Second Circuit, the 'bringing of [an] NLRB charge establishes that [a plaintiff] had actual knowledge of the breach." Ode, 2008 WL 5262421, at *2 (quoting Kavowras, 328 F.3d at 55) (alterations in original); see also Sanchez v. Local 660, United Workers of Am., 25 F. Supp. 3d 261, 266 (S.D.N.Y. 2014) ("Courts in this Circuit have specifically noted that the bringing of the NLRB charge establishes that [the plaintiff] had actual knowledge of the breach by that date." (alterations in original) (quotation marks omitted)). Here, Diaz filed an NLRB charge on May 26, 2010, alleging that Local 241 failed to process her overtime distribution grievance. (Decl. of Mary Ellen Donnelly in Supp. of Def.'s Mot. to Dismiss ("Donnelly Decl."), Ex. E.) Alonso similarly filed an NLRB charge against Local 241 on July 1, 2016, alleging that the union refused to assist members in enforcing the overtime assignment provision of the CBA. (Donnelly Decl., Ex. G.) Alonso also filed a second NLRB charge —against Columbia—that same day, alleging that Columbia failed to abide by the overtime assignment provision of the CBA. (Donnelly Decl., Ex. H.) The six-month statute of limitations on the claims asserted within these charges undoubtedly began to run when the charges were filed with the NLRB. See Kavowras, 328 F.3d at 55.

The problem for Columbia, however, is that this Court cannot determine whether many of the issues raised by Diaz and Alonso in their NLRB charges are the same as those asserted in this action. See Kavowras, 328 F.3d at 55 ("In his NLRB charge, [the plaintiff] alleged in a general manner the same misconduct by the Union which he charged in his complaint. His bringing of the NLRB charge establishes that he had actual knowledge of the breach...." (emphasis added)); Payton v. U.S. Postal Serv., 2016 WL 7494859, at *3 (E.D.N.Y. Dec. 29, 2016) ("In this circuit, if a party files a charge with the NLRB alleging breach of the duty of fair representation, and then later files a complaint alleging the same general conduct, the filing of the NLRB charge demonstrates actual knowledge of the breach." (emphasis added)); Katsaros v. Transit-Mix Concrete Corp., 615 F. Supp. 450, 451 (S.D.N.Y. 1985) ("Since the NLRB charges were essentially similar to those upon which this action is based it is clear that ... plaintiff knew or reasonably should have known of all the facts which are the factual predicate for his present action." (emphasis added)). The NLRB charges appended to Columbia's motion to dismiss do discuss inequitable overtime distribution, but they do so broadly. For example, Diaz's NLRB charge only states that Local 241 "failed and refused to process [her] overtime distribution grievance." (Donnelly Decl., Ex. E.) There is no mention, however, of the basis for her grievance. And it is plausible that the overtime distribution issues alleged in the NLRB charges are different than the wrongful conduct alleged in this action,

Diaz v. Local No. 241, Transport Workers Union of..., Not Reported in Fed....

Case 9:19-cv-00609-DNH-ML    Document 95    Filed 01/10/24    Page 118 of 128

2019 WL 3765924

namely that overtime was preferentially distributed to friends and relatives of Local 241 officials. Without more information concerning the NLRB charges, the Court cannot determine that Alonso's and Diaz's claims are time-barred.[2]

 **8**  The lone exception to this Court's conclusion is that Alonso is precluded from claiming that overtime lists were not posted until January 2018. Indeed, the affidavit accompanying Alonso's NLRB charge against Columbia demonstrates his awareness that—as of July 2016—overtime lists were not being posted. (Donnelly Decl., Ex. I.) Accordingly, Alonso's claim concerning the posting of overtime lists is time-barred. He may, however, still proceed on his claim that, once the lists were posted, they understated overtime hours worked by relatives and friends of Local 241 officials since his affidavit is silent on this issue.


CONCLUSION

For the foregoing reasons, Columbia's motion to dismiss is granted in part and denied in part. To the extent Plaintiffs assert a hybrid § 301 claim based on Local 241's alleged inequitable distribution of overtime, that claim is dismissed. Alonso's claim concerning Defendants' failure to post overtime lists is dismissed as time-barred. In all other respects, Columbia's motion to dismiss the Amended Complaint is denied. The stay of discovery is lifted. The parties shall submit a proposed discovery schedule by August 30, 2019. The parties are directed to appear for a status conference with the Court on September 4, 2019 at 11:30 a.m.

SO ORDERED.


**All Citations**

Not Reported in Fed. Supp., 2019 WL 3765924


**Footnotes**

1       The Amended Complaint appears to allege that Columbia and Local 241 both retained the authority to distribute overtime hours. This inconsistency does not doom the pleading because Federal Rule of Civil Procedure 8(d)(3) authorizes Plaintiffs to "state as many separate claims ... as [they] [have], regardless of consistency." Moreover, the Court notes that Article 6, Section 3(h) of the CBA does not specify whether Columbia, Local 241, or a combination of the two is ultimately responsible for the distribution of overtime. The Court expects that this issue—the resolution of which may prove critical in this action—will be fleshed out in discovery.

2       Like the issue of which Defendant retained authority to distribute overtime under the CBA, the Court expects this issue will be explored during discovery and will be ripe for summary judgment.

Kavanaugh v. Village of Green Island, Not Reported in Fed. Supp. (2018)

2018 WL 1033288

Case 9:19-cv-00609-DNH-ML    Document 95    Filed 01/10/24    Page 119 of 128

2018 WL 1033288
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kevin T. KAVANAUGH, Plaintiff,

v.

VILLAGE OF GREEN ISLAND, et al., Defendants.

Civ. No. 8:14-CV-1244 (DJS)

|

Signed 02/22/2018

**Attorneys and Law Firms**

THE KINDLON LAW FIRM, PLLC, OF COUNSEL: GENNARO D. CALABRESE, ESQ., 52 James Street, 5 [th] Floor, Albany, New York 12207, Attorneys for Plaintiff.

COOK, NETTER, LAW FIRM, OF COUNSEL: ERIC M. KURTZ, ESQ., P.O. Box 3939, 85 Main Street, Kingston, New York 12402, Attorneys for Defendants Green Island and Johnson and Rice.

THE REHFUSS LAW FIRM, P.C., OF COUNSEL: STEPHEN J. REHFUSS, ESQ, 40 British American Boulevard, Latham, New York 12110, Attorneys for Defendants City of Albany and Scalise.

**MEMORANDUM-DECISION AND ORDER**

Daniel J. Steward, United States Magistrate Judge

**I. Introduction**

**\*1** Plaintiff Kevin Kavanaugh brings this action against the Defendants pursuant to 42 U.S.C. § 1983 and New York state law, alleging claims arising out of his arrest on July 21, 2013. Dkt. No. 103, Second Am. Compl. The case has now been resolved against a large number of the original Defendants. Dkt. Nos. 200, 209, & 211. The Defendants that remain include the Village of Green Island, and its Police Officers Paul Johnson and William Rice ("The Green Island Defendants"), as well as the City of Albany and its Police Officer Anthony Scalise ("The City of Albany Defendants"). Presently before the Court is the City of Albany Defendants' Motion for Partial Summary Judgment and the Green Island Defendants' Motion for Summary Judgment. Dkt. Nos. 183 & 188. For the reasons that follow, the City of Albany Defendants' Motion is **granted**, and the Green Island Defendants' Motion is **granted in part and denied in part**.

**II. Facts**

On July 21, 2003 Plaintiff Kevin Kavanaugh was smoking marijuana while operating his girlfriend's Honda Civic in the Village of Green Island. Dkt. No. 188-5, Kavanaugh 50-h, at pp. 13-16. The Village of Green Island Police attempted to execute a traffic stop, but Plaintiff refused to pull over because he did not have a license and had drugs in the car, and instead led the police on a high-speed chase down Interstate 787, reaching speeds in excess of 90 mph. *Id.* at pp. 16-17. Engaged in the pursuit were two Officers from Green Island, Officers Johnson and Rice, and an Officer from the Watervliet Police, Anthony Harbour. Dkt. No. 188-8, Officer Johnson Dep., at pp. 14-15; Dkt No. 188-9, Officer Rice Dep., at pp. 16-18; Dkt. No. 188-11, Officer Harbour Dep., at p. 8. Plaintiff went West on Interstate 90, and then turned off on the Henry Johnson Boulevard/Arbor Hill exit.

2018 WL 1033288

Kavanaugh 50-h, at p. 21. When Plaintiff reached the Clinton Avenue intersection, he claims he encountered two police cars from the City of Albany impeding his route, [1] and, having second thoughts about the actions that he had taken to that point, he brought his vehicle to a complete stop, thus ending the chase. *Id.* at pp. 21-22. While sitting in his vehicle, Plaintiff then ingested the drug ketamine, commonly referred to as "Special K." *Id.* at pp. 14 & 22.

It is at this point that the version of events differ significantly between those alleged by Plaintiff and the moving Defendants. Plaintiff maintains that Officer Johnson of the Green Island Police approached his vehicle, and that Plaintiff got out of the vehicle and indicated to Officer Johnson that he was not resisting. *Id.* at pp. 25-26. Despite that, Plaintiff claims that Officer Johnson took hold of him and slammed him to the ground. *Id.* Other Officers then joined in, and Plaintiff claims that he was hit with a nightstick; that Officers had their knees on his back and neck; that other Officers were standing on the back of his legs; all the while a State Trooper was kicking him in the side of the head. *Id.* Other Officers, including the Albany police, allegedly observed this occurring but failed to intervene. *Id.* at pp. 25-28. Plaintiff alleges that during this time he told the Officers to stop hitting him. *Id.* at p. 35.

**\*2** Next, Plaintiff alleges that he was handcuffed, picked up by Officers and was walked by Officer Johnson over to a Village of Green Island police car where his head was repeatedly slammed into the roof of that car. *Id.* at pp. 31-32. Plaintiff then claims, that while still handcuffed, Officer Johnson "ripped" his right shoe off his foot, and in doing so violently twisted his ankle causing him to yell out. *Id.* at pp. 30-31; Dkt. No. 203-3, Kavanaugh Aff'd, at ¶¶ 3-5. Plaintiff had numerous pins in his right ankle as a result of a 2012 fall from a tree. Kavanaugh 50-h at pp. 32-33. As a result of this event, Plaintiff maintains that all portions of his body hurt and it felt like he had been "hit by a Mack truck." *Id.* at p. 37.

Plaintiff was then transported to the Green Island Police Station, where he asked for medical attention. *Id.* According to Officer Johnson, Plaintiff complained of leg pain shortly after the incident, and upon viewing the leg "[i]t just looked like a dead leg, grayish white, like a wax museum leg or something." Officer Johnson Dep. at p. 32. Within twenty minutes he was taken to the Samaritan Hospital and was seen. Kavanaugh 50-h, pp. 37-38. Ultimately Plaintiff maintains that as a result of this incident the circulation to his right foot was severely impacted and, seven days after the event, his right leg had to be amputated from the knee down, at Albany Medical Center. *Id.* at pp. 41-42; Kavanaugh Aff'd at ¶¶ 9-11; Dkt No. 203-2, pp. 14-17.

The Green Island Defendants, on the other hand, assert that it was State Trooper Johnson who pulled Plaintiff from his vehicle and, because Plaintiff was not compliant, Trooper Johnson then took Plaintiff to the ground using an arm bar technique. Trooper Johnson Dep. at pp. 15-17. Defendants claim that while Plaintiff was on the ground he was still resisting arrest by refusing to give up his arm, or by pulling away from the Trooper, and it was only at this point that Officer Johnson began to assist the Trooper in subduing Plaintiff. Officer Johnson Dep. at p. 21. During the struggle Trooper Johnson struck Plaintiff two to four times in the back to gain compliance. *Id.*; Trooper Johnson Dep. at p. 25. At that point in time Plaintiff was handcuffed and put in a patrol car by Officer Johnson. Officer Johnson Dep. at p. 23. Officer Johnson also took off Plaintiff's shoe, but denies using any excessive force in doing so. *Id.* at p. 26 ("they came off easy."). According to Officer Johnson, no other Police Officer struck, punched or kicked Plaintiff during this time, except as specifically stated above. *Id.* at pp. 23-26.

While Officer Rice acknowledges being involved in the high-speed pursuit with Plaintiff, he maintains that he was late to arrive at the scene of the arrest because he stopped to pick up a bag of drugs that the Plaintiff had thrown out his car window during the course of the chase. Officer Rice Dep. at p. 20. As a result, Officer Rice testified that when he arrived at the scene the Plaintiff had already been subdued and was leaning against the car with Officer Johnson removing his shoes. *Id.* at pp. 23-25. Thus, he maintains he did not use any excessive force against Plaintiff, nor was he present when such force was used. *Id.*

Finally, the Defendants maintain that Plaintiff did not sustain any acute injury, or aggravation of a previous injury, to his right foot or ankle on the date of the incident. Defs.' SMF at ¶ 35.

### III. The Defendants' Motions

On behalf of the Village of Green Island and its two officers, Johnson and Rice, Green Island counsel asserts several points in his Motion: (1) that the Officers were entitled to use force to effectuate the lawful arrest of Plaintiff, and that the admissible evidence establishes that force used was reasonable as a matter of law and Plaintiff's claims to the contrary are contradictory and not credible; (2) that reasonable force does not become excessive simply because it aggravates a pre-existing condition that was unknown to the officers; (3) that there is no basis for a claim that the Police Officers failed to intervene to stop excessive force; (4) that, in any event, the Police Officers are entitled to qualified immunity; (5) that Plaintiff's substantive due process claim is duplicative of his excessive force claim and must be dismissed; (6) that Plaintiff has failed to establish a *Monell* claim regarding the Defendant Village's alleged failure to train officers to intervene to stop excessive force by fellow officers; (7) that the state law claims of assault, battery, and intentional infliction of emotional distress are barred by the one-year statue limitations; (8) that any claims against Green Island alleging vicarious responsibility should be dismissed; (9) that a negligence claim cannot be properly asserted because no such claim was included in the Notice of Claim, because there has been no showing of a special duty, and because a negligence claim cannot coexist with an excessive use of force claim; (10) that the state law claim for negligent infliction of emotional distress is duplicative of Plaintiff's other claims; and (11) that any punitive damage claim against a municipality cannot stand.

**\*3** The City of Albany's Motion is more narrowly tailored. The Albany Defendants maintain that no *Monell* claim has been established against the City for its alleged failure to train its officers to intervene; that the claim for punitive damages against the City of Albany is improper; and that the Plaintiff's substantive due process claim should be dismissed because it merely replicates his Fourth Amendment claim.

Plaintiff opposes both Motions. Dkt. Nos. 193 & 203. However, Plaintiff's counsel does concede that Plaintiff's Twelfth Cause of Action, a § 1983 claim premised upon alleged violations of the Substantive Due Process Clause, is properly dismissed as duplicative of his Fourth Amendment claim. Dkt. No. 203-1, Pl's Mem. of Law at p. 20. Plaintiff also does not oppose dismissal of his Eighth Cause of Action, alleging negligence against the Village of Green Island, or his Eleventh Cause of Action, alleging negligent infliction of emotional distress. *Id.* at pp. 17 & 20. Finally, Plaintiff concedes that an award of punitive damages against a municipality is not allowed, and clarifies that his claim for punitive damages is only against the individual Police Officers. *Id.* at p. 20.

In light of the foregoing, the only issues left to be decided on the present Motions are whether a § 1983 claim premised upon *Monell* liability can proceed against the Village and the City; whether questions of fact exist which would require a trial concerning Plaintiff's allegations of excessive force and failure to intervene, and whether the Officers involved are entitled to qualified immunity; and whether Plaintiff's state law claims can proceed, or are barred on statute of limitations grounds or because of some other impediment.

### IV. Discussion

#### A. Summary Judgment Standard

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material

Case 9:19-cv-00609-DNH-ML   Document 95   Filed 01/10/24   Page 122 of 128

Kavanaugh v. Village of Green Island, Not Reported in Fed. Supp. (2018)

2018 WL 1033288

facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

**\*4** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and [ ] interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995).

Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B. Excessive Force, Failure to Intervene, and Qualified Immunity

"The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d. Cir. 2010); *see also Graham v. Connor*, 490 U.S. 386, 394–95 (1989). Utilizing the "perspective of a reasonable officer on the scene," *Graham v. Connor*, 490 U.S. at 396, the court must consider a multitude of factors, including: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy v. Freshwater*, 623 F.3d at 96 (citing *Graham v. Connor*, 490 U.S. at 396). "Application of physical force is excessive when it is more than is necessary under the circumstances." *Brown v. City of New York*, 2013 WL 491926, at \*10 (S.D.N.Y. Feb. 8, 2013) (citing *Curry v. City of Syracuse*, 316 F.3d 324, 332 (2d Cir. 2003)).

"Given the need for such a fact-intensive inquiry, 'granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively reasonable.' " *Hill v. City of New York*, 2005 WL 3591719, at \*3 (E.D.N.Y. Dec. 30, 2005) (quoting *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 123 (2d Cir. 2004)); *see also Greenaway v. Cty. of Nassau*, 97 F. Supp. 3d 225, 235 (E.D.N.Y. 2015) ("Because objective reasonableness is extremely fact-specific, summary judgment on the issue is often inappropriate.").

The evidence presented to the Court on this Motion does not warrant granting summary judgment to the Green Island Defendants. As noted above, the Court's role in this regard is not to compare and weigh the evidence, and to conclude that the Defendant's version is more likely to be correct. The Court's proper role ends at the point when it concludes that there are material questions of fact as to whether any of the moving Defendants used more force than necessary in effectuating the arrest of Plaintiff, or failed to intervene in the face of excessive force. That point has now been reached. Plaintiff clearly asserts that

Officer Johnson used force far in excess of what was necessary, especially in light of Plaintiff's claim that he was offering no resistance. A reasonable jury could well conclude that the acts of slamming Plaintiff to the ground, punching and hitting him, ramming his head into the roof of a police car, and violently twisting his ankle in the process of removing sneakers, if true, was conduct that was unreasonable, excessive, and accordingly, unconstitutional.

**\*5** Recognizing that the version of events posited by Plaintiff would generally overcome a motion for summary judgement, the Green Island Defendants nevertheless argue that the Court can disregard Plaintiff's claim under the doctrine annunciated by the Second Circuit in *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005). As recently summarized by Senior United States Judge Lawrence Kahn:

> ... *Jeffreys* held that in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, a district court may weigh the credibility of the plaintiff's version of events in determining whether to grant summary judgment. 426 F.3d at 554. If the plaintiff's account is so contradictory and incomplete that no reasonable juror would credit it, and if the moving party ... meet[s] the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor, then the court may enter summary judgment in favor of the defendant. *Id.* at 554–55. As the Second Circuit later noted, [t]he facts in *Jeffreys* ... were extreme. *Matheson v. Kitchen*, 515 Fed.Appx. 21, 23 (2d Cir. 2013). The *Jeffreys* plaintiff offered, for the first time in litigation, a version of events that directly contradicted the account he had previously and consistently provided, and that was inconsistent with all other evidence in the record.

*Bryant v. Bouvia*, 2017 WL 383356, at \*1 (N.D.N.Y. Jan. 27, 2017)(internal quotations omitted).

*Jeffreys* is not controlling on the present Motion for several reasons. First, Plaintiff has not presented wholly inconsistent positions. Rather, he has consistently claimed, at his 50-h examination, during his deposition, and in connection with his present submissions, that he was the victim of excessive force during his arrest by certain police officers, while other police officers failed to intervene. *See generally* Am. Compl.; Kavanaugh 50-h; Kavanaugh Dep.; Kavanaugh Aff'd. While Plaintiff's most recent Affidavit may add more facts, or amplify his prior claim, it does not contradict it. This is fundamentally different than the plaintiff in *Jeffreys*, who claimed on three prior occasions that he jumped out the window causing his injuries, and only after a motion for summary judgment was filed did he change that version of events to claim that the police officers threw him out the window. *Jeffreys v. City of New York*, 426 F.3d at 552. Second, the plaintiff in *Jeffreys* was unable to identify any of the individuals who allegedly attacked him, *id.*, but here Mr. Kavanaugh has consistently identified the officers he claims assaulted him, or who allegedly failed to intervene. Finally, unlike *Jeffreys*, the medical records submitted to the Court are not wholly inconsistent with Plaintiff's claim, as adequately summarized by Dr. Eisenbaum in his September 25, 2016 letter to Plaintiff's counsel. Dkt. No. 203-2, at pp. 16-17.

The Green Island Defendants' strenuous arguments that Plaintiff's testimony is contradicted by the testimony of three separate Police Officers who maintain that any use of force was appropriate; that Plaintiff may have been impaired by drugs; and that the Plaintiff only sustained a scratch from the pavement (the Defendants maintain that the amputation of Plaintiff's right leg seven days after the incident was likely caused by events unrelated to the arrest),[2] Green Island Mem. of Law at pp. 9-10, are all certainly appropriate matters for cross-examination and summation before a jury, but they do not warrant granting summary judgment.

**\*6** Officer Rice maintains that he is entitled to summary judgment because he was not present at the time when the Plaintiff was taken to the ground, and only arrived after the fact, and further that he had no physical contact with Plaintiff. Dkt. No. 188-2, Green Island Mem. of Law at p. 6; Rice Dep. at pp. 20-21, 25. As related by Officer Rice in his deposition testimony, while he was involved in the high-speed pursuit near its end, he witnessed the Plaintiff toss a black bag out of his vehicle. Rice

Kavanaugh v. Village of Green Island, Not Reported in Fed. Supp. (2018)

2018 WL 1033288

Dep. at p. 18. He quickly stopped and picked it up, and then "proceeded to catch up to the pursuit." [3] *Id.* at 20. Plaintiff counters that while he does not know their names, he does know that there were multiple Green Island Police Officers at the scene of his arrest, Dkt. No. 188-6, Kavanaugh Dep. at p. 41 ("I know there was Green Island officers"); Kavanaugh 50-h at p. 47 ("there was more than one, yes"), and the subsequent evidence shows that the only two Green Island Officers involved in this incident were Officers Johnson and Rice. Officer Johnson Dep. at pp. 20-21; Officer Rice Dep. at p. 24. Trooper Eric Johnson also recalls seeing Officer Rice at the scene at the point when Plaintiff was handcuffed and in custody. Trooper Johnson Dep. at pp. 17-18 ("And I know Officer William Rice was there"). Officer Rice himself acknowledges that when he arrived the Plaintiff was in handcuffs leaning up against the car, and he witnessed Officer Johnson remove both of Plaintiff's sneakers. Officer Rice Dep., at pp. 20-21. This is significant because an important part of Plaintiff's claim is that he was also assaulted *after* his handcuffing and while at the police car, when Officers slammed his head into the roof of the car, and when Officer Johnson forcibly ripped his sneakers off his feet. Second Am. Compl. at ¶¶ 31-36.

The fact that Officer Rice claims he had no physical contact with the Plaintiff, even if true, is not determinative. A police officer who, though not participating, is present while an assault by fellow officers upon a detainee occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."). In such circumstances, liability depends upon whether the officer in question "(1) possessed actual knowledge of the use by another officer of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force." *Lewis v. Mollette*, 752 F. Supp. 2d 233, 244 (N.D.N.Y. 2010) (citing *Cicio v. Lamora*, 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010)). "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Anderson v. Branen*, 17 F. 3d at 557. Here, the competing versions of events must be resolved by the trier of fact and prevent the issuance of summary judgment on this claim.

Finally, the Defendant Green Island Officers are not entitled to qualified immunity at this stage of the proceeding. *See Thomas v. Roach*, 165 F. 3d 137, 143 (2d Cir. 1999) ("summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.").

## C. *Monell* Liability

Plaintiff alleges that the City of Albany and the Village of Green Island did not properly train its Officers on their obligation to intervene when faced with excessive force being used by fellow law enforcement. Second Am. Compl. at ¶¶ 106-124; Pl.'s Mem. of Law, at pp. 14-16. "[A] local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy" only if the failure to train "amount[s] to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.' " *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Canton v. Harris*, 489 U.S. 378, 388 (1989)). Deliberate indifference is a "stringent standard of fault," which requires " 'proof that a municipal actor disregarded a known or obvious consequence' " of the particular failure in training. *Id.* (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62. (quoting *Bd. of Cty. Comm'rs of Bryan Cty*, 520 U.S. at 409). The Supreme Court has cautioned that a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* at 61.

 **\*7** The deposition testimony of the Police Officers in question belies Plaintiff's contention that they were not trained with respect to their obligations regarding the use of force. For example, City of Albany Police Officer Scalise testified that he did receive training regarding the proper use of force both in the police academy as well as in yearly in-service trainings. Dkt. No. 188-10, Scalise Dep., at p. 9. Officer Scalise also received training regarding the prevention of unnecessary force by other

Case 9:19-cv-00609-DNH-ML    Document 95    Filed 01/10/24    Page 125 of 128
Kavanaugh v. Village of Green Island, Not Reported in Fed. Supp. (2018)
2018 WL 1033288

officers, although he was not sure if he received written materials on that issue. *Id.* at p. 11. The Scalise deposition testimony included the following question and answer:

> Q. Can you state your understanding of what the policy is of the Albany Police Department, regarding the prevention of unnecessary force by another officer?

> A. Pretty much it's if I observe an officer using unnecessary force, I'd step in. I wouldn't allow it to happen in my presence.

*Id.* at pp. 11-12.

Similarly, Green Island Police Officer William Rice testified that he received training concerning use of force at the State Police Academy, as well as during yearly updates during his police career, and that Green Island does have a policy concerning use of force. Officer Rice Dep. at pp. 10, 42-44. With regard to prevention or intervention of misconduct by other Officers, Officer Rice felt that it was covered under the use of force policy and under the general obligation of the police to stop crimes that occur within their presence. As he stated: "use of force is always a hot topic within the agency, the Sheriff's office agency, so I'm sure we have discussed the proper steps of notifying the supervisors and/or stopping it if—obviously if you feel that it's a violation of law, then you have to step in." *Id.* at pp. 44-45. The Green Island Use of Force Policy specifically provides that "the force used must be the minimum amount necessary to achieve lawful objectives." Dkt. No. 203-2, Ex. 7, p. 1. Moreover, the Policy specifically refers to New York Penal Law Article 35, which only provides a justification for conduct which is required or authorized by law, or performed by a public servant in the reasonable exercise of his official powers. *Id.* Accordingly, force used by police officers in excess of what is authorized by § 35.05 of the Penal Law is, in itself, criminal conduct. The policy specifically directs officers to adhere to the guidelines in Article 35. *Id.*

This testimony amply carries the moving Defendants' burden to establish that both municipalities did in fact provide training to their officers on the use of force.

In the present case, Plaintiff's claim is not premised upon, or supported by, any expert analysis of the actual training received by the Village or City Officers in question, or by an established history of misconduct, but rather upon the single assertion that the Defendants cannot produce a particular written policy that specifically deals with the issue of intervention in the face of excessive force. As stated by Plaintiff's counsel:

> The record suggests that Defendant City of Albany does not train its officers (or, in the alternative, the training is deficient) regarding the duty to intervene to protect against excessive force. Failure to train can be discerned from Defendant City of Albany's position that documents containing directives and or policies ... regarding prevention of unreasonable force do not exist. It is submitted that the lack of a written policy is proof that the officers are not properly trained.

Dkt. No. 193-1, Pl.'s Mem. of Law, at pp 2-3. Regarding the Village of Green Island, Plaintiff's counsel similarly asserts that "[f]ailure to train can be discerned from Defendant Village of Green Island's position that documents containing directives and/or policies (and, thus, training materials) regarding the prevention of unreasonable force do not exist. Pl.'s Mem. of Law at p. 14.

**\*8** Plaintiff's claim that the lack of a written policy is proof of a failure to train is inconsistent with *Connick's* statement that "failure-to-train liability is concerned with the substance of the training, not the particular instructional format." *Connick v. Thompson*, 563 U.S. at 68. The absence of a written policy, even if true, is thus not dispositive of a failure to train. *Hines v. City of Albany*, 2011 WL 2620381, at \*13 n.11 (N.D.N.Y. 2011).

Upon review of the entire record submitted in opposition to these Motions, there is no evidence to support Plaintiff's failure-to-train claim against either the Village of Green Island or the City of Albany. Providing evidentiary proof of a deficient training

Case 9:19-cv-00609-DNH-ML    Document 95    Filed 01/10/24    Page 126 of 128

Kavanaugh v. Village of Green Island, Not Reported in Fed. Supp. (2018)

2018 WL 1033288

program, and showing how that deficiency can be said to have caused a constitutional violation, is not only a basic precept of opposing Motions such as these, but it also serves to ensure that this mode of liability is not merely a proxy for a theory of respondeat superior liability, a theory not allowed in a § 1983 claim. *Amnesty Am. v. Town of West Hartford*, 361 F. 3d 113, 130-31 (2d Cir. 2004). Here, Plaintiff's allegation that the City or the Village failed to train its officers is entirely conclusory and thus, subject to dismissal. *Id.*; *Ayuso v. Amerosa*, 2008 WL 141862 (N.D.N.Y. Jan. 11, 2008).

### D. The State Law Claims

The Green Island Defendants' Motion for Summary Judgment on Plaintiff's assault, battery, and intentional infliction of emotional distress claims based upon statute of limitations grounds, is wholly misplaced. Those claims are governed, not by a one-year statute limitations as Defendants claim, but by a year and ninety day time bar, and were therefore timely interposed, as already found by the District Court in its decision on December 30, 2016. *See* Dkt. No. 176, at p. 8. Green Island's related argument that the claim of vicarious liability against the Village should likewise be dismissed as the underlying claims are stale, is likewise rejected.

In addition, the Green Island Defendants' argument that the state law negligence claim should be dismissed because it contradicts Plaintiff's assault and battery claims was previously considered by Judge Sannes in her December 30, 2016 Memorandum-Decision and Order, and was not accepted. Dkt. No. 176 at p. 13 ("Plaintiff may proceed with his negligence claim while also alleging excessive force."). This Court is in agreement with the reasoning espoused by Judge Sannes, and therefore adopts it.

The Green Island Defendants only sought to dismiss the state law claim for intentional infliction of emotional distress ("IIED") upon statute of limitations grounds. While that argument has not proven to be meritorious, the Court's review of the Plaintiff's IIED claim raised issues concerning its validity. In particular, a claim for intentional infliction of emotional distress is generally unavailable where other traditional tort remedies apply. *Naccarato v. Scarselli*, 124 F. Supp. 2d 36, 44 (N.D.N.Y. 2000); *Hansel v. Sheridan*, 991 F. Supp. 69, 75 (N.D.N.Y. 1998). Pursuant to FED. R. CIV. P. 56(f), the Court placed counsel on notice with regard to this issue and gave them an opportunity to address it at oral argument. That discussion confirmed that all of the conduct complained of by the Plaintiff regarding the Officers, and all the resultant damage, is covered by Plaintiff's claim for assault and battery. Accordingly, as the Plaintiff has not alleged an element of an intentional infliction of emotional distress claim that is different, or in addition, to what is recoverable under the traditional torts alleged, the IIED claim must be dismissed. Plaintiff consents to dismissal of this claim.

### V. Conclusion

**\*9** **WHEREFORE**, it is hereby

**ORDERED**, that Defendant City of Albany's Motion for Partial Summary Judgment (Dkt. No. 183) is **GRANTED**; and it is further

**ORDERED**, that the Defendant Green Island's Motion for Summary Judgment (Dkt. No. 188) is **GRANTED IN PART AND DENIED IN PART**; and it is further

**ORDERED**, that Plaintiff's claim under 42 U.S.C. § 1983 alleging a Substantive Due Process violation, the Twelfth Cause of Action, is **DISMISSED**; and is further

**ORDERED**, that Plaintiff's claims under 42 U.S.C. § 1983 against the City of Albany and the Village of Green Island, alleging *Monell* liability, are **DISMISSED**; and it is further

Case 9:19-cv-00609-DNH-ML    Document 95    Filed 01/10/24    Page 127 of 128
Kavanaugh v. Village of Green Island, Not Reported in Fed. Supp. (2018)
2018 WL 1033288

**ORDERED**, the Plaintiff's claim for intentional infliction of emotional distress against all Defendants, as asserted in his Fourth Cause of Action, and as a portion of his Fifth Cause of Action, is hereby **DISMISSED** *sua sponte* by the Court; and it is further

**ORDERED**, that Plaintiff's claim against the Village of Green Island for negligent training, hiring, and supervision, the Eighth Cause of Action, is **DISMISSED**; and is further

**ORDERED**, that Plaintiff's claim for negligent infliction of emotional distress against the Village of Green Island, the Eleventh Cause of Action, is **DISMISSED**; and is further

**ORDERED**, that Defendants' Motions to dismiss the punitive damage claims against the Village and the City are **GRANTED**, as no such claim is, or could be, contained in the Second Amended Complaint; and it is further

**ORDERED**, that Defendants' Johnson and Rice's Motion for Summary Judgment dismissing the Plaintiff's claim under 42 U.S.C. § 1983 for excessive force, or in the alternative, granting them qualified immunity, is **DENIED**; and it is further

**ORDERED**, that the Green Island Defendants' Motion to dismiss the Plaintiff's state law assault and battery claims on the grounds that they are barred by the statute of limitations is **DENIED**; and it is further

**ORDERED**, that the claims that remain against Officers Johnson and Rice are claims under 42 U.S.C. § 1983 for excessive force and/or failure to intervene; and state law claims for assault, battery, negligence, and failure to intervene; and it is further

**ORDERED**, that the claim that remains against Officer Scalise is a section 1983 claim for failure to intervene; and it is further

**ORDERED**, that the claims that remain against the Village of Greene Island are state law claims for vicarious liability; and is further

**ORDERED**, that no claims against the City of Albany remain and therefore the City of Albany is **DISMISSED** as a Defendant.

**SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1033288

### Footnotes

1    Trooper Eric Johnson testified that he was working with Albany Police on that shift as part of the joint policing program known as "Operation Impact" and he and Albany Police Officer Anthony Scalise were in the same vehicle near the Clinton Avenue intersection at the time the chase came to an end. Dkt. No. 188-7, Trooper Johnson Dep. at pp. 9-10. Trooper Johnson notes that Plaintiff was stopped by civilian traffic, and not a police road block, and that after Plaintiff came to a stop he, Trooper Johnson, was the first officer to approach Plaintiff's vehicle and have physical contact with him. *Id.* at pp. 11-14.

2    In deciding the present Motion it is not necessary for the Court to resolve the complicated causation issues raised by counsel for the Green Island Defendants. By determining that a question of fact exists on the issue of excessive force, the Court also leaves to the jury to determine, if they find liability, what the resultant damages should be based upon the testimony of the witnesses; any competent medical proof; and the principles of law which authorize a plaintiff to recover

2018 WL 1033288

for all the foreseeable consequences of a constitutional violation. *See Mauer v. United States*, 668 F.2d 98, 99-100 (2d Cir. 1981)("[i]t is a settled principle of tort law that when a defendant's wrongful conduct causes injury, he is fully liable for the resulting damage even though the injured plaintiff had a preexisting condition that made the consequences of the wrongful act more severe than they would have been for a normal victim.").

3    The Court notes that it would have taken some time for Officer Rice to recover the bag before he resumed pursuit of Plaintiff. However, Plaintiff also testified that after he pulled to a stop, he waited a minute or two before he got out of the car and was then allegedly assaulted. Kavanaugh 50-h, at p. 24

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.